The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON PAGE TWO OF THE FORM.)

## I. (a) PLAINTIFFS
LAURIE MARIE LASKEY

### DEFENDANTS
MICROSOFT CORPORATION, and DOES 1 through 1000

**(b)** County of Residence of First Listed Plaintiff  Onslow County, NC
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant  King County, WA
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
LAURIE MARIE LASKEY (PRO SE)
120 Briar Hollow Drive
Jacksonville, NC  28540
(910) 548-3345

Attorneys (If Known)
LESLIE N. HARVEY, ESQ.
HELLER EHRMAN, LLP
333 Bush Street
San Francisco, CA  94104  Tel.: 415-772-6000

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

- [ ] 1 U.S. Government Plaintiff
- [ ] 2 U.S. Government Defendant
- [ ] 3 Federal Question (U.S. Government Not a Party)
- [X] 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [ ] 1 | Incorporated or Principal Place of Business In This State | [ ] 4 | [X] 4 |
| Citizen of Another State | [X] 2 | [ ] 2 | Incorporated and Principal Place of Business In Another State | [ ] 5 | [X] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| [ ] 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | [ ] 610 Agriculture | [ ] 422 Appeal 28 USC 158 | [ ] 400 State Reapportionment |
| [ ] 120 Marine | [ ] 310 Airplane | [ ] 362 Personal Injury — Med. Malpractice | [ ] 620 Other Food & Drug | [ ] 423 Withdrawal 28 USC 157 | [ ] 410 Antitrust |
| [ ] 130 Miller Act | [ ] 315 Airplane Product Liability | [ ] 365 Personal Injury — Product Liability | [ ] 625 Drug Related Seizure of Property 21 USC 881 | | [ ] 430 Banks and Banking |
| [ ] 140 Negotiable Instrument | [ ] 320 Assault, Libel & Slander | [ ] 368 Asbestos Personal Injury Product Liability | [ ] 630 Liquor Laws | **PROPERTY RIGHTS** | [ ] 450 Commerce |
| [ ] 150 Recovery of Overpayment & Enforcement of Judgment | [ ] 330 Federal Employers' Liability | | [ ] 640 R.R. & Truck | [ ] 820 Copyrights | [ ] 460 Deportation |
| [ ] 151 Medicare Act | [ ] 340 Marine | **PERSONAL PROPERTY** | [ ] 650 Airline Regs. | [ ] 830 Patent | [ ] 470 Racketeer Influenced and Corrupt Organizations |
| [ ] 152 Recovery of Defaulted Student Loans (Excl. Veterans) | [ ] 345 Marine Product Liability | [ ] 370 Other Fraud | [ ] 660 Occupational Safety/Health | [ ] 840 Trademark | [ ] 480 Consumer Credit |
| | | [ ] 371 Truth in Lending | [ ] 690 Other | | [ ] 490 Cable/Sat TV |
| [ ] 153 Recovery of Overpayment of Veteran's Benefits | [ ] 350 Motor Vehicle | [ ] 380 Other Personal Property Damage | **LABOR** | **SOCIAL SECURITY** | [ ] 810 Selective Service |
| [ ] 160 Stockholders' Suits | [ ] 355 Motor Vehicle Product Liability | [ ] 385 Property Damage Product Liability | [ ] 710 Fair Labor Standards Act | [ ] 861 HIA (1395ff) | [ ] 850 Securities/Commodities/Exchange |
| [ ] 190 Other Contract | [X] 360 Other Personal Injury | | [ ] 720 Labor/Mgmt. Relations | [ ] 862 Black Lung (923) | [ ] 875 Customer Challenge 12 USC 3410 |
| [ ] 195 Contract Product Liability | | | [ ] 730 Labor/Mgmt. Reporting & Disclosure Act | [ ] 863 DIWC/DIWW (405(g)) | [ ] 890 Other Statutory Actions |
| [ ] 196 Franchise | | | [ ] 740 Railway Labor Act | [ ] 864 SSID Title XVI | [ ] 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | [ ] 865 RSI (405(g)) | [ ] 892 Economic Stabilization Act |
| [ ] 210 Land Condemnation | [ ] 441 Voting | [ ] 510 Motions to Vacate Sentence | [ ] 790 Other Labor Litigation | | [ ] 893 Environmental Matters |
| [ ] 220 Foreclosure | [ ] 442 Employment | **Habeas Corpus:** | [ ] 791 Empl. Ret. Inc. Security Act | **FEDERAL TAX SUITS** | [ ] 894 Energy Allocation Act |
| [ ] 230 Rent Lease & Ejectment | [ ] 443 Housing/Accommodations | [ ] 530 General | | [ ] 870 Taxes (U.S. Plaintiff or Defendant) | [ ] 895 Freedom of Information Act |
| [ ] 240 Torts to Land | [ ] 444 Welfare | [ ] 535 Death Penalty | **IMMIGRATION** | [ ] 871 IRS—Third Party 26 USC 7609 | [ ] 900 Appeal of Fee Determination Under Equal Access to Justice |
| [ ] 245 Tort Product Liability | [ ] 445 Amer. w/Disabilities - Employment | [ ] 540 Mandamus & Other | [ ] 462 Naturalization Application | | |
| [ ] 290 All Other Real Property | [ ] 446 Amer. w/Disabilities - Other | [ ] 550 Civil Rights | [ ] 463 Habeas Corpus - Alien Detainee | | [ ] 950 Constitutionality of State Statutes |
| | [ ] 440 Other Civil Rights | [ ] 555 Prison Condition | [ ] 465 Other Immigration Actions | | |

## V. ORIGIN (Place an "X" in One Box Only)

- [ ] 1 Original Proceeding
- [X] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from another district (specify)
- [ ] 6 Multidistrict Litigation
- [ ] 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
28 U.S.C. 1332
Brief description of cause:
Plaintiff's suit is for negligence, products liability, & intentional torts.  Amount in controversy exceeds $75,000.

## VII. REQUESTED IN COMPLAINT:
- [ ] CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23
DEMAND $ n/a (unspecified)
CHECK YES only if demanded in complaint:
JURY DEMAND: [ ] Yes  [X] No

## VIII. RELATED CASE(S) IF ANY
PLEASE REFER TO CIVIL L.R. 3-12 CONCERNING REQUIREMENT TO FILE "NOTICE OF RELATED CASE".

## IX. DIVISIONAL ASSIGNMENT (CIVIL L.R. 3-2)
(PLACE AND "X" IN ONE BOX ONLY)
[X] SAN FRANCISCO/OAKLAND  [ ] SAN JOSE

DATE
March 17, 2008

SIGNATURE OF ATTORNEY OF RECORD

American LegalNet, Inc
www.FormsWorkflow.com



1  LESLIE N. HARVEY, State Bar No. 241203
   HELLER EHRMAN LLP
2  333 Bush Street
   San Francisco, California 94104-2878
3  Telephone: (415) 772-6000
   Facsimile: (415) 772-6268
4  Email: Leslie.Harvey@hellerehrman.com

5  Attorneys for Defendant
   MICROSOFT CORPORATION
6

7

8              UNITED STATES DISTRICT COURT

9            NORTHERN DISTRICT OF CALIFORNIA

10 LAURIE MARIE LASKEY,                    Case No.

11              Plaintiff,                 NOTICE OF REMOVAL OF
                                           ACTION UNDER 28 U.S.C. § 1441
12 v.

13 MICROSOFT CORPORATION, and DOES 1
   through 1000, inclusive,
14
                Defendants.
15

16

17

18

19

20

21

22

23

24

25

26

27

Heller
Ehrman LLP   28
                                1
       NOTICE OF REMOVAL OF ACTION UNDER 28 U.S.C. § 1441

**TO THE CLERK OF THE ABOVE-ENTITLED COURT AND TO PLAINTIFF LAURIE MARIE LASKEY:**

PLEASE TAKE NOTICE that Defendant Microsoft Corporation ("Microsoft") hereby removes to this Court the state court action described below, pursuant to 28 U.S.C. §§ 1441 and 1446.

1.  On or about January 30, 2008, Plaintiff Laurie Marie Laskey ("Plaintiff") filed a Complaint for Personal Injury and Identity Theft ("Complaint") in the Superior Court of the State of California, County of Sonoma, entitled, "Laurie Marie Laskey v. Microsoft Corporation, and Does 1 through 1000" Case No. SCV 242287 (the "Action"). A true and correct copy of the Summons and Complaint is attached hereto as Exhibit A.

2.  February 15, 2008 was the first date upon which Microsoft was served with a copy of the Complaint and Summons. Fewer than thirty days have elapsed since this action became removable to this Court. This Notice of Removal is therefore timely pursuant to 28 U.S.C. § 1446(b).

3.  Other than defendant Microsoft, there are no other defendants in this action (other than fictitiously named "Doe" defendants).

4.  A true and correct copy of the *Notice to State Court of Filing of Notice of Removal* which is being filed in the Superior Court of the State of California, County of Sonoma, concurrently with the filing of this Notice is attached as Exhibit B. Exhibit B will also be served concurrently on plaintiff as required by 28 U.S.C. § 1446(d).

5.  Exhibits A through B, inclusive, constitute all pleadings filed and served in the state court process. Microsoft has not pled, answered or otherwise appeared in the state court action.

## JURISDICTION

6.  This action is a civil action over which this Court has original jurisdiction under 28 U.S.C. § 1332, and is one which may be removed to this Court by the defendants pursuant to 28 U.S.C. § 1441, in that it is a civil action between citizens of different states, and the matter in controversy exceeds the sum of $75,000.00, exclusive of interest and costs.

Heller
Ehrman LLP

2

NOTICE OF REMOVAL OF ACTION UNDER 28 U.S.C. § 1441

1    7.    According to the Complaint, Plaintiff's address is in Jacksonville, North

2 Carolina.  Ex. A.  Upon information and belief, Plaintiff was, at the time the Action was

3 filed, and still is, a citizen of the state of North Carolina.

4    8.    Defendant Microsoft Corporation is a Washington corporation with its

5 principal place of business in Washington state.  *See* Exhibit C at 1.  Microsoft was, at the

6 time this action was filed, and still is, a citizen of the state of Washington.

7    9.    The amount in controversy in this Action exceeds $75,000.00, exclusive of

8 interest and costs.  In addition to compensatory and punitive damages, plaintiff seeks

9 damages at least equal to the sum of the "net worth" of Microsoft plus Microsoft's insurance

10 coverage.  Plaintiff further indicates in the Complaint that she will seek to multiply this sum

11 by the number of years she allegedly suffered injury due to Microsoft's conduct.  Attached

12 as Exhibit D is a recent report from Yahoo! Finance, demonstrating that Microsoft's net

13 worth, as embodied by its market capitalization as of March 17, 2008, is approximately

14 $260 billion.  While Defendants deny that Plaintiff is entitled to any relief from Defendants,

15 the potential cost to the defendants of such requested relief, if granted, exceeds $75,000.00.

16    10.    This entire action may be removed to this Court pursuant to 28 U.S.C. §§ 1441

17 and 1446 because it is a civil action brought in a state court of which the district courts of

18 the United States have original jurisdiction, and this district and division embrace the place

19 where the state action is pending.

20    11.    As demonstrated by the facts set forth above, the action described herein is

21 one in which this Court has original jurisdiction pursuant to 28 U.S.C. §§ 1332 and 1441, in

22 that it is a civil action between a citizen of North Carolina and a citizen of Washington, and

23 the matter in controversy involves more than $75,000.00, exclusive of interest and costs.

24                    **INTRADISTRICT ASSIGNMENT**

25    12.    Because this action is a civil action removed from the Superior Court of the

26 County of Sonoma, it is to be assigned to either the San Francisco Division or Oakland

27 Division pursuant to Local Rule 3-5(d).

28

Heller
Ehrman LLP

                                     3

NOTICE OF REMOVAL OF ACTION UNDER 28 U.S.C. § 1441

1      WHEREFORE, Microsoft prays that this action be removed from the Superior Court

2  of the State of California, County of Sonoma, to the United States District Court for the

3  Northern District of California.

4

5  Dated: March 17, 2008               HELLER EHRMAN LLP

6

7                         By:

8                         LESLIE N. HARVEY
                            Attorneys for Defendants

9                         MICROSOFT CORPORATION

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

4

NOTICE OF REMOVAL OF ACTION UNDER 28 U.S.C. § 1441

# EXHIBIT A

SUM-100

# SUMMONS
## (CITACION JUDICIAL)

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
Microsoft Corporation

Does 1-1000

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
Laurie Marie Laskey

<div>

*FOR COURT USE ONLY*
*(SOLO PARA USO DE LA CORTE)*

## ENDORSED
## FILED

JAN 3 0 2008

SUPERIOR COURT OF CALIFORNIA
COUNTY OF SONOMA

</div>

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association.

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.courtinfo.ca.gov/selfhelp/espanol/), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.courtinfo.ca.gov/selfhelp/espanol/) o poniéndose en contacto con la corte o el colegio de abogados locales.*

| The name and address of the court is: <br> *(El nombre y dirección de la corte es):* | CASE NUMBER: <br> *(Número del Caso):* SCV 242287 |
|---|---|

Superior Court of Sonoma County
600 Administration Drive  Room 107J
Santa Rosa CA 95403

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Laurie Marie Laskey
120 Briar Hollow Drive, Jacksonville NC 28540 910-548-3345

| DATE: JAN 3 0 2008 <br> *(Fecha)* | DENISE L. GORDON Clerk, by *(Secretario)* | MALA FERNANDEZ | , Deputy <br> *(Adjunto)* |
|---|---|---|---|

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED:** You are served

[SEAL]

1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☑ on behalf of *(specify):* Microsoft Corporation

   under: ☑ CCP 416.10 (corporation)          ☐ CCP 416.60 (minor)
          ☐ CCP 416.20 (defunct corporation)   ☐ CCP 416.70 (conservatee)
          ☐ CCP 416.40 (association or partnership)  ☐ CCP 416.90 (authorized person)
          ☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

Page 1 of 1

| Form Adopted for Mandatory Use <br> Judicial Council of California <br> SUM-100 [Rev. January 1, 2004] | **SUMMONS** | Code of Civil Procedure §§ 412.20, 465 <br> American Legalnet, Inc. | www.USCourtForms.com |
|---|---|---|---|

PLD-PI-001

| | |
|---|---|
| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):*<br>Laurie Marie Laskey<br>120 Briar Hollow Dr<br>Jacksonville NC 28540<br><br>TELEPHONE NO: 910-548-3345     FAX NO. *(Optional):*<br>E-MAIL ADDRESS *(Optional):*<br>ATTORNEY FOR *(Name):* | FOR COURT USE ONLY<br><br>ENDORSED<br>FILED<br><br>JAN 3 0 2008<br><br>SUPERIOR COURT OF CALIFORNIA<br>COUNTY OF SONOMA |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF Sonoma
STREET ADDRESS: 600 Administration Dr
MAILING ADDRESS:
CITY AND ZIP CODE: Santa Rosa CA 95403
BRANCH NAME: civil

PLAINTIFF: Laurie Marie Laskey

DEFENDANT: Microsoft Corporation

[✓] DOES 1 TO 1000

| | |
|---|---|
| COMPLAINT—Personal Injury, Property Damage, Wrongful Death<br>[ ] AMENDED *(Number):*<br>Type *(check all that apply):*<br>[ ] MOTOR VEHICLE  [✓] OTHER *(specify):* Identity Theft<br>  [ ] Property Damage    [ ] Wrongful Death<br>  [✓] Personal Injury    [ ] Other Damages *(specify):* | |
| Jurisdiction *(check all that apply):*<br>[ ] ACTION IS A LIMITED CIVIL CASE<br>  Amount demanded  [ ] does not exceed $10,000<br>          [ ] exceeds $10,000, but does not exceed $25,000<br>[✓] ACTION IS AN UNLIMITED CIVIL CASE (exceeds $25,000)<br>[ ] ACTION IS RECLASSIFIED by this amended complaint<br>  [ ] from limited to unlimited<br>  [ ] from unlimited to limited | CASE NUMBER:<br><br>SCV  242287 |

1. **Plaintiff** *(name or names):* Laurie Marie Laskey
alleges causes of action against defendant *(name or names):*
Microsoft Corporation

2. This pleading, including attachments and exhibits, consists of the following number of pages: 47

3. Each plaintiff named above is a competent adult
   a. [ ] **except plaintiff** *(name):*
      (1) [ ] a corporation qualified to do business in California
      (2) [ ] an unincorporated entity *(describe):*
      (3) [ ] a public entity *(describe):*
      (4) [ ] a minor  [ ] an adult
         (a) [ ] for whom a guardian or conservator of the estate or a guardian ad litem has been appointed
         (b) [ ] other *(specify):*
      (5) [ ] other *(specify):*
   b. [ ] **except plaintiff** *(name):*
      (1) [ ] a corporation qualified to do business in California
      (2) [ ] an unincorporated entity *(describe):*
      (3) [ ] a public entity *(describe):*
      (4) [ ] a minor  [ ] an adult
         (a) [ ] for whom a guardian or conservator of the estate or a guardian ad litem has been appointed
         (b) [ ] other *(specify):*
      (5) [ ] other *(specify):*

[ ] Information about additional plaintiffs who are not competent adults is shown in Attachment 3.

Page 1 of 3

| | | |
|---|---|---|
| Form Approved for Optional Use<br>Judicial Council of California<br>PLD-PI-001 [Rev. January 1, 2007] | **COMPLAINT—Personal Injury, Property**<br>**Damage, Wrongful Death** | Code of Civil Procedure, § 425.12<br>www.courtinfo.ca.gov<br><br>American LegalNet, Inc.<br>www.FormsWorkflow.com |

PLD-PI-001

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| Laurie Marie Laskey v Microsoft Corporation | |

4. ☐ **Plaintiff** *(name)*:

is doing business under the fictitious name *(specify)*:

and has complied with the fictitious business name laws.

5. **Each defendant named above is a natural person**

  a. ☑ **except defendant** *(name)*: Microsoft Corporation    c. ☐ **except defendant** *(name)*:

    (1) ☐ a business organization, form unknown       (1) ☐ a business organization, form unknown

    (2) ☑ a corporation                    (2) ☐ a corporation

    (3) ☐ an unincorporated entity *(describe)*:      (3) ☐ an unincorporated entity *(describe)*:

    (4) ☐ a public entity *(describe)*:         (4) ☐ a public entity *(describe)*:

    (5) ☐ other *(specify)*:               (5) ☐ other *(specify)*:

  b. ☐ **except defendant** *(name)*:         d. ☐ **except defendant** *(name)*:

    (1) ☐ a business organization, form unknown       (1) ☐ a business organization, form unknown

    (2) ☐ a corporation                    (2) ☐ a corporation

    (3) ☐ an unincorporated entity *(describe)*:      (3) ☐ an unincorporated entity *(describe)*:

    (4) ☐ a public entity *(describe)*:         (4) ☐ a public entity *(describe)*:

    (5) ☐ other *(specify)*:               (5) ☐ other *(specify)*:

  ☐ Information about additional defendants who are not natural persons is contained in Attachment 5.

6. **The true names of defendants sued as Does are unknown to plaintiff.**

  a. ☑ Doe defendants *(specify Doe numbers)*: 1 to 1000      were the agents or employees of other named defendants and acted within the scope of that agency or employment.

  b. ☑ Doe defendants *(specify Doe numbers)*: 1 to 1000      are persons whose capacities are unknown to plaintiff.

7. ☐ Defendants who are joined under Code of Civil Procedure section 382 are *(names)*:

8. **This court is the proper court because**

  a. ☐ at least one defendant now resides in its jurisdictional area.

  b. ☐ the principal place of business of a defendant corporation or unincorporated association is in its jurisdictional area.

  c. ☑ injury to person or damage to personal property occurred in its jurisdictional area.

  d. ☑ other *(specify)*:

     Court of Appeals sent me to the lower court

9. ☑ Plaintiff is required to comply with a claims statute, and

  a. ☐ has complied with applicable claims statutes, or

  b. ☑ is excused from complying because *(specify)*:

     Computer crimes that involves the theft of my identity based on product liability and premise liability and negligence. I just figured it out and have not been able to find anyone to help me. They are all afraid.

**COMPLAINT—Personal Injury, Property Damage, Wrongful Death**

PLD-PI-001

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| Laurie Marie Laskey v Microsoft Corporation | |

10. The following causes of action are attached and the statements above apply to each *(each complaint must have one or more causes of action attached)*:
   a. ☐ Motor Vehicle
   b. ☑ General Negligence
   c. ☑ Intentional Tort
   d. ☑ Products Liability
   e. ☑ Premises Liability
   f. ☑ Other *(specify)*:

   Computer crimes, Identity Theft, FCC Violations, Code Violations, Technical Violations, Split Tunneling, Security Breach, Invasion of privacy, stalking, etc.

11. Plaintiff has suffered
   a. ☑ wage loss
   b. ☑ loss of use of property
   c. ☑ hospital and medical expenses
   d. ☑ general damage
   e. ☑ property damage
   f. ☑ loss of earning capacity
   g. ☑ other damage *(specify)*:

   Lower credit score, expense of discovery, case related expenses, emotional distress, attorneys fees, discrimination, etc.

12. ☐ The damages claimed for wrongful death and the relationships of plaintiff to the deceased are
   a. ☐ listed in Attachment 12.
   b. ☐ as follows:

13. The relief sought in this complaint is within the jurisdiction of this court.

14. **Plaintiff prays** for judgment for costs of suit; for such relief as is fair, just, and equitable; and for
   a. (1) ☑ compensatory damages
      (2) ☑ punitive damages
      The amount of damages is *(in cases for personal injury or wrongful death, you must check (1))*:
      (1) ☐ according to proof
      (2) ☑ in the amount of: $ A + B = C (C x D) see attached

15. ☑ The paragraphs of this complaint alleged on information and belief are as follows *(specify paragraph numbers)*:
   I've been attached to a Virtual Private Network without my knowledge and hacked into.
   faulty system has created a security breach per RFC1918

Date: 1-22-08

Laurie Marie Laskey
_____
(TYPE OR PRINT NAME)

*Laurie Marie Laskey*
_____
(SIGNATURE OF PLAINTIFF OR ATTORNEY)

PLD-PI-001 [Rev. January 1, 2007]          **COMPLAINT—Personal Injury, Property Damage, Wrongful Death**          Page 3 of 3

CM-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | FOR COURT USE ONLY |
|---|---|
| Laurie Marie Laskey<br>120 Briar Hollow Dr<br>Jacksonville NC 28540<br>   TELEPHONE NO.: 910-548-3345   FAX NO.: | **ENDORSED**<br>**FILED**<br><br>**JAN 3 0 2008**<br>by<br>SUPERIOR COURT OF CALIFORNIA<br>COUNTY OF SONOMA |

ATTORNEY FOR *(Name):*

SUPERIOR COURT OF CALIFORNIA, COUNTY OF Sonoma
  STREET ADDRESS: 600 Administration Drive
  MAILING ADDRESS:
  CITY AND ZIP CODE: Santa Rosa CA 95403
  BRANCH NAME: civil

CASE NAME:
Laurie Marie Laskey v Microsoft Corporation

| CIVIL CASE COVER SHEET | | Complex Case Designation | | CASE NUMBER: |
|---|---|---|---|---|
| [✓] Unlimited<br>(Amount<br>demanded<br>exceeds $25,000) | [ ] Limited<br>(Amount<br>demanded is<br>$25,000 or less) | [ ] Counter [ ] Joinder<br>Filed with first appearance by defendant<br>(Cal. Rules of Court, rule 3.402) | | SCV 242287<br>JUDGE:<br>DEPT: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check one box below for the case type that best describes this case:

**Auto Tort**
[ ] Auto (22)
[ ] Uninsured motorist (46)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
[ ] Asbestos (04)
[ ] Product liability (24)
[ ] Medical malpractice (45)
[ ] Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
[ ] Business tort/unfair business practice (07)
[ ] Civil rights (08)
[ ] Defamation (13)
[ ] Fraud (16)
[ ] Intellectual property (19)
[ ] Professional negligence (25)
[ ] Other non-PI/PD/WD tort (35)

**Employment**
[ ] Wrongful termination (36)
[ ] Other employment (15)

**Contract**
[ ] Breach of contract/warranty (06)
[ ] Rule 3.740 collections (09)
[ ] Other collections (09)
[ ] Insurance coverage (18)
[ ] Other contract (37)

**Real Property**
[ ] Eminent domain/inverse condemnation (14)
[ ] Wrongful eviction (33)
[ ] Other real property (26)

**Unlawful Detainer**
[ ] Commercial (31)
[ ] Residential (32)
[ ] Drugs (38)

**Judicial Review**
[ ] Asset forfeiture (05)
[ ] Petition re: arbitration award (11)
[ ] Writ of mandate (02)
[ ] Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
[ ] Antitrust/Trade regulation (03)
[ ] Construction defect (10)
[✓] Mass tort (40)
[ ] Securities litigation (28)
[ ] Environmental/Toxic tort (30)
[ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
[ ] Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
[ ] RICO (27)
[ ] Other complaint *(not specified above)* (42)

**Miscellaneous Civil Petition**
[ ] Partnership and corporate governance (21)
[ ] Other petition *(not specified above)* (43)

2. This case [✓] is [ ] is not    complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
  a. [✓] Large number of separately represented parties    d. [ ] Large number of witnesses
  b. [✓] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve    e. [✓] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
  c. [✓] Substantial amount of documentary evidence    f. [ ] Substantial postjudgment judicial supervision
3. Remedies sought *(check all that apply):* a. [✓] monetary  b. [ ] nonmonetary; declaratory or injunctive relief  c. [✓] punitive
4. Number of causes of action *(specify):* 20
5. This case [ ] is [✓] is not    a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

Date: 1-22-08

Laurie Marie Laskey
(TYPE OR PRINT NAME)                               *Laurie Marie Laskey*
                                             (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

                                                         Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California                **CIVIL CASE COVER SHEET**                 Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;
                                                                        Cal. Standards of Judicial Administration, std. 3.10

PLD-PI-001(2)

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| Laurie Marie Laskey v Microsoft Corporation | |

2
_____
(number)

**CAUSE OF ACTION—General Negligence**    Page  2
_____

ATTACHMENT TO  [✓] Complaint    [ ] Cross - Complaint

*(Use a separate cause of action form for each cause of action.)*

GN-1. Plaintiff *(name)*:  Laurie Marie Laskey

alleges that defendant *(name)*:  Microsoft Corporation

[✓] Does  1 _____  to  1000 _____

was the legal (proximate) cause of damages to plaintiff. By the following acts or omissions to act, defendant negligently caused the damage to plaintiff
on *(date)*:
at *(place)*: 930 Shiloh Road, Windsor CA 95492

*(description of reasons for liability):*

You have a faulty system which created a security breach that allowed other to hack into my computer and caused me to lose my means of employment.

A virtual server is being used? Is that a game server? or does it relate to a virtual private network?

Form Approved for Optional Use
Judicial Council of California
PLD-PI-001(2) [Rev. January 1, 2007]

**CAUSE OF ACTION—General Negligence**

Code of Civil Procedure 425.12
www.courtinfo.ca.gov

American LegalNet, Inc.
www.FormsWorkflow.com

PLD-PI-001(3)

| SHORT TITLE: | CASE NUMBER |
|---|---|
| Laurie Marie Laskey v Microsoft Corporation | |

__1_____    **CAUSE OF ACTION—Intentional Tort**    **Page** __1__
   *(number)*

ATTACHMENT TO    [✓] Complaint    [ ] Cross - Complaint

*(Use a separate cause of action form for each cause of action.)*

IT-1. Plaintiff *(name):*  Laurie Marie Laskey

   alleges that defendant *(name):*  Microsoft Corporation

      [✓] Does 1_____  to  1000_____

was the legal (proximate) cause of damages to plaintiff. By the following acts or omissions to act, defendant intentionally caused the damage to plaintiff
on *(date):* 11-19-2002
at *(place):* 7882 Shira Street, Windsor CA 95492

*(description of reasons for liability):*

Microsoft maintained a faulty system.

microsoft will need to provide a history report on the maintenance of their servers since they are not being maintained properly. This is an intentional act. microsoft has created a premises liability issue.

(1) would be a hacker more than one would be a crime ring. Microsoft is supporting a crime ring.

Form Approved for Optional Use
Judicial Council of California
PLD-PI-001(3) [Rev. January 1, 2007]

**CAUSE OF ACTION–Intentional Tort**

Code of Civil Procedure, § 426.12
www.courtinfo.ca.gov

American LegalNet, Inc.
www.FormsWorkflow.com

PLD-PI-001(3)

| SHORT TITLE: | CASE NUMBER |
|---|---|
| Laurie Marie Laskey v Microsoft Corporation | |

2
_____
(number)

## CAUSE OF ACTION—Intentional Tort    Page _2_

ATTACHMENT TO    [✓] Complaint    [ ] Cross - Complaint

*(Use a separate cause of action form for each cause of action.)*

IT-1. Plaintiff *(name)*: Laurie Marie Laskey

alleges that defendant *(name)*: Microsoft Corporation

[✓] Does 1 _____ to 1000 _____

was the legal (proximate) cause of damages to plaintiff. By the following acts or omissions to act, defendant intentionally caused the damage to plaintiff
on *(date)*: 5-08-2003
at *(place)* 930 Shiloh Road, Windsor CA 95492

*(description of reasons for liability)*:

Microsoft maintained a faulty system.

On 11-8-2005 DNS report 4 warnings

on 1-11-2006 DNS report 4 warnings 2 fails
went from bad to worse? An intentional act.
Do they switch it back and forth when ever
they want to hack? i was continually
exposed to a harmfull environment and lost
my means of employment because of it.

Form Approved for Optional Use
Judicial Council of California
PLD-PI-001(3) [Rev. January 1, 2007]

**CAUSE OF ACTION—Intentional Tort**

Code of Civil Procedure, § 425.12
www.courtinfo.ca.gov

American LegalNet, Inc.
www.FormsWorkflow.com

PLD-PI-001(4)

| SHORT TITLE: Laurie Marie Laskey v Microsoft Corporation | CASE NUMBER: |
|---|---|

| | CAUSE OF ACTION—Premises Liability | Page ___1___ |
|---|---|---|

<u>1</u>
(number)

ATTACHMENT TO  ☑ Complaint    ☐ Cross - Complaint
*(Use a separate cause of action form for each cause of action.)*

Prem.L-1. Plaintiff *(name)*: Laurie Marie Laskey

alleges the acts of defendants were the legal (proximate) cause of damages to plaintiff.

On *(date)*: 10 - 17 - 2 0 0 2          plaintiff was injured on the following premises in the following

fashion *(description of premises and circumstances of injury)*:

I was connected to a faulty system and it created a fault. I do not know where Microsoft Corporation servers are located.

At the time of the injury I was at home on my computer.

Prem.L-2.  ☑ **Count One—Negligence** The defendants who negligently owned, maintained, managed and operated the described premises were *(names)*:

Microsoft Corporation

☑ Does  1  to  1000

Prem.L-3.  ☑ **Count Two—Willful Failure to Warn** [Civil Code section 846] The defendant owners who willfully or maliciously failed to guard or warn against a dangerous condition, use, structure, or activity were *(names)*:

Microsoft Corporation

☑ Does  1  to  1000

Plaintiff, a recreational user, was  ☐ an invited guest  ☐ a paying guest.

Prem.L-4.  ☑ **Count Three—Dangerous Condition of Public Property** The defendants who owned public property on which a dangerous condition existed were *(names)*:

Microsoft Corporation

☑ Does  1  to  1000

a. ☐ The defendant public entity had  ☐ actual  ☐ constructive notice of the existence of the dangerous condition in sufficient time prior to the injury to have corrected it.
b. ☑ The condition was created by employees of the defendant public entity.

Prem.L-5. a. ☑ **Allegations about Other Defendants** The defendants who were the agents and employees of the other defendants and acted within the scope of the agency were *(names)*:

Microsoft Corporation will have to provide the names of anyone who worked on their servers or had access to their system.

☑ Does  1  to  1000

b. ☑ The defendants who are liable to plaintiffs for other reasons and the reasons for their liability are ☐ described in attachment Prem.L-5.b ☑ as follows *(names)*:

Microsoft Corporation created a premise liability issue which allowed other access to my personal information and theft of my identity online. etc.

Page 1 of 1

Form Approved for Optional Use
Judicial Council of California
PLD-PI-001(4) [Rev. January 1, 2007]

CAUSE OF ACTION—Premises Liability

Code of Civil Procedure, § 425.12
www.courtinfo.ca.gov

American LegalNet, Inc.
www.FormsWorkflow.com

PLD-PI-001(5)

| SHORT TITLE:<br>Laurie Marie Laskey v Microsoft Corporation | CASE NUMBER: |
|---|---|

_____1_____    **CAUSE OF ACTION—Products Liability**    Page ___1___
     *(number)*

ATTACHMENT TO  [✓] Complaint   [ ] Cross - Complaint
*(Use a separate cause of action form for each cause of action.)*

Plaintiff *(name):* Laurie Marie Laskey

Prod. L-1. On or about *(date):* *file date on Computer* plaintiff was injured by the following product:
Microsoft Corporations equipment, wiring, servers, routers, filters, computers, software, etc
*my evidence dates back to 1996.*

Prod. L-2. Each of the defendants knew the product would be purchased and used without inspection for defects.
The product was defective when it left the control of each defendant. The product at the time of injury
was being
   [✓] used in the manner intended by the defendants.
   [ ] used in the manner that was reasonably foreseeable by defendants as involving a substantial danger not
   readily apparent. Adequate warnings of the danger were not given.

Prod. L-3. Plaintiff was a
   [✓] purchaser of the product.                [✓] user of the product.
   [✓] bystander to the use of the product.      [ ] other *(specify):*

PLAINTIFF'S INJURY WAS THE LEGAL (PROXIMATE) RESULT OF THE FOLLOWING:
Prod. L- 4. [✓] **Count One—Strict liability** of the following defendants who
   a. [✓] manufactured or assembled the product *(names):*
      Microsoft Corporation

      [✓] Does 1_____ to  1000_____
   b. [✓] designed and manufactured component parts supplied to the manufacturer *(names):*
      Microsoft Corporation

      [✓] Does 1_____ to  1000_____
   c. [✓] sold the product to the public *(names):*
      Microsoft Corporation

      [✓] Does 1_____ to  1000_____
Prod. L-5. [ ]  **Count Two—Negligence** of the following defendants who owed a duty to plaintiff *(names):*

      [ ] Does _____ to  _____
Prod. L-6. [ ]  **Count Three—Breach of warranty** by the following defendants *(names):*

      [ ] Does _____ to  _____
   a. [ ] who breached an implied warranty
   b. [ ] who breached an express warranty which was
      [ ] written   [ ] oral
Prod. L-7. [✓] The defendants who are liable to plaintiffs for other reasons and the reasons for the liability are
      [ ] listed in Attachment-Prod. L-7 [✓] as follows:
      The theft of my identity online, their product(s) and system allow for that.

      *Premise liability*

Form Approved for Optional Use
Judicial Council of California
PLD-PI-001(5) [Rev. January 1, 2007]
**CAUSE OF ACTION—Products Liability**
Code of Civil Procedure, § 425.12
www.courtinfo.ca.gov

American LegalNet, Inc.
www.FormsWorkflow.com

PLD-PI-001(2)

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| Laurie Marie Laskey v Microsoft Corporation | |

1
_____
(number)

**CAUSE OF ACTION—General Negligence**    Page    1

ATTACHMENT TO  [✓] Complaint    [ ] Cross - Complaint

*(Use a separate cause of action form for each cause of action.)*

GN-1. Plaintiff *(name):*  Laurie Marie Laskey

alleges that defendant *(name):*  Microsoft Corporation

[✓] Does    1_____    to    1000_____

was the legal (proximate) cause of damages to plaintiff. By the following acts or omissions to act, defendant
negligently caused the damage to plaintiff

on *(date):*   11 - 19 - 2002

at *(place):*  7882 Shira Street, Windsor CA 95492

*(description of reasons for liability):*

You have a faulty system which created a security breach.

was the windows 95 print program ever upgraded?
the hackers work in the background and the
printer icon shows up in windows 98 and the
other current versions. if it was never upgraded
microsofts employees would have knowledge
of that. My printer does strange things and
strange things appear on my computer(s)

Form Approved for Optional Use
Judicial Council of California
PLD-PI-001(2)) [Rev. January 1, 2007]

**CAUSE OF ACTION—General Negligence**

Code of Civil Procedure 425.12
www.courtinfo.ca.gov

American LegalNet, Inc.
www.FormsWorkflow.com

Case 3:08-cv-01465-WHA    Document 1-2    Filed 03/17/2008    Page 17 of 117

# Leaving Scraps on the Desktop Deliberately

The Clipboard is a handy way to copy information from one place to another, but it has a major limitation: Every time you copy something new to the Clipboard, it replaces what was copied there before. What if you want to copy a *bunch* of things from a document?

If you were cutting and pasting over a real desktop, you could leave little scraps lying everywhere, ready for later use. The same *scraps* concept works with Windows 95: You can move information from window to window, using the desktop as a temporary storage area for your scraps of information.

For example, suppose that you have some paragraphs in a WordPad document you want to copy to some other places. Highlight the first paragraph, drag it out of the WordPad window, and drop it onto the desktop. Poof! A small Scrap icon appears on your desktop. See another interesting paragraph? Drag it onto the desktop, as well: Another Scrap icon appears.

Eventually, you'll have copies of your report's best paragraphs sitting in little scraps on your desktop. To move any of the scraps into another document, just drag them into that other document's window and let go.

Any remaining, unused scraps can be dumped into the Recycling Bin, or simply left on the desktop, adding a nice, comfortable layer of clutter.



To make a scrap, highlight the information you want to move, usually by running the mouse pointer over it while holding down the mouse button. Then, point at the highlighted information and, while holding down the mouse button, point at the Desktop. Let go of the mouse button, and a scrap containing that information appears on the Desktop.

*Note:* Not all Windows 95 applications support Scraps. In fact, WordPad is the only program in the Windows 95 box that can use Scraps.

# Controlling the Printer

Many of the Windows 95 features work in the background. You know that they're there *only* when something is wrong and weird messages start flying around. The Windows 95 print program is one of those programs.

When you choose the Print command in a program, you may see the little Windows 95 printer icon appear at the bottom corner of your screen. When your printer stops spitting out pages, the little printer icon disappears.

Controlling Someones computer via the printer ?
the hackers work in the back g
The printer icon shows up in windo
the windows 95 feature ever

**DNSstuff.com**
YOUR DESTINATION FOR DNS AND NETWORKING TOOLS

**ServerBeach**
Self managed hosting

**FREE iPOD**

Home   Products   Tools   DNSreport   Resource Center   Forum   How Tools Work

# Tools

Your IP: 12.109.34.167   ASN: 7018 [ATT-INTERNET4]   Near: Quantico, Virginia United States

## DNSreport for msft.net

Generated by www.DNSreport.com at 17:29:11 GMT on 20 Jan 2008.

Email link to

| Category | Status | Test Name | Information |
|---|---|---|---|
| | PASS | Missing Direct Parent check | OK. Your direct parent zone exists, which is good. Some domains (usually third or fourth level domains, such as example.co.us) do not have a direct parent zone ('co.us' in this example), which is legal but can cause confusion. |
| INFO | | NS records at parent servers | Your NS records at the parent servers are:<br><br>ns1.msft.net. [207.68.160.190] [TTL=172800] [US]<br>ns2.msft.net. [65.54.240.126] [TTL=172800] [US]<br>ns3.msft.net. [213.199.161.77] [TTL=172800] [GB]<br>ns4.msft.net. [207.46.66.126] [TTL=172800] [US]<br>ns5.msft.net. [65.55.238.126] [TTL=172800] [US]<br><br>[These were obtained from a.gtld-servers.net] |

| Parent | PASS | Parent nameservers have your nameservers listed | OK. When someone uses DNS to look up your domain, the first step (if doesn't already know about your domain) is to go to the parent server. If you aren't listed there, you can't be found. But you are listed there. |
|---|---|---|---|
| | PASS | Glue at parent nameservers | OK. The parent servers have glue for your nameservers. That means they send out the IP address of your nameservers, as well as their hos names. |
| | PASS | DNS servers have A records | OK. All your DNS servers either have A records at the zone parent servers, or do not need them (if the DNS servers are on other TLDs). A records are required for your hostnames to ensure that other DNS servers can reach your DNS servers. Note that there will be problems your DNS servers do not have these same A records. |
| | INFO | NS records at your nameservers | Your NS records at your nameservers are:<br><br>ns4.msft.net.   [207.46.66.126]   [TTL=172800]<br>ns5.msft.net.   [65.55.238.126]   [TTL=172800]<br>ns1.msft.net.   [207.68.160.190]  [TTL=172800]<br>ns2.msft.net.   [65.54.240.126]   [TTL=172800]<br>ns3.msft.net.   [213.199.161.77]  [TTL=172800] |
| | PASS | Open DNS servers | OK. Your DNS servers do not announce that they are open DNS servers. Although there is a slight chance that they really are open DNS servers this is very unlikely. Open DNS servers increase the chances that of cache poisoning, can degrade performance of your DNS, and can cause your DNS servers to be used in an attack (so it is good that your DNS servers do not appear to be open DNS servers). |
| | PASS | Mismatched glue | OK. The DNS report did not detect any discrepancies between the glue provided by the parent servers and that provided by your authoritative |

| | | DNS servers. |
|---|---|---|
| PASS | No NS A records at nameservers | OK. Your nameservers do include corresponding A records when asked your NS records. This ensures that your DNS servers know the A record corresponding to all your NS records. |
| PASS | All nameservers report identical NS records | OK. The NS records at all your nameservers are identical. |
| PASS | All nameservers respond | OK. All of your nameservers listed at the parent nameservers responde |
| PASS | Nameserver name validity | OK. All of the NS records that your nameservers report seem valid (no or partial domain names). |
| PASS | Number of nameservers | OK. You have 5 nameservers. You must have at least 2 nameservers (RFC2182 section 5 recommends at least 3 nameservers), and preferal no more than 7. |
| PASS | Lame nameservers | OK. All the nameservers listed at the parent servers answer authoritatively for your domain. |
| PASS | Missing (stealth) nameservers | OK. All 5 of your nameservers (as reported by your nameservers) are a listed at the parent servers. |
| PASS | Missing nameservers 2 | OK. All of the nameservers listed at the parent nameservers are also listed as NS records at your nameservers. |
| PASS | No CNAMEs for domain | OK. There are no CNAMEs for msft.net. RFC1912 2.4 and RFC2181 10. state that there should be no CNAMEs if an NS (or any other) record is |

|  |  |  |
|---|---|---|
|  |  | present. |
| PASS | No NSs with CNAMEs | OK. There are no CNAMEs for your NS records. RFC1912 2.4 and RFC2181 10.3 state that there should be no CNAMEs if an NS (or any other) record is present. |
| PASS | Nameservers on separate class C's | OK. You have nameservers on different Class C (technically, /24) IP ranges. You must have nameservers at geographically and topologically dispersed locations. RFC2182 3.1 goes into more detail about secondary nameserver location. |
| PASS | All NS IPs public | OK. All of your NS records appear to use public IPs. If there were any private IPs, they would not be reachable, causing DNS delays. |
| WARN | TCP Allowed | WARNING: One or more of your DNS servers does not accept TCP connections. Although rarely used, TCP connections are occasionally used instead of UDP connections. When firewalls block the TCP DNS connections, it can cause hard-to-diagnose problems. The problem servers are:<br><br>207.68.160.190: Error [No response to TCP packets].<br>65.54.240.126: Error [No response to TCP packets].<br>213.199.161.77: Error [No response to TCP packets].<br>207.46.66.126: Error [No response to TCP packets].<br>65.55.238.126: Error [No response to TCP packets]. |
| INFO | Nameservers versions | [For security reasons, this test is limited to members] |
| PASS | Stealth NS record leakage | Your DNS servers do not leak any stealth NS records (if any) in non-NS requests. |
|  |  | Your SOA record [TTL=86400] is:<br><br>Primary nameserver: ns1.msft.net. |

| | | SOA record | Hostmaster E-mail address: msnhst.microsoft.com.<br>Serial #: 2007121102<br>Refresh: 1800<br>Retry: 900<br>Expire: 2419200<br>Default TTL: 3600 |
|---|---|---|---|
| SOA | INFO | | |
| | PASS | NS agreement on SOA Serial # | OK. All your nameservers agree that your SOA serial number is 2007121102. That means that all your nameservers are using the same data (unless you have different sets of data with the same serial number which would be very bad)! Note that the DNSreport only checks the NS records listed at the parent servers (not any stealth servers). |
| | PASS | SOA MNAME Check | OK. Your SOA (Start of Authority) record states that your **master** (primary) name server is: **ns1.msft.net.**. That server is listed at the parent servers, which is correct. |
| | PASS | SOA RNAME Check | OK. Your SOA (Start of Authority) record states that your DNS contact E-mail address is: **msnhst@microsoft.com.** (techie note: we have change the initial '.' to an @' for display purposes). |
| | PASS | SOA Serial Number | OK. Your SOA serial number is: **2007121102**. This appears to be in the recommended format of YYYYMMDDnn, where 'nn' is the revision. So th indicates that your DNS was last updated on 11 Dec 2007 (and was a revision #2). This number **must** be incremented every time you make a DNS change. |
| | PASS | SOA REFRESH value | OK. Your SOA REFRESH interval is : **1800 seconds**. This seems normal (about 3600-7200 seconds is good if not using DNS NOTIFY; RFC1912 2. recommends a value between 1200 to 43200 seconds (20 minutes to 12 hours)). This value determines how often secondary/slave nameserver check with the master for updates. |
| | | | OK. Your SOA RETRY interval is : **900 seconds**. This seems normal (abo |

|  |  |  |  |
|---|---|---|---|
|  | PASS | SOA RETRY value | 120-7200 seconds is good). The retry value is the amount of time your secondary/slave nameservers will wait to contact the master nameserver again if the last attempt failed. |
|  | PASS | SOA EXPIRE value | OK. Your SOA EXPIRE time: **2419200 seconds**. This seems normal (about 1209600 to 2419200 seconds (2-4 weeks) is good). RFC1912 suggests 2-4 weeks. This is how long a secondary/slave nameserver will wait before considering its DNS data stale if it can't reach the primary nameserver. |
|  | PASS | SOA MINIMUM TTL value | OK. Your SOA MINIMUM TTL is: **3600 seconds**. This seems normal (about 3,600 to 86400 seconds or 1-24 hours is good). RFC2308 suggests a value of 1-3 hours. This value used to determine the default (technically, minimum) TTL (time-to-live) for DNS entries, but now is used for negative caching. |
| MX * | FAIL | MX Category | ERROR: I couldn't find any MX records for msft.net. If you want to receive E-mail on this domain, you should have MX record(s). Without any MX records, mailservers should attempt to deliver mail to the A record for msft.net. I can't continue in a case like this, so I'm assuming you don't receive mail on this domain. |
| Mail * | FAIL | Connect to mail servers | ERROR: I could not find any mailservers for msft.net. |
| WWW * | FAIL | WWW Category | ERROR: I couldn't find any A records for www.msft.net. But I did find a referral to ns1.msft.net. (and maybe others). If you want a website at www.msft.net, you will need an A record for www.msft.net. If you do not want a website at www.msft.net, you can ignore this error. |

Legend:



| Ippages.com Shortcuts... | ☑ |
| Please support our advertisers if you can... | ☑ |
| ippages.com Featured Articles... | ☑ |

**Microsoft Help & Updates**
Fix Microsoft Errors, Free Download Free
Microsoft Support Today!
dllfix.net

**Repair for Windows XP**
Free Registry Scan, fix errors and improve
performance - 5 Star Rated.
www.pctools.com

**Network Analysis Tools**
Get the Network Visibility You Need
Troubleshoot & Resolve Problems
www.FlukeNetworks.com

Ac

| | |
|---|---|
| Lookup IP Address: | 207.46.130.108 |
| | • *Find other web sites (if any) besides microsoft.com hosted at this IP Address* |
| Lookup IP Address Long: | 3475931756 |
| | • *Do lookups with ?lpn=3475931756 rather than ?lp=207.46.130.108 if you wish* |
| Lookup Host Name: | microsoft.com |
| | • *Get DNSreport.com report* <br> • *Get Alexa Site Info* <br> • *Get whois.sc report* <br> • *Find similar domain names* <br> • *See ICANN list of accredited domain-name registrars* |
| Lookup Internet Service Provider (ISP): | Microsoft Corp (**verified**) |
| Lookup IP Address belongs to (Organization): | Microsoft Corp (**verified**) <br> Microsoft Corp IP Address Range(s)... ☑ |
| Lookup Country: | US-United States (**verified**) 🏳 <br> US-United States Country Web Sites ☑ |
| Lookup Country Code3: | USA (**verified**) |
| Lookup Country Currency: | USD-US Dollar (**verified**) |
| | • *Calculate currency exchanges at xe.com* <br> • *Conversions of Area, Capacity, Volume, Circular measure, Computer storage, Distance, Length, Energy, Work, Fuel Consumption, Power, Pressure, Speed, Temperature, Time, Torque, Mass and Weight at convertplus.com* |
| Lookup Continent: | North America (**verified**) |
| Lookup IP Address in EU: | no (**verified**) |
| Lookup Nationality: | American (**verified**) |
| Lookup Nationality Plural: | Americans (**verified**) |

| | |
|---|---|
| Lookup State: | WA-Washington **(verified)** |
| | Yahoo! State maps ▾ |
| Lookup City: | Redmond |

- *Map of Redmond at Mapquest.com*
- *Map of Redmond at GlobeXplorer.com*
- *Map of Redmond at Terraserver-usa.com*
- *Map of Redmond at Maptech.com*
- *Map of Redmond at Multimap.com*
- *Map of Redmond at Google Maps*

| | |
|---|---|
| Lookup Latitude: | 47.6738 **(verified)** |
| Lookup Longitude: | -122.089 **(verified)** |
| Lookup Timezone (relative to UTC): | -08:00 |
| | Timezones near Latitude 47.6738, Longitude -122.089... ▾ |
| | Timezones near Redmond WA... ▾ |
| Lookup Area Code: | provided to subscribers only |
| Lookup Postal/Zip Code: | provided to subscribers only |
| Lookup DMA Code: | provided to subscribers only |
| Lookup Nmap scan of 207.46.130.108 port 80: | 80/tcp open http |
| Lookup Nmap scan of 207.46.130.108 port 25: | 25/tcp filtered smtp |
| Lookup .com whois.Internic.net: | Whois Server Version 1.3 |

Domain names in the .com and .net domains can now be registered
with many different competing registrars. Go to http://www.internic.net
for detailed information.

*[handwritten: mirrors AOL →]*

MICROSOFT.COM.ZZZZ.DNSW.COM
MICROSOFT.COM.ZZZ.IS.0WNED.AND.HAX0RED.BY.SUB7.NET
MICROSOFT.COM.WILL.LIVE.FOREVER.BECOUSE.UNIXSUCKS.COM
MICROSOFT.COM.WILL.BE.SLAPPED.IN.THE.FACE.BY.MY.BLUE.VEINED.SPANNER.NET
MICROSOFT.COM.WILL.BE.BEATEN.WITH.MY.SPANNER.NET
MICROSOFT.COM.WAREZ.AT.TOPLIST.GULLI.COM
MICROSOFT.COM.WANADOODOO.COM
MICROSOFT.COM.SMELLS.SIMPLECODES.COM
MICROSOFT.COM.SHOULD.GIVE.UP.BECAUSE.LINUXISGOD.COM
MICROSOFT.COM.RAWKZ.MUH.WERLD.MENTALFLOSS.CA
MICROSOFT.COM.OHMYGODITBURNS.COM
MICROSOFT.COM.LIVES.AT.SHAUNEWING.COM
MICROSOFT.COM.IS.NOT.HOSTED.BY.ACTIVEDOMAINDNS.NET
MICROSOFT.COM.IS.NOT.AS.COOL.AS.SIMPLECODES.COM
MICROSOFT.COM.IS.IN.BED.WITH.CURTYV.COM
MICROSOFT.COM.IS.GOD.BECOUSE.UNIXSUCKS.COM
MICROSOFT.COM.IS.A.STEAMING.HEAP.OF.FUCKING-BULLSHIT.NET

*[handwritten left margin: not very professional !]*

*[handwritten: ?]*

*[handwritten bottom: The F word shows up on my computer?]*



MICROSOFT.COM.HAS.ITS.OWN.CRACKLAB.COM
MICROSOFT.COM.HAS.A.PRESENT.COMING.FROM.HUGHESMISSILES.COM
MICROSOFT.COM.FLINGS.POO.AT.MONKEYCORE.COM
MICROSOFT.COM.FILLS.ME.WITH.BELLIGERENCE.NET
MICROSOFT.COM.CAN.GO.FUCK.ITSELF.AT.SECZY.COM
MICROSOFT.COM.ARE.GODDAMN.PIGFUCKERS.NET.NS-NOT-IN-SERVICE.COM
MICROSOFT.COM.AND.MINDSUCK.BOTH.SUCK.HUGE.ONES.AT.EXEGETE.NET
MICROSOFT.COM

To single out one record, look it up with "xxx", where xxx is one of the
of the records displayed above. If the records are the same, look them up
with "=xxx" to receive a full display for each record.

>>> Last update of whois database: Tue, 8 Nov 2005 02:18:48 EST <<<

NOTICE: The expiration date displayed in this record is the date the
registrar's sponsorship of the domain name registration in the registry is
currently set to expire. This date does not necessarily reflect the expiration
date of the domain name registrant's agreement with the sponsoring
registrar. Users may consult the sponsoring registrar's Whois database to
view the registrar's reported date of expiration for this registration.

TERMS OF USE: You are not authorized to access or query our Whois
database through the use of electronic processes that are high-volume and
automated except as reasonably necessary to register domain names or
modify existing registrations; the Data in VeriSign Global Registry
Services' ("VeriSign") Whois database is provided by VeriSign for
information purposes only, and to assist persons in obtaining information
about or related to a domain name registration record. VeriSign does not
guarantee its accuracy. By submitting a Whois query, you agree to abide
by the following terms of use: You agree that you may use this Data only
for lawful purposes and that under no circumstances will you use this Data
to: (1) allow, enable, or otherwise support the transmission of mass
unsolicited, commercial advertising or solicitations via e-mail, telephone,
or facsimile; or (2) enable high volume, automated, electronic processes
that apply to VeriSign (or its computer systems). The compilation,
repackaging, dissemination or other use of this Data is expressly
prohibited without the prior written consent of VeriSign. You agree not to
use electronic processes that are automated and high-volume to access or
query the Whois database except as reasonably necessary to register
domain names or modify existing registrations. VeriSign reserves the right
to restrict your access to the Whois database in its sole discretion to ensure
operational stability. VeriSign may restrict or terminate your access to the
Whois database for failure to abide by these terms of use. VeriSign
reserves the right to modify these terms at any time.

The Registry database contains ONLY .COM, .NET, .EDU domains and
Registrars.

Google™ | microsoft.com | | Search |

Lookup microsoft.com in simple text at http://www.lppages.com/simple
or in xml format at http://www.lppages.com/xml

IP Address Lookup Form

IP Address: _____

or Host Name: _____

Lookup Subscription Key: _____

Lookup    8 more Lookups allowed today.

Check your Subscription status here.

Choose the lookup fields you want to see. Using our simple text or xml interface, you can specify with the &get= parameter any available field name, in any sequence. For example http://www.ippages.com/simple/?host=yahoo.com&get=ip,country,state_name,city,timezone will get you a comma-delimited list of only the 5 lookup fields specified.

Multiple data sources are used for some lookup fields. You will see **(verified)** whenever and wherever we can get the same result from more than 1 data source. In some instances, though, this will only be available to subscribers.

**IP Address Lookup file to upload:**

_____    Browse...

Lookup Subscription Key: _____

Lookup data fields to retrieve: ip,country_code,remaining_count

- For a complete list of available Lookup data fields, do your file upload from here.

Upload Lookup File

Need to purchase additional IP Address Lookups? Or get access to all returned data fields? Or need more consistent, faster lookup results? 🌐

ippages.com Shortcuts...

Version 3.04.085. Dynamically created with PHP, MySQL, Javascript, MaxMind GeoIP, and Ip2Location in 72.8575 seconds. Maps and boundary data are copyrighted by FOTW Flags of the World. Use more than once every 10 seconds is not allowed. Now providing services to over 500,000 IP Addresses per month, from over 150 countries. Comments? Ideas? Click here.
Print... | Close |

XML Powered

# Whois Source

sponsored in part by
**DOMAIN SPONSOR** .COM



Whois Source | Mark Alert | Internet Statistics | Domain News | Whois Directory | Webmaster Information | XML API Partners | Registry Partners | Newsletter | About us

Reverse IP - Bulk Check - Preferences - Remote Search - Shopping Cart - Login

Name Spinner  Domain Explorer  At Auction  For Sale (new)

Search **Name Spinner:** [microsoft        ]  [Search]

Search **Domain Explorer:** [microsoft        ]  [Search]  · advanced
· preferences

| Block: | ☐ numbers | **Adult Filter:** ⦿ on  ○ off |
|---|---|---|
| Hyphens: | ○ No | ○ Yes  ⦿ Show both |
| Options: | ☐ Left Anchor | ☐ Right Anchor  ☐ Ordered |
| Search: | ○ Active only | ○ Deleted only  ⦿ Both |
| Options: | Results: [100] | Domain Length: [25] |

Search **At Auction:** [microsoft        ]  [Search]  · advanced
· preferences

Search **For Sale:** (new) [microsoft        ]  [Search]

**Spry VPS Hosting**
cPanel/Plesk | 100% Root | Pick OS
Unlimited Domains from $33.29/mo
www.spry.com

**DomainSponsor.com**
Get paid to Park your domains.
Fastest Payout in the industry.
www.domainsponsor.com

**Simply the best Whois**
Whois Source respects privacy.
We protect your email address.
www.whois.sc

Advertise on Whois S

## MICROSOFT.COM

| | |
|---|---|
| **Website Title:** | Microsoft Corporation |
| **Meta Description:** | The entry page to Microsoft's Web site. Fin software, solutions, answers, support, and Microsoft news. |
| **Meta Keywords:** | products; headlines; downloads; news; Wel site; what's new; solutions; services; softwa contests; corporate news; |
| **Response Code:** | 200 |
| **SSL Cert:** | www.microsoft.com expires in 106 days |
| **Alexa Trend/Rank:** | ⬇ 13 (1 Month)   11 (3 Month) |
| **DMOZ:** | 1039 listings |
| **Y! Directory:** | 244 listings |

Image updated 2005-10-01

| | |
|---|---|
| **Website Status:** | Active |
| **Reverse IP:** | Web server hosts 6 websites (reverse ip tool require free login) |
| **Server Type:** | Microsoft-IIS/6.0 |
| **IP Address:** | 207.46.18.30 (ARIN & RIPE IP search) |
| **IP Location:** | ▓▓ - Washington - Redmond - Microsoft C( |
| **Blacklist Status:** | Clear |
| **Cached Whois:** | Cached today |
| **Whois History:** | 968 records stored Oldest: 2001-12-19 Newest: 2005-11-08 |
| **Record Type:** | Domain Name |
| **Monitor:** | Monitor or Backorder |
| **Wildcard search:** | 'microsoft' in all domains. |
| **Other TLDs:** | .com .net .org .info .biz .us X X X X X X |
| **Name Server:** | NS3.MSFT.NET |
| **ICANN Registrar:** | TUCOWS INC. |
| **Created:** | 1991-05-02 |
| **Expires:** | 2014-05-03 |
| **Status:** | REGISTRAR-LOCK |

**Alexa Related Sites: 11**
sun.com
adobe.com
redhat.com
novell.com
linux.org
ibm.com
hp.com
corel.com
apple.com
pspinc.com
yahoo.com

Registrant:
Microsoft Corporation
One Microsoft Way
Redmond, WA 98052
US

Domain name: MICROSOFT.COM

Administrative Contact:
  Administrator, Domain  domains@microsoft.com

  One Microsoft Way
  Redmond, WA 98052
  US
  +1.4258828080
Technical Contact:
  Hostmaster, MSN  msnhst@microsoft.com

  One Microsoft Way

Redmond, WA 98052
US
+1.4258828080


Registration Service Provider:
DBMS VeriSign, dbms-support@verisign.com

800-579-2848 x4
Please contact DBMS VeriSign for domain updates, DNS/Nameserver
changes, and general domain support questions.


Registrar of Record: TUCOWS, INC.
Record last updated on 27-Jan-2005.
Record expires on 03-May-2014.
Record created on 02-May-1991.

Domain servers in listed order:
NS5.MSFT.NET   207.46.138.20
NS3.MSFT.NET   213.199.144.151
NS2.MSFT.NET   64.4.25.30
NS4.MSFT.NET   207.46.66.75
NS1.MSFT.NET   207.46.245.230


Domain status: REGISTRAR-LOCK



## Domains For Sale
by Name Intelligence

| Price | Domain | Price | Domain | Price | Domain |
|---|---|---|---|---|---|
| $500.00 | microsoftwireless.com | $75.00 | microsoftbooks.com | $700.00 | microsoftlinks.com |
| $700.00 | microsoftsystems.com | $100.00 | microsofthistory.com | $300.00 | microsoftwin.com |
| $400.00 | badmicrosoft.com | $300.00 | microsoftgate.com | $200.00 | microsoftguru.com |
| $60.00 | microsoftproduct.com | $500.00 | microsoftprograms.com | $500.00 | microsoftpatches.cc |



## Domains at Auction
by Name Intelligence

| | | |
|---|---|---|
| microsoftsecuritylitigation.com | microsoftsecuritysettlement.com | microsoftsecurityclassaction.co |
| microsoftsecuritylawsuit.com | elpleitomicrosoft.com | microsoft-e.com |
| procesmicrosoft.com | pleitomicrosoft.com | rechtsstreitmicrosoft.com |

# DNS Report for microsoft.com

**Generated by www.DNSreport.com at 16:12:04 GMT on 08 Nov 2005.**

| Category | Status | Test Name | Information |
|---|---|---|---|
| Parent | PASS | Missing Direct Parent check | OK. Your direct parent zone exists, which is good. Some domains (usually third or fourth level domains, such as example.co.us) do not have a direct parent zone ('co.us' in this example), which is legal but can cause confusion. |
| | INFO | NS records at parent servers | Your NS records at the parent servers are:<br><br>ns1.msft.net. [207.46.245.230] [TTL=172800] [US]<br>ns2.msft.net. [64.4.25.30] [TTL=172800] [US]<br>ns3.msft.net. [213.199.144.151] [TTL=172800] [UK]<br>ns4.msft.net. [207.46.66.75] [TTL=172800] [US]<br>ns5.msft.net. [207.46.138.20] [TTL=172800] [US]<br><br>[These were obtained from h.gtld-servers.net] |
| | PASS | Parent nameservers have your nameservers listed | OK. When someone uses DNS to look up your domain, the first step (if it doesn't already know about your domain) is to go to the parent servers. If you aren't listed there, you can't be found. But you are listed there. |
| | PASS | Glue at parent nameservers | OK. The parent servers have glue for your nameservers. That means they send out the IP address of your nameservers, as well as their host names. |
| | PASS | DNS servers have A records | OK. All your DNS servers either have A records at the zone parent servers, or do not need them (if the DNS servers are on other TLDs). A records are required for your hostnames to ensure that other DNS servers can reach your DNS servers. Note that there will be problems if your DNS servers do not have these same A records. |
| | INFO | NS records at your nameservers | Your NS records at your nameservers are:<br><br>ns1.msft.net. [207.46.245.230] [TTL=172800]<br>ns2.msft.net. [64.4.25.30] [TTL=172800]<br>ns3.msft.net. [213.199.144.151] [TTL=172800]<br>ns4.msft.net. [207.46.66.75] [TTL=172800]<br>ns5.msft.net. [207.46.138.20] [TTL=172800] |
| | PASS | Mismatched glue | OK. The DNS report did not detect any discrepancies between the glue provided by the parent servers and that provided by your authoritative DNS servers. |
| | PASS | No NS A records at nameservers | OK. Your nameservers do include corresponding A records when asked for your NS records. This ensures that your DNS servers know the A records corresponding to all your NS records. |

| | | | |
|---|---|---|---|
| **NS** | **PASS** | All nameservers report identical NS records | OK. The NS records at all your nameservers are identical. |
| | **PASS** | All nameservers respond | OK. All of your nameservers listed at the parent nameservers responded. |
| | **PASS** | Nameserver name validity | OK. All of the NS records that your nameservers report seem valid (no IPs or partial domain names). |
| | **PASS** | Number of nameservers | OK. You have 5 nameservers. You must have at least 2 nameservers (RFC2182 section 5 recommends at least 3 nameservers), and preferably no more than 7. |
| | **PASS** | Lame nameservers | OK. All the nameservers listed at the parent servers answer authoritatively for your domain. |
| | **PASS** | Missing (stealth) nameservers | OK. All 5 of your nameservers (as reported by your nameservers) are also listed at the parent servers. |
| | **PASS** | Missing nameservers 2 | OK. All of the nameservers listed at the parent nameservers are also listed as NS records at your nameservers. |
| | **PASS** | No CNAMEs for domain | OK. There are no CNAMEs for microsoft.com. RFC1912 2.4 and RFC2181 10.3 state that there should be no CNAMEs if an NS (or any other) record is present. |
| | **PASS** | No NSs with CNAMEs | OK. There are no CNAMEs for your NS records. RFC1912 2.4 and RFC2181 10.3 state that there should be no CNAMEs if an NS (or any other) record is present. |
| | **PASS** | Nameservers on separate class C's | OK. You have nameservers on different Class C (technically, /24) IP ranges. You must have nameservers at geographically and topologically dispersed locations. RFC2182 3.1 goes into more detail about secondary nameserver location. |
| | **PASS** | All NS IPs public | OK. All of your NS records appear to use public IPs. If there were any private IPs, they would not be reachable, causing DNS delays. |
| | **INFO** | Nameservers versions | Your nameservers have the following versions:<br><br>207.46.245.230: No version info available (CHAOS not implemented).<br>64.4.25.30: No version info available (CHAOS not implemented).<br>213.199.144.151: No version info available (CHAOS not implemented).<br>207.46.66.75: No version info available (CHAOS not |

| | | | |
|---|---|---|---|
| | | | implemented).<br>207.46.138.20: No version info available (CHAOS not implemented). |
| | PASS | Stealth NS record leakage | Your DNS servers do not leak any stealth NS records (if any) in non-NS requests. |
| SOA | INFO | SOA record | Your SOA record [TTL=3600] is:<br><br>`Primary nameserver: dns.cp.msft.net.`<br>`Hostmaster E-mail address: msnhst.microsoft.com.`<br>`Serial #: 2005110701`<br>`Refresh: 300`<br>`Retry: 600`<br>`Expire: 2419200`<br>`Default TTL: 3600` |
| | PASS | NS agreement on SOA serial # | OK. All your nameservers agree that your SOA serial number is 2005110701. That means that all your nameservers are using the same data (unless you have different sets of data with the same serial number, which would be very bad)! Note that the DNS Report only checks the NS records listed at the parent servers (not any stealth servers). |
| | WARN | SOA MNAME Check | WARNING: Your SOA (Start of Authority) record states that your **master** (primary) name server is: **dns.cp.msft.net.**. However, that server is not listed at the parent servers as one of your NS records! This is probably legal, but you should be sure that you know what you are doing. |
| | PASS | SOA RNAME Check | OK. Your SOA (Start of Authority) record states that your DNS contact E-mail address is: **msnhst@microsoft.com.** (techie note: we have changed the initial '.' to an '@' for display purposes). |
| | PASS | SOA Serial Number | OK. Your SOA serial number is: **2005110701**. This appears to be in the recommended format of YYYYMMDDnn, where 'nn' is the revision. For example, if you are making the 3rd change on 02 May 2000, you would use 2000050203. This number **must** be incremented every time you make a DNS change. |
| | WARN | SOA REFRESH value | WARNING: Your SOA REFRESH interval is : **300 seconds**. This seems low. You should consider increasing this value to about 3600-7200 seconds. RFC1912 2.2 recommends a value between 1200 to 43200 seconds (20 minutes to 12 hours). A value that is too low will unncessarily increase Internet traffic. |
| | PASS | SOA RETRY | OK. Your SOA RETRY interval is : **600 seconds**. This seems normal (about 120-7200 seconds is good). The retry value is the amount of time your secondary/slave |

| | | | |
|---|---|---|---|
| | | value | nameservers will wait to contact the master nameserver again if the last attempt failed. |
| | **PASS** | SOA EXPIRE value | OK. Your SOA EXPIRE time: **2419200 seconds**. This seems normal (about 1209600 to 2419200 seconds (2-4 weeks) is good). RFC1912 recommends 2-4 weeks. This is how long a secondary/slave nameserver will wait before considering its DNS data stale if it can't reach the primary nameserver. |
| | **PASS** | SOA MINIMUM TTL value | OK. Your SOA MINIMUM TTL is: **3600 seconds**. This seems normal (about 3,600 to 86400 seconds or 1-24 hours is good). RFC2308 suggests a value of 1-3 hours. This value used to determine the default (technically, minimum) TTL (time-to-live) for DNS entries, but now is used for negative caching. |
| MX | **INFO** | MX Record | Your 3 MX records are:<br>10 mailc.microsoft.com. [TTL=3600] IP=205.248.102.79 [TTL=3600] [US]<br>IP=205.248.102.78 [TTL=3600] [US]<br>10 maila.microsoft.com. [TTL=3600] IP=131.107.3.125 [TTL=3600] [US]<br>IP=131.107.3.124 [TTL=3600] [US]<br>10 mailb.microsoft.com. [TTL=3600] IP=131.107.3.123 [TTL=3600] [US]<br>IP=205.248.102.77 [TTL=3600] [US] |
| | **PASS** | Invalid characters | OK. All of your MX records appear to use valid hostnames, without any invalid characters. |
| | **PASS** | All MX IPs public | OK. All of your MX records appear to use public IPs. If there were any private IPs, they would not be reachable, causing slight mail delays, extra resource usage, and possibly bounced mail. |
| | **PASS** | MX records are not CNAMEs | OK. Looking up your MX record did not just return a CNAME. If an MX record query returns a CNAME, extra processing is required, and some mail servers may not be able to handle it. |
| | **PASS** | MX A lookups have no CNAMEs | OK. There appear to be no CNAMEs returned for A records lookups from your MX records (CNAMEs are prohibited in MX records, according to RFC974, RFC1034 3.6.2, RFC1912 2.4, and RFC2181 10.3). |
| | **PASS** | MX is host name, not IP | OK. All of your MX records are host names (as opposed to IP addresses, which are not allowed in MX records). |
| | **PASS** | Multiple MX records | OK. You have multiple MX records. This means that if one is down or unreachable, the other(s) will be able to accept mail for you. |
| | **PASS** | Differing MX-A | OK. I did not detect differing IPs for your MX records (this would happen if your DNS servers return different IPs than the DNS servers that are |

| | records | authoritative for the hostname in your MX records). |
|---|---|---|
| **PASS** | Duplicate MX records | OK. You do not have any duplicate MX records (pointing to the same IP). Although technically valid, duplicate MX records can cause a lot of confusion, and waste resources. |
| **PASS** | Reverse DNS entries for MX records | OK. The IPs of all of your mail server(s) have reverse DNS (PTR) entries. RFC1912 2.1 says you should have a reverse DNS for all your mail servers. It is strongly urged that you have them, as many mailservers will not accept mail from mailservers with no reverse DNS entry. Note that this information is *cached*, so if you changed it recently, it will not be reflected here (see the www.DNSstuff.com Reverse DNS Tool for the current data). The reverse DNS entries are:<br>`78.102.248.205.in-addr.arpa mail5.microsoft.com. [TTL=2460]`<br>`124.3.107.131.in-addr.arpa mail2.microsoft.com. [TTL=2460]`<br>`77.102.248.205.in-addr.arpa mailb.microsoft.com. [TTL=2460]` |
| **PASS** | Connect to mail servers | OK: I was able to connect to all of your mailservers. |
| **PASS** | Mail server host name in greeting | OK: All of your mailservers have their host name in the greeting:<br>`mailb.microsoft.com:`<br>`  220 IGS-IMC-01.northamerica.corp.microsoft.com <Inbound SM`<br>`Virtual Server> Tue, 8 Nov 2005 08:12:10 -0800`<br>`mailc.microsoft.com:`<br>`  220 IGS-IMC-02.northamerica.corp.microsoft.com <Inbound SM`<br>`Virtual Server> Tue, 8 Nov 2005 08:12:10 -0800`<br>`maila.microsoft.com:`<br>`  220 IGR-IMC-02.redmond.corp.microsoft.com <Inbound SMTP`<br>`Virtual Server> Tue, 8 Nov 2005 08:12:11 -0800` |
| **PASS** | Acceptance of NULL <> sender | OK: All of your mailservers accept mail from "<>". You are required (RFC11 5.2.9) to receive this type of mail (which includes reject/bounce messages and return receipts). |
| **PASS** | Acceptance of postmaster address | OK: All of your mailservers accept mail to postmaster@microsoft.com (as required by RFC822 6.3, RFC1123 5.2.7, and RFC2821 4.5.1). |
| **PASS** | Acceptance of abuse address | OK: All of your mailservers accept mail to abuse@microsoft.com. |
| **INFO** | Acceptance of domain | WARNING: One or more of your mailservers does not accept mail in the domain literal format (user@[0.0.0.0]). Mailservers are technically required RFC1123 5.2.17 to accept mail to domain literals for any of its IP addresses. I accepting domain literals can make it more difficult to test your mailserver, an can prevent you from receiving E-mail from people reporting problems with your mailserver. However, it is unlikely that any problems will occur if the domain literals are not accepted (mailservers at many common large domains have this problem). |

Mail

| | | | |
|---|---|---|---|
| | literals | `mailb.microsoft.com's postmaster@[205.248.102.77] response:`<br>`    >>> RCPT TO:<postmaster@[205.248.102.77]>`<br>`    <<< 550 5.7.1 Unable to relay for postmaster@[205.248.102.`<br>`mailc.microsoft.com's postmaster@[205.248.102.78] response:`<br>`    >>> RCPT TO:<postmaster@[205.248.102.78]>`<br>`    <<< 550 5.7.1 Unable to relay for postmaster@[205.248.102.`<br>`maila.microsoft.com's postmaster@[131.107.3.124] response:`<br>`    >>> RCPT TO:<postmaster@[131.107.3.124]>`<br>`    <<< 550 5.7.1 Unable to relay for postmaster@[131.107.3.12` | | |
| **PASS** | Open relay test | OK: All of your mailservers appear to be closed to relaying. This is *not* a thorough check, you can get a thorough one here.<br>mailb.microsoft.com OK: 550 5.7.1 Unable to relay for Not.abuse.see.www.DNSreport.com.from.IP.12.109.34.158@DNSreport.com<br>mailc.microsoft.com OK: 550 5.7.1 Unable to relay for Not.abuse.see.www.DNSreport.com.from.IP.12.109.34.158@DNSreport.com<br>maila.microsoft.com OK: 550 5.7.1 Unable to relay for Not.abuse.see.www.DNSreport.com.from.IP.12.109.34.158@DNSreport.com | | |
| **PASS** | SPF record | You have an SPF record. This is very good, as it will help prevent spammers from abusing your domain. Your SPF record is:<br>`"v=spf1 mx redirect=_spf.microsoft.com"` `[TTL=3600]` | | |
| **WWW** | | **INFO** | WWW Record | Your www.microsoft.com A record is:<br>`www.microsoft.com.  CNAME  toggle.www.ms.akadns.net.` |
| | | **PASS** | All WWW IPs public | OK. All of your WWW IPs appear to be public IPs. If there were IPs, they would not be reachable, causing problems reaching you |
| | | **WARN** ✳ | CNAME Lookup | WARNING. Your web site (www.microsoft.com) has a CNAME pointing to toggle.www.ms.akadns.net.. That by itself is confusin acceptable. However, the CNAME record in this case causes an e lookup, which will slightly delay visitors to your website, and use bandwidth. |

Legend:

- Rows with a FAIL indicate a problem that in most cases really should be fixed.
- Rows with a WARN indicate a possible minor problem, which often is not worth pursuing.
- Note that all information is accessed in real-time (except where noted), so this is the freshest information about your domain.

(C) Copyright 2000-2005 R. Scott Perry

Find law 10

1h~~~~~~~~~~~~~~~~~~~~Return-Path: <unit1lbb@hotmail.com>
Received: from mx10.nyc.untd.com (mx10.nyc.untd.com [10.140.24.70])
        by maildeliver07.lax.untd.com with SMTP id AAA87W8DXAW9CH3A
        for <temptress2000@juno.com> (sender <unit1lbb@hotmail.com>);
        Tue, 19 Nov 2002 09:44:25 -0800 (PST)
Received: from hotmail.com (f122.law4.hotmail.com [216.33.149.122])
        by mx10.nyc.untd.com with SMTP id AAA87W8DDAQCNERJ
        for <temptress2000@juno.com> (sender <unit1lbb@hotmail.com>);
        Tue, 19 Nov 2002 12:44:03 -0500 (EST)
Received: from mail pickup service by hotmail.com with Microsoft
SMTPSVC;
        Tue, 19 Nov 2002 09:44:02 -0800
Received: from 12.218.155.165 by lw4fd.law4.hotmail.msn.com with HTTP;
        Tue, 19 Nov 2002 17:44:01 GMT
X-Originating-IP: [12.218.155.165]
From: "Butch Davis" <unit1lbb@hotmail.com>
To: temptress2000@juno.com
Bcc:
Subject: Chemistry Test while swimming..
Date: Tue, 19 Nov 2002 09:44:01 -0800
Mime-Version: 1.0
Content-Type: multipart/mixed; boundary="-----_NextPart_000_1439_37b3_
1052"
Message-ID: <F122vHHNxE87diADJHF0000eaf4@hotmail.com>
X-OriginalArrivalTime: 19 Nov 2002 17:44:02.0305 (UTC) FILETIME=
[3F62A710:01C28FF3]

Why does law 4 Show up ?

now I have a match

showmyip.com Shortcuts...
Please support our advertisers if you can...

showmyip.com Featured Articles...

**Spyware Virus Remover**
PC Magazine Editor's Choice Winner Best Anti-Spyware. Download Now!
www.pctools.com

**Wireless Lan Sniffer**
Advanced network tools for IT professionals. Learn more here.
optiview.flukenetworks.com

Ads by Google                                                    Advertise on this site

| | |
|---|---|
| .ookup IP Address: | 207.68.172.246 |
| | • *Find other web sites (if any) besides msn.com hosted at this IP Address* |
| .ookup IP Address Long: | 3477384438 |
| | • *Do lookups with ?ipn=3477384438 rather than ?ip=207.68.172.246 if you wish* |
| .ookup Host Name: | msn.com |
| | • Get DNSreport.com report |
| | • Get Alexa Site Info |
| | • Get whois.sc report |
| | • Find similar domain names |
| | • See ICANN list of accredited domain-name registrars |
| .ookup Reverse Host Name (DNS lookup on 207.68.172.246) : | email.msn.com |
| | • Get DNSreport.com report |
| | • Get Alexa Site Info |
| | • Get whois.sc report |
| | • find similar domain names |
| .ookup Internet Service Provider (ISP): | Microsoft Corp **(verified)** |
| .ookup IP Address belongs to (Organization): | Microsoft Corp **(verified)** |
| | Microsoft Corp IP Address Range(s)... |
| .ookup Domain Name Server(s): | • *ns1.msft.net (207.46.245.230) in Redmond, Washington, United States* |
| | • *ns2.msft.net (64.4.25.30) in Redmond, Washington, United States* |
| | • *ns3.msft.net (213.199.144.151) in London, Lambeth, United Kingdom* |
| | • *ns4.msft.net (207.46.66.75) in Redmond, Washington, United States* |
| | • *ns5.msft.net (207.46.138.20) in Redmond, Washington, United States* |
| .ookup Domain Mail Server(s): | • *5 mx2.hotmail.com (65.54.244.40) in Redmond, Washington, United States* |
| | • *5 mx3.hotmail.com (65.54.244.72) in Redmond, Washington, United States* |
| | • *5 mx4.hotmail.com (65.54.245.104) in Redmond, Washington, United States* |
| | • *5 mx1.hotmail.com (64.4.50.50) in Redmond, Washington, United States* |

' Address properties of msn.com --> snowmyip.com ~--

_ookup Country:                              US-United States (verified)

                                            US-United States Country Web Sites

_ookup Country Code3:                        USA (verified)

_ookup Country Currency:                      USD-US Dollar (verified)

                                            • Calculate currency exchanges at xe.com
                                            • Conversions of Area, Capacity, Volume, Circular measure,
                                            Computer storage, Distance, Length, Energy, Work, Fuel
                                            Consumption, Power, Pressure, Speed, Temperature, Time,
                                            Torque, Mass and Weight at convertplus.com

_ookup Continent:                            North America (verified)

_ookup IP Address in EU:                     no (verified)

_ookup Nationality:                          American (verified)

_ookup Nationality Plural:                   Americans (verified)

_ookup State:                                WA-Washington (verified)

                                            Yahool State maps

                                            Washington, United States best web sites...    Go...

_ookup City:                                 Redmond

                                            Try Google Location Search in Redmond?

                                            • Map of Redmond at Mapquest.com
                                            • Map of Redmond at GlobeXplorer.com
                                            • Map of Redmond at Terraserver-usa.com
                                            • Map of Redmond at Maptech.com
                                            • Map of Redmond at Multimap.com
                                            • Map of Redmond at Google Maps

_ookup Latitude:                             47.6738 (verified)

_ookup Longitude:                            -122.089 (verified)

_ookup Timezone (relative to UTC):           -08:00

                                            Timezones near Latitude 47.6738, Longitude -122.089...

                                            Timezones near Redmond WA...

ookup Area Code:                             provided to subscribers only

ookup Postal/Zip Code:                       provided to subscribers only

ookup DMA Code:                              provided to subscribers only

ookup Nmap scan of 207.68.172.246 port 80:  available only with &get=nmap parameter

ookup Nmap scan of 207.68.172.246 port 25:  available only with &get=nmap parameter

Google™ msn.com              [ Search ]

‍

.ookup msn.com in simple text at http://___.showmyip.com/simple
or in xml format at http://www.showmyip.com/xml

## Address Lookup Form

IP Address:

or Host Name:

Lookup Subscription Key:

[ Lookup ]    95 more Lookups allowed today.

Check your Subscription status here.

Choose the lookup fields you want to see. Using our simple text or xml interface, you can specify with the &get= parameter any available field name, in any sequence. For example http://www.showmyip.com/simple/?host=yahoo.com&get=ip,country,state_name,city,timezone will get you a comma-delimited list of only the 5 lookup fields specified.

Multiple data sources are used for some lookup fields. You will see (verified) whenever and wherever we can get the same result from more than 1 data source. In some instances, though, this will only be available to subscribers.

## IP Address Lookup file to upload:                                     [ Browse... ]

Lookup Subscription Key:

Lookup data fields to retrieve:  Ip,country_code,remaining_count

- For a complete list of available Lookup data fields, do your file upload from here.

[ Upload Lookup File ]

Need to purchase additional IP Address Lookups? Or get access to
all returned data fields? Or need more consistent, faster lookup
results? ⊛

showmyip.com Shortcuts...

XML Powered

# Whois Source





Reverse IP - Bulk Check - Preferences - Remote Search - Shopping Cart - Login

Name Spinner Domain Explorer At Auction For Sale (new)

Search Name Spinner: msn          [ Search ]

Search Domain Explorer: msn        [ Search ]   · advanced preferences

| Block: | ☐ numbers | Adult Filter: | ◉ on ○ off |
|---|---|---|---|
| Hyphens: | ○ No | ○ Yes | ◉ Show both |
| Options: | ☐ Left Anchor | ☐ Right Anchor | ☐ Ordered |
| Search: | ○ Active only | ○ Deleted only | ◉ Both |
| Options: | Results: 100 | Domain Length: 25 | |

Search At Auction: msn          [ Search ]   · advanced preferences

Search For Sale: (new) msn        [ Search ]

**DomainSponsor.com**
Get paid to Park your domains,
Fastest Payout in the industry.
www.domainsponsor.com

**Spry VPS Hosting**
cPanel/Plesk | 100% Root | Pick OS
Unlimited Domains from $33.29/mo
www.spry.com

**Simply the best Whois**
Whois Source respects privacy.
We protect your email address.
www.whois.sc

Advertise on Whois Source

---

## ✱ MSN.COM

| | |
|---|---|
| **Website Title:** | MSN.com |
| **Response Code:** | 200 |
| **SSL Cert:** | No valid SSL on this Host, Get Secure |
| **Alexa Trend/Rank:** | 2 (1 Month)   2 (3 Month) |
| **DMOZ:** | 3514 listings |
| **Y! Directory:** | 461 listings |
| **Website Status:** | Active |
| **Reverse IP:** | Web server hosts 3 websites (reverse ip tool requires free login) |
| **Server Type:** | Microsoft-IIS/6.0 |
| **IP Address:** | 207.68.183.32 (ARIN & RIPE IP search) |
| **IP Location:** | ■ - Washington - Redmond - Microsoft Corp |
| **Blacklist Status:** | Clear |
| **Cached Whois:** | Cached today |
| | 920 records stored |

Image updated 2005-10-02

**Alexa Related Sites: 11**
altavista.com
netscape.com
microsoft.com
hotbot.com
google.com
go.com
geocities.com
excite.com
cnet.com
aol.com
yahoo.com

| | |
|---|---|
| **Whois History:** | Oldest: 2002-06-01<br>Newest: 2006-01-11 |
| **Record Type:** | Domain Name |
| **Monitor:** | Monitor or Backorder |
| **Wildcard search:** | 'msn' in all domains. |
| **Other TLDs:** | .com .net .org .info .biz .us<br>☐ [1 available domains] |
| **Name Server:** | NS3.MSFT.NET |
| **ICANN Registrar:** | TUCOWS INC. |
| **Created:** | 1994-11-10 |
| **Expires:** | 2014-06-04 |
| **Status:** | REGISTRAR-LOCK |

Registrant:
Microsoft Corporation
One Microsoft Way
Redmond, WA 98052
US

Domain name: MSN.COM

Administrative Contact:
   Administrator, Domain   domains@microsoft.com
   One Microsoft Way
   Redmond, WA 98052
   US
   +1.4258828080
Technical Contact:
   Hostmaster, MSN   msnhst@microsoft.com
   One Microsoft Way
   Redmond, WA 98052
   US
   +1.4258828080

Registration Service Provider:
   DBMS VeriSign,   dbms-support@verisign.com
   800-579-2848 x4
   Please contact DBMS VeriSign for domain updates, DNS/Nameserver
   changes, and general domain support questions.

Registrar of Record: TUCOWS, INC.
Record last updated on 28-Jan-2005.
Record expires on 04-Jun-2014.
Record created on 10-Nov-1994.

Domain servers in listed order:
   NS1.MSFT.NET   207.46.245.230

NS3.MSFT.NET   213.199.14...1
NS5.MSFT.NET   207.46.138.20
NS2.MSFT.NET   64.4.25.30
NS4.MSFT.NET   207.46.66.75

Domain status: REGISTRAR-LOCK

## Domains
### For Sale
by Name Intelligence

| Price | Domain | Price | Domain | Price | Domain |
|---|---|---|---|---|---|
| $10.00 | MsnBz.com | $699.00 | GayMsn.com | $499.00 | MsnGay.com |
| $60.00 | YesMsn.com | $200.00 | MsnNo.com | $200.00 | EzMsn.com |
| $300.00 | MsnBbs.com | $60.00 | 96Msn.com | $20.00 | YoMsn.com |
| $800.00 | Msn04.com | $60.00 | Msn55.com | $200.00 | Msn51.com |

## Domains at Auction
by Name Intelligence

LOIMetMsn.com         MsnWarez.com         CoMsnArt.com

MsnLawsuit.com        PoMsnGriffs.com      CoolMsn.net

NyMsn.com

# DNS Report for msn.com

Generated by www.DNSreport.com at 20:42:42 GMT on 11 Jan 2006.

| Category | Status | Test Name | Information |
|---|---|---|---|
| Parent | PASS | Missing Direct Parent check | OK. Your direct parent zone exists, which is good. Some domains (usually third or fourth level domains, such as example.co.us) do not have a direct parent zone ('co.us' in this example), which is legal but can cause confusion. |
| | INFO | NS records at parent servers | Your NS records at the parent servers are:<br>`ns1.msft.net.` [207.46.245.230] [TTL=172800] [US]<br>`ns2.msft.net.` [64.4.25.30] [TTL=172800] [US]<br>`ns3.msft.net.` [213.199.144.151] [TTL=172800] [UK]<br>`ns4.msft.net.` [207.46.66.75] [TTL=172800] [US]<br>`ns5.msft.net.` [207.46.138.20] [TTL=172800] [US]<br>[These were obtained from g.gtld-servers.net] |
| | PASS | Parent nameservers have your nameservers listed | OK. When someone uses DNS to look up your domain, the first step (if it doesn't already know about your domain) is to go to the parent servers. If you aren't listed there, you can't be found. But you are listed there. |
| | PASS | Glue at parent nameservers | OK. The parent servers have glue for your nameservers. That means they send out the IP address of your nameservers, as well as their host names. |
| | PASS | DNS servers have A records | OK. All your DNS servers either have A records at the zone parent servers, or do not need them (if the DNS servers are on other TLDs). A records are required for your hostnames to ensure that other DNS servers can reach your DNS servers. Note that there will be problems if your DNS servers do not have these same A records. |
| NS | INFO | NS records at your | Your NS records at your nameservers are:<br>`ns2.msft.net.` [64.4.25.30] [TTL=172800] |

| | | nameservers | ns3.msft.net. [213.199.144.151] [TTL=172800] ns4.msft.net. [207.46.66.75] [TTL=172800] ns5.msft.net. [207.46.138.20] [TTL=172800] ns1.msft.net. [207.46.245.230] [TTL=172800] |
|---|---|---|---|
| | PASS | Mismatched glue | OK. The DNS report did not detect any discrepancies between the glue provided by the parent servers and that provided by your authoritative DNS servers. |
| | PASS | No NS A records at nameservers | OK. Your nameservers do include corresponding A records when asked for your NS records. This ensures that your DNS servers know the A records corresponding to all your NS records. |
| | PASS | All nameservers report identical NS records | OK. The NS records at all your nameservers are identical. |
| | PASS | All nameservers respond | OK. All of your nameservers listed at the parent nameservers responded. |
| | PASS | Nameserver name validity | OK. All of the NS records that your nameservers report seem valid (no IPs or partial domain names). |
| | PASS | Number of nameservers | OK. You have 5 nameservers. You must have at least 2 nameservers (RFC2182 section 5 recommends at least 3 nameservers), and preferably no more than 7. |
| | PASS | Lame nameservers | OK. All the nameservers listed at the parent servers answer authoritatively for your domain. |
| | PASS | Missing (stealth) nameservers | OK. All 5 of your nameservers (as reported by your nameservers) are also listed at the parent servers. |
| | PASS | Missing nameservers 2 | OK. All of the nameservers listed at the parent nameservers are also listed as NS records at your nameservers. |
| | PASS | No CNAMEs for domain | OK. There are no CNAMEs for msn.com. RFC1912 2.4 and RFC2181 10.3 state that there should be no CNAMEs if an NS (or any other) record is present. |

| | | | |
|---|---|---|---|
| | PASS | No NSs with CNAMEs | OK. There are no CNAMEs for your NS records. RFC1912 2.4 and RFC2181 10.3 state that there should be no CNAMEs if an NS (or any other) record is present. |
| | PASS | Nameservers on separate class C's | OK. You have nameservers on different Class C (technically, /24) IP ranges. You must have nameservers at geographically and topologically dispersed locations. RFC2182 3.1 goes into more detail about secondary nameserver location. |
| | PASS | All NS IPs public | OK. All of your NS records appear to use public IPs. If there were any private IPs, they would not be reachable, causing DNS delays. |
| | INFO | Nameservers versions | Your nameservers have the following versions:<br><br>207.46.245.230: No version info available (CHAOS not implemented).<br>64.4.25.30: No version info available (CHAOS not implemented).<br>213.199.144.151: No version info available (CHAOS not implemented).<br>207.46.66.75: No version info available (CHAOS not implemented).<br>207.46.138.20: No version info available (CHAOS not implemented). |
| | PASS | Stealth NS record leakage | Your DNS servers do not leak any stealth NS records (if any) in non-NS requests. |
| SOA | INFO | SOA record | Your SOA record [TTL=86400] is:<br>`Primary nameserver: dns.cp.msft.net.`<br>`Hostmaster E-mail address:`<br>`msnhst.microsoft.com.`<br>`Serial #: 2006010504`<br>`Refresh: 1800`<br>`Retry: 900`<br>`Expire: 2419200`<br>`Default TTL: 900` |
| | PASS | NS agreement on SOA serial # | OK. All your nameservers agree that your SOA serial number is 2006010504. That means that all your nameservers are using the same data (unless you have different sets of data with the same serial number, which would be very bad)! Note that the DNS Report only checks the NS records listed at the parent servers (not any stealth servers). |
| | WARN | SOA | WARNING: Your SOA (Start of Authority) |

| | MNAME Check | record states that your **master** (primary) name server is: **dns.cp.msft.net.**. However, that server is not listed at the parent servers as one of your NS records! This is probably legal, but you should be sure that you know what you are doing. |
|---|---|---|
| PASS | SOA RNAME Check | OK. Your SOA (Start of Authority) record states that your DNS contact E-mail address is: **msnhst@microsoft.com.** (techie note: we have changed the initial '.' to an '@' for display purposes). |
| PASS | SOA Serial Number | OK. Your SOA serial number is: **2006010504**. This appears to be in the recommended format of YYYYMMDDnn, where 'nn' is the revision. For example, if you are making the 3rd change on 02 May 2000, you would use 2000050203. This number **must** be incremented every time you make a DNS change. |
| PASS | SOA REFRESH value | OK. Your SOA REFRESH interval is : **1800 seconds**. This seems normal (about 3600-7200 seconds is good if not using DNS NOTIFY; RFC1912 2.2 recommends a value between 1200 to 43200 seconds (20 minutes to 12 hours)). This value determines how often secondary/slave nameservers check with the master for updates. |
| PASS | SOA RETRY value | OK. Your SOA RETRY interval is : **900 seconds**. This seems normal (about 120-7200 seconds is good). The retry value is the amount of time your secondary/slave nameservers will wait to contact the master nameserver again if the last attempt failed. |
| PASS | SOA EXPIRE value | OK. Your SOA EXPIRE time: **2419200 seconds**. This seems normal (about 1209600 to 2419200 seconds (2-4 weeks) is good). RFC1912 recommends 2-4 weeks. This is how long a secondary/slave nameserver will wait before considering its DNS data stale if it can't reach the primary nameserver. |
| PASS | SOA MINIMUM TTL value | OK. Your SOA MINIMUM TTL is: **900 seconds**. This seems normal (about 3,600 to 86400 seconds or 1-24 hours is good). RFC2308 suggests a value of 1-3 hours. This value used to determine the default (technically, minimum) TTL (time-to-live) for DNS entries, but now is used for negative |

| | | | caching. |
|---|---|---|---|
| MX | INFO | MX Record | Your 4 MX records are:<br>5 mx4.hotmail.com. [TTL=900] IP=65.54.245.104 [TTL=3600] [US]<br>IP=65.54.190.179 [TTL=3600] [US]<br>IP=65.54.244.104 [TTL=3600] [US]<br>IP=65.54.244.232 [TTL=3600] [US]<br>5 mx1.hotmail.com. [TTL=900] IP=65.54.244.8 [TTL=3600] [US]<br>IP=64.4.50.50 [TTL=3600] [US]<br>IP=65.54.245.8 [TTL=3600] [US]<br>IP=65.54.244.136 [TTL=3600] [US]<br>5 mx2.hotmail.com. [TTL=900] IP=65.54.245.40 [TTL=3600] [US]<br>IP=65.54.244.168 [TTL=3600] [US]<br>IP=65.54.244.40 [TTL=3600] [US]<br>IP=65.54.190.50 [TTL=3600] [US]<br>5 mx3.hotmail.com. [TTL=900] IP=65.54.244.200 [TTL=3600] [US]<br>IP=64.4.50.179 [TTL=3600] [US]<br>IP=65.54.244.72 [TTL=3600] [US]<br>IP=65.54.245.72 [TTL=3600] [US] |
| | PASS | Invalid characters | OK. All of your MX records appear to use valid hostnames, without any invalid characters. |
| | PASS | All MX IPs public | OK. All of your MX records appear to use public IPs. If there were any private IPs, they would not be reachable, causing slight mail delays, extra resource usage, and possibly bounced mail. |
| | PASS | MX records are not CNAMEs | OK. Looking up your MX record did not just return a CNAME. If an MX record query returns a CNAME, extra processing is required, and some mail servers may not be able to handle it. |
| | PASS | MX A lookups have no CNAMEs | OK. There appear to be no CNAMEs returned for A records lookups from your MX records (CNAMEs are prohibited in MX records, according to RFC974, RFC1034 3.6.2, RFC1912 2.4, and RFC2181 10.3). |
| | PASS | MX is host name, not IP | OK. All of your MX records are host names (as opposed to IP addresses, which are not allowed in MX records). |
| | PASS | Multiple MX records | OK. You have multiple MX records. This means that if one is down or unreachable, the other(s) will be able to accept mail for you. |

| | | | |
|---|---|---|---|
| PASS | Differing MX-A records | | OK. I did not detect differing IPs for your MX records (this would happen if your DNS servers return different IPs than the DNS servers that are authoritative for the hostname in your MX records). |
| PASS | Duplicate MX records | | OK. You do not have any duplicate MX records (pointing to the same IP). Although technically valid, duplicate MX records can cause a lot of confusion, and waste resources. |
| PASS | Reverse DNS entries for MX records | | OK. The IPs of all of your mail server(s) have reverse DNS (PTR) entries. RFC1912 2.1 says you should have a reverse DNS for all your mail servers. It is strongly urged that you have them, as many mailservers will not accept mail from mailservers with no reverse DNS entry. Note that this information is *cached*, so if you changed it recently, it will not be reflected here (see the www.DNSstuff.com Reverse DNS Tool for the current data). The reverse DNS entries are: `232.244.54.65.in-addr.arpa mx4.hotmail.com.` [TTL=2455] `136.244.54.65.in-addr.arpa mail.hotmail.com.` [TTL=2698] `50.190.54.65.in-addr.arpa mail.hotmail.com.` [TTL=2455] `72.245.54.65.in-addr.arpa bay0-mc11-f.bay0.hotmail.com.` [TTL=3325] |
| Mail ✳ | | Connect to mail servers | ERROR: I could not complete a connection to one or more of your mailservers: mx2.hotmail.com: Timed out [Last data sent: [Did not connect]] |
| ✳ | WARN | Mail server host name in greeting | WARNING: One or more of your mailservers is claiming to be a host other than what it really is (the SMTP greeting should be a 3-digit code, followed by a space or a dash, then the host name). This probably won't cause any harm, but is a technical violation of RFC821 4.3 (and RFC2821 4.3.1). Note that the hostname given in the SMTP greeting should have an A record pointing back to the same server. |

mx4.hotmail.com claims to be host bay0-

| | | is at 65.54.244.143, not 65.54.244.136]. mx3.hotmail.com claims to be host bay0-mc11-f2.bay0.hotmail.com [but that host is at 65.54.245.74, not 65.54.245.72]. |
|---|---|---|
| PASS | Acceptance of NULL <> sender | OK: All of your mailservers accept mail from "<>". You are required (RFC1123 5.2.9) to receive this type of mail (which includes reject/bounce messages and return receipts). |
| | Acceptance of postmaster address | ERROR: One or more of your mailservers does not accept mail to postmaster@msn.com. Mailservers are required (RFC822 6.3, RFC1123 5.2.7, and RFC2821 4.5.1) to accept mail to postmaster. mx4.hotmail.com's postmaster response: >>> RCPT TO:<postmaster@msn.com> <<< 550 Requested action not taken: mailbox unavailable mx1.hotmail.com's postmaster response: >>> RCPT TO:<postmaster@msn.com> <<< 550 Requested action not taken: mailbox unavailable mx3.hotmail.com's postmaster response: >>> RCPT TO:<postmaster@msn.com> <<< 550 Requested action not taken: mailbox unavailable |
| PASS | Acceptance of abuse address | OK: All of your mailservers accept mail to abuse@msn.com. |
| INFO | Acceptance of domain literals | WARNING: One or more of your mailservers does not accept mail in the domain literal format (user@[0.0.0.0]). Mailservers are technically required RFC1123 5.2.17 to accept mail to domain literals for any of its IP addresses. Not accepting domain literals can make it more difficult to test your mailserver, and can prevent you from receiving E-mail from people reporting problems with your mailserver. However, it is unlikely that any problems will occur if the |

domain literals are not accepted (mailservers at many common large domains have this problem). mx1.hotmail.com's

| | | |
|---|---|---|
| | | ```<<< 501 Invalid Address mx3.hotmail.com's postmaster@[65.54.245.72] response: >>> RCPT TO:<postmaster@[65.54.245.72]> <<< 501 Invalid Address``` |
| **PASS** | Open relay test | OK: All of your mailservers appear to be closed to relaying. This is *not* a thorough check, you can get a thorough one <u>here</u>. mx1.hotmail.com OK: 550 Requested action not taken: mailbox unavailable mx4.hotmail.com OK: 550 Requested action not taken: mailbox unavailable mx3.hotmail.com OK: 550 Requested action not taken: mailbox unavailable |
| **PASS** | SPF record | You have an <u>SPF record</u>. This is very good, as it will help prevent spammers from abusing your domain. Your SPF record is: ```"v=spf1 include:spf-a.hotmail.com include:spf-b.hotmail.com include:spf-c.hotmail.com include:spf-d.hotmail.com ~all" [TTL=900]``` |

| | | | |
|---|---|---|---|
| **WWW** | **INFO** | WWW Record | Your www.msn.com A record is: ```www.msn.com. CNAME www.msn.com.nsatc.net. [TTL=900]``` |
| | **PASS** | All WWW IPs public | OK. All of your WWW IPs appear to be public IPs. If there were any private IPs, they would not be reachable, causing problems reaching your web site. |
| | **WARN** | CNAME Lookup | WARNING. Your web site (www.msn.com) has a CNAME record pointing to www.msn.com.nsatc.net.. That by itself is confusing, but acceptable. However, the CNAME record in this case causes an extra DNS lookup, which will slightly delay visitors to your website, and use extra bandwidth. |



Received: from mx5.nyc.untd.com (mx5.nyc.untd.com [10.[illegible].24.65])
by m24.bos.untd.com with SMTP id AAA848JJ6A6WUSJS
for <Temptress2000@juno.com> (sender <dizzyd_213@hotmail.com>);
Thu, 17 Oct 2002 16:44:15 -0400 (EST)
Received: from hotmail.com (f53.law10.hotmail.com [64.4.15.53])
by mx5.nyc.untd.com with SMTP id AAA848JJYA29CDFJ
for <Temptress2000@juno.com> (sender <dizzyd_213@hotmail.com>);
Thu, 17 Oct 2002 16:44:06 -0400 (EST)
Received: from mail pickup service by hotmail.com with Microsoft
SMTPSVC;
Thu, 17 Oct 2002 13:44:06 -0700
Received: from 216.127.163.43 by lw10fd.law10.hotmail.msn.com with HTTP;
Thu, 17 Oct 2002 20:44:05 GMT
X-Originating-IP: [216.127.163.43]
From: "Desiree Perry" <dizzyd_213@hotmail.com>
To: Temptress2000@juno.com
Bcc:
Subject: Fwd: Noises
Date: Thu, 17 Oct 2002 13:44:05 -0700
Mime-Version: 1.0
Content-Type: multipart/mixed; boundary="----=_NextPart_000_5c6c_2f21_1fdb"
Message-ID: <F53stMVhEUsebmspH2q000006e@hotmail.com>
X-OriginalArrivalTime: 17 Oct 2002 20:44:06.0032 (UTC) FILETIME=[EF46D100:01C2761D]

Time zone?

Desree and I did exchange e-mails (my co-worker at McClures)

what does law10 mean? Is this the trace file?

Is this why the phone wiring on the side of my home was installed different then it should have been?

Is there a file open at the DA's?, FBI?, CIA?

Does this have something todo with the time and time zones?

What did I cut off of the side of my house at the phone box? 10-f[illegible]

6

*[handwritten]* Tower computer?    MS08ACC...
*[handwritten]* need file date.

*[The upper portion of the page consists of unreadable binary/corrupted characters.]*

HTTPMail Polling☐☐☐Domain is MSN.com☐☐HTTPMail Friendly Name☐☐HTTPMail
Use Sicily☐HTTPMail Prompt for Password☐☐☐HTTPMail Password2☐☐HTTPMail User
Name☐☐HTTPMail Server☐SMTP Prompt for Password☐☐☐SMTP Signature☐☐SMTP
Certificate☐☐☐SMTP Split Message Size☐SMTP Split Messages☐SMTP Reply To Email
Address☐SMTP Email Address☐SMTP Organization Name☐☐SMTP Display Name☐SMTP
Timeout☐☐☐SMTP Secure Connection☐☐SMTP Port☐☐SMTP Use Sicily☐SMTP
Password2☐☐SMTP User Name☐SMTP Server☐POP3 Prompt for Password☐☐☐Outlook Cache
Name☐☐POP3 Skip☐☐Account☐☐☐Expire Days☐Remove When Expired☐Remove When
Deleted☐Leave Mail On Server☐☐☐POP3 Timeout☐☐☐POP3 Secure Connection☐☐POP3
Port☐☐POP3 Use Sicily☐POP3 Password2☐☐POP3 User Name☐POP3 Server☐NNTP Prompt
for Password☐☐☐NNTP Signature☐☐☐NNTP Posting☐☐☐NNTP Polling☐☐☐NNTP Data
Directory☐Use Group Descriptions☐☐NNTP Split Message Size☐NNTP Split
Messages☐NNTP Reply To Email Address☐NNTP Email Address☐NNTP Organization
Name☐NNTP Display Name☐☐NNTP Timeout☐☐☐NNTP Secure Connection☐☐NNTP
Port☐☐NNTP Use Sicily☐NNTP Password2☐☐NNTP User Name☐NNTP Server☐LDAP
NTDS☐☐LDAP Paged Result Support☐☐☐LDAP Advanced Search Attributes☐LDAP Simple
Search☐☐LDAP Bind DN☐☐☐LDAP Logo☐☐LDAP Secure Connection☐☐LDAP Port☐☐LDAP
URL☐☐☐LDAP Resolve Flag☐☐☐LDAP Server ID☐☐LDAP Search Base☐☐☐☐LDAP Search
Return☐LDAP Timeout☐☐☐LDAP Authentication☐LDAP Password2☐☐LDAP User Name☐LDAP
Server☐IMAP Poll All Folders☐☐☐IMAP Dirty☐☐IMAP Prompt for Password☐☐☐IMAP
Drafts Folder☐☐IMAP Sent Items Folder☐☐IMAP Svr-side Special Folders☐☐IMAP NOOP
Interval☐☐IMAP Full List☐☐IMAP Polling☐☐☐IMAP Use LSUB☐☐☐IMAP Data
Directory☐IMAP Root Folder☐☐☐IMAP Timeout☐☐☐IMAP Secure Connection☐☐IMAP
Port☐☐☐IMAP Use Sicily☐IMAP Password2☐☐IMAP User Name☐IMAP Server☐Server Read
Only☐☐☐Unique ID☐☐☐Make Available Offline☐Service☐Backup Connectoid☐☐☐Account
ID☐☐Connection Flags☐☐☐Connectoid☐Connection Type☐Last Updated☐☐☐Temporary
Account☐☐Account Name☐☐☐☐## Athena_Account_Manager_Notification_Message ##☐☐☐No
modify accts☐Server

*[handwritten]* why?

*[handwritten]* where does the other half of the
email as

SUPERIOR COURT OF CALIFORNIA, COUNTY OF SONOMA
CIVIL DIVISION
600 ADMINISTRATION DRIVE, ROOM 107-J
SANTA ROSA, CALIFORNIA 95403-2878
(707) 521-6500
www.sonomasuperiorcourt.com

(FOR COURT USE ONLY)

**ENDORSED
FILED**

**JAN 3 0 2008**

SUPERIOR COURT OF CALIFORNIA
COUNTY OF SONOMA

NOTICE OF ASSIGNMENT TO ONE JUDGE FOR ALL PURPOSES,
NOTICE OF CASE MANAGEMENT CONFERENCE,
and ORDER TO SHOW CAUSE

Case number:

$SCV$ 242287

## A COPY OF THIS NOTICE MUST BE SERVED WITH THE SUMMONS AND COMPLAINT
## AND WITH ANY CROSS-COMPLAINT

1. **THIS ACTION IS ASSIGNED TO HON,** ROBERT S. BOYD _____ **FOR ALL PURPOSES.**
   Pursuant to California Rules of Court, Rule 2.111(7), the assigned judge's name must appear below the number of the case and the nature of the paper on the first page of each paper presented for filing.
2. A Case Management Conference has been set at the time and place indicated below:

   Date: JUN 1 2 2008        Time: 3:30pm        Courtroom: 21
   Location:    3035 CLEVELAND AVE STE 200
                SANTA ROSA CA 95403

3. No later than 15 calendar days before the date set for the case management conference or review, each party must file a case management statement [Judicial Council form #CM-110] and serve it on all other parties in the case. In lieu of each party's filing a separate case management statement, any two or more parties may file a joint statement.
4. At the conference, counsel for each party and each self-represented party must appear personally or by telephone [California Rules of Court, Rule 3.670(c)(2)]; must be familiar with the case; and must be prepared to discuss and commit to the party's position on the issues listed in California Rules of Court, Rule 3.727.
5. Pre-approved dispositions are recorded three (3) court days prior to the case management conference. These may be obtained by calling (707) 521-6883 or by going to http://www.sonomasuperiorcourt.com/tentative/index.php.

## ORDER TO SHOW CAUSE

To Plaintiff(s), Cross-complainants, and/or their attorneys of record:
If, on the date shown above, you are not in compliance with timely filing requirements stated in California Rules of Court, Rules 3.110 and/or 3.725, you must then and there show cause why this Court should not impose monetary and/or terminating sanctions.

| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, state bar number, and address) | FOR COURT USE ONLY |
|---|---|
| TELEPHONE NO.:    FAX NO. *(Optional)*:<br>E-MAIL ADDRESS *(Optional)*:<br>ATTORNEY FOR *(Name)*: | |
| SUPERIOR COURT OF CALIFORNIA, COUNTY OF SONOMA<br>600 ADMINISTRATION DRIVE, ROOM 107-J<br>SANTA ROSA, CALIFORNIA 95403-2878 | |
| PLAINTIFF/PETITIONER:<br><br>DEFENDANT/RESPONDENT: | |

| **ADR INFORMATION SHEET**<br>[Sonoma County Superior Court Rules, Rule 16] | CASE NUMBER: |
|---|---|
| (Check one):  ☐ **UNLIMITED CASE**<br>(Amount demanded exceeds $25,000)   ☐ **LIMITED CASE**<br>(Amount demanded is $25,000 or less) | Date:<br>Time:<br>Location:<br>Assigned Judge: |

## NOTICE TO ALL PARTIES AND THEIR ATTORNEYS

The policy of the Sonoma County Superior Court is:

"The formal litigation of legal claims and disputes is expensive and time consuming. The overall results achieved by some or all of the parties are often unsatisfactory. There are many modern alternatives to formal court litigation which are less expensive, less time consuming, and more beneficial to the parties. It is therefore the firm policy and goal of this court to encourage the parties in all civil cases to explore and pursue private dispute resolution alternatives at the earliest possible date." (Local Rule 16.1.)

Although most (90-98%) cases do settle, many settlements come only after a considerable amount of time, money, and resources have been expended. Such expenditures, as well as the adversarial nature of litigation, can be a disincentive to settlement. The Sonoma County Superior Court encourages the use of Alternative Dispute Resolution (ADR) as early as possible after the parties become aware of a dispute.

Most ADR processes are voluntary and are paid for by the parties themselves, but ADR has proved in many cases to be faster, cheaper, and more effective than traditional litigation.

### ADVANTAGES OF ADR:

The filing of your complaint or answer may be just the beginning of the costs that you will incur during the course of your lawsuit. Lawsuits can be extremely costly. By utilizing ADR methods early in the course of your case, you may significantly reduce these costs by either resolving the case before expensive discovery and trial proceedings are commenced or by narrowing the scope of your discovery by identifying disputed and undisputed factual and legal issues.

ADR can be a fast, economical, efficient, and effective way to resolve civil cases, and most litigants report satisfaction with the process. ADR procedures can be scheduled at your convenience and can be completed in a fraction of the time required for traditional litigation. The cost of ADR will depend on the procedure and the provider you select, and the cost is typically less than litigation.

Most ADR processes are confidential but can result in enforceable agreements. Many ADR processes will give you an opportunity to test the strengths and weaknesses of your case without adverse impact in the event of a trial. Depending upon the method of ADR you select, it may be the last chance for you to control the outcome of your dispute before you place the decision in the hands of a judge or jury.

### METHODS OF ADR:

**A. MEDIATION:** Mediation is one of the most frequently used methods of ADR because it is informal, quick, convenient and confidential. In this process the parties select a neutral mediator who facilitates the identification of issues and areas of agreement and assists in finding a resolution or settlement of the dispute. Since mediation requires the agreement of the parties to resolve the matter, control of the proceedings and a determination of the settlement terms remains completely in the parties' hands. The mediator remains neutral and assists the parties in arriving at terms that are mutually agreeable.

| PLAINTIFF/PETITIONER: | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: | |

**B. ARBITRATION:** The parties jointly employ a neutral third party or a panel of neutrals to listen to both sides and render a decision. The parties are free to make the arbitrator's decision binding or non-binding. When non-binding, the arbitrator's decision serves as guide or influence upon the parties to bring them closer to settlement. If it is binding, the decision of the arbitrator will be final and generally avoids any further proceedings in the case. Non-binding judicial arbitration may be ordered in certain cases before trial.

**C. EARLY NEUTRAL EVALUATION:** A neutral evaluator is hired by the parties to give an evaluation of the case to help settle it. You or your attorney will be permitted to prepare a written statement, present critical witnesses or other evidence, argue your case to the evaluator, meet separately and confidentially with the evaluator, and utilize the evaluator to communicate any settlement offers to the opposing party.

**D. PRIVATE SETTLEMENT CONFERENCE:** A voluntary settlement conference is similar to early neutral evaluation in that the parties employ a neutral settlement officer who attempts to persuade the parties to accept a compromise position. It is a form of facilitated negotiation in which the settlement officer may express an opinion about the value of the case, the substantive merits of each party's position, and the probable outcome of the trial.

There are various other methods or combinations of methods of ADR, such as summary jury trial, mini-trial, special master and discovery referee. The court encourages the parties to be creative in selecting the process which has the best chance of resolving the case as quickly, effectively, and inexpensively as possible. You will have a chance to review your ADR options at the time of the Early Mediation and Case Management Conference.

**The undersigned party is willing to agree to any of the following forms of ADR at this time (for family law and probate actions only). Your selection will inform the other parties in the case of your current thoughts regarding the use of ADR. If all parties agree on a particular ADR method, you will be asked to file a stipulation on the court's form. The stipulation form (Sonoma County Superior Court form #MISC-101) can be found at the court's web site and is available at the court.)**

| | | | |
|---|---|---|---|
| ☐ | Mediation | ☐ | Early Neutral Evaluation |
| ☐ | Non-binding Private Arbitration | ☐ | Binding Private Arbitration |
| ☐ | Voluntary Settlement Conference | ☐ | Summary Jury Trial |
| ☐ | Other _____ | ☐ | Judicial Arbitration |

I / We certify that I / We have read and understood (or have had explained to me / us) the foregoing.

Date: _____        _____
                                                            Signature of Party

Date: _____        _____
                                                            Signature of Party

Date: _____        _____
                                                      Signature of Attorney for Party
                                        ☐ Additional signatures are attached

**NOTE: This form requires the signatures of the parties and their attorney. All parties must complete, file and serve this form in accordance with Sonoma County Superior Court Rules, Rule 16. See Rule 16.3 for specific filing and service instructions.**

| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, state bar number, and address) | FOR COURT USE ONLY |
|---|---|
| TELEPHONE NO.:                              FAX NO. (Optional): <br> E-MAIL ADDRESS (Optional): <br> ATTORNEY FOR (Name): | |

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF SONOMA**
600 ADMINISTRATION DRIVE, ROOM 107-J
SANTA ROSA, CALIFORNIA 95403-2878

PLAINTIFF/PETITIONER:

DEFENDANT/RESPONDENT:

| **STIPULATION AND ORDER REFERRING MATTER TO ALTERNATIVE DISPUTE RESOLUTION** | CASE NUMBER: |
|---|---|
| (Check one): ☐ **UNLIMITED CASE** (Amount demanded exceeds $25,000)   ☐ **LIMITED CASE** (Amount demanded is $25,000 or less) | Date: <br> Time: <br> Location: <br> Assigned Judge: |

The parties hereby stipulate to refer the case to the following Alternate Dispute Resolution Process:

☐ Mediation                          ☐ Non-binding Private Arbitration
☐ Binding Private Arbitration        ☐ Private Settlement Conference
☐ Early Neutral Evaluation           ☐ Judicial Arbitration

The ADR process will be conducted by (name of individual): _____

Provider's Address: _____

Provider's Telephone: _____  Fax: _____  E-mail address: _____
☐ No agreement
The ADR process will be conducted on (date): _____
☐ No agreement

☐   The parties have reached agreement as to the payment of fees of ADR provider.
☐   The parties have not reached agreement as to the payment of fees of ADR provider.

_____          _____
Type or print name of ☐ Party without attorney ☐ Attorney for        **(Date and Sign)** Attorney or party without
☐ Plaintiff/Petitioner ☐ Defendant/Respondent/Contestant              attorney (Sign in blue ink)

_____          _____
Type or print name of ☐ Party without attorney ☐ Attorney for        **(Date and Sign)** Attorney or party without
☐ Plaintiff/Petitioner ☐ Defendant/Respondent/Contestant              attorney (Sign in blue ink)

☐   Additional signatures are attached

| PLAINTIFF/PETITIONER: | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: | |

## ORDER

### A REVIEW HEARING IS SCHEDULED AS FOLLOWS:

_____        _____
           Date                                    Time

All parties must appear at the Review Hearing.  In the event that the case is settled and a dismissal, a notice of settlement or a judgment is filed at least 3 court days before the scheduled Review Hearing, the Review Hearing will be dropped  and no one should appear. You must check the phone message at _____or go to http://www.SonomaSuperiorCourt.com/tentative/index.html where the tentative dispositions will be posted the day before you are scheduled to come to court to determine if you must appear.

*THE FIRST ATTORNEY OR PARTY LISTED  MUST FILE PROOF OF SERVICE OF A COPY OF THIS ORDER ON ALL PARTIES.*

_____        _____
           Date                              JUDGE OF THE SUPERIOR COURT

CM-110

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address)* | FOR COURT USE ONLY |
|---|---|

TELEPHONE NO.:                           FAX NO. *(Optional)*:

E-MAIL ADDRESS *(Optional)*:

ATTORNEY FOR *(Name)*:

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF**

STREET ADDRESS:

MAILING ADDRESS:

CITY AND ZIP CODE:

BRANCH NAME:

PLAINTIFF/PETITIONER:

DEFENDANT/RESPONDENT:

| **CASE MANAGEMENT STATEMENT** | CASE NUMBER: |
|---|---|
| (Check one): ☐ **UNLIMITED CASE** ☐ **LIMITED CASE** (Amount demanded exceeds $25,000) (Amount demanded is $25,000 or less) | |

**A CASE MANAGEMENT CONFERENCE** is scheduled as follows:

Date:                Time:                Dept.:                Div.:                Room:

Address of court *(if different from the address above)*:

**INSTRUCTIONS: All applicable boxes must be checked, and the specified information must be provided.**

1. **Party or parties** *(answer one)*:
   a. ☐  This statement is submitted by party *(name)*:
   b. ☐  This statement is submitted **jointly** by parties *(names)*:

2. **Complaint and cross-complaint** *(to be answered by plaintiffs and cross-complainants only)*
   a.     The complaint was filed on *(date)*:
   b. ☐  The cross-complaint, if any, was filed on *(date)*:

3. **Service** *(to be answered by plaintiffs and cross-complainants only)*
   a. ☐  All parties named in the complaint and cross-complaint have been served, or have appeared, or have been dismissed.
   b. ☐  The following parties named in the complaint or cross-complaint
       (1) ☐  have not been served *(specify names and explain why not)*:
       (2) ☐  have been served but have not appeared and have not been dismissed *(specify names)*:
       (3) ☐  have had a default entered against them *(specify names)*:
   c. ☐  The following additional parties may be added *(specify names, nature of involvement in case, and the date by which they may be served)*:

4. **Description of case**
   a.   Type of case in ☐ complaint  ☐ cross-complaint   *(describe, including causes of action)*:

| Form Adopted for Mandatory Use Judicial Council of California CM-110 [Rev. January 1, 2007] | **CASE MANAGEMENT STATEMENT** | Cal. Rules of Court, rules 3.720–3.730 www.courtinfo.ca.gov |
|---|---|---|

American LegalNet, Inc.
www.FormsWorkflow.com

CM-110

| PLAINTIFF/PETITIONER: | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: | |

4  b.  Provide a brief statement of the case, including any damages. *(If personal injury damages are sought, specify the injury and damages claimed, including medical expenses to date [indicate source and amount], estimated future medical expenses, lost earnings to date, and estimated future lost earnings. If equitable relief is sought, describe the nature of the relief.)*

☐  *(If more space is needed, check this box and attach a page designated as Attachment 4b.)*

5.  **Jury or nonjury trial**
The party or parties request ☐ a jury trial ☐ a nonjury trial    *(if more than one party, provide the name of each party requesting a jury trial):*

6  **Trial date**
a.  ☐ The trial has been set for *(date):*
b.  ☐ No trial date has been set. This case will be ready for trial within 12 months of the date of the filing of the complaint *(if not, explain):*

c.  Dates on which parties or attorneys will not be available for trial *(specify dates and explain reasons for unavailability):*

7  **Estimated length of trial**
The party or parties estimate that the trial will take *(check one):*
a.  ☐ days *(specify number):*
b  ☐ hours (short causes) *(specify):*

8.  **Trial representation** *(to be answered for each party)*
The party or parties will be represented at trial ☐ by the attorney or party listed in the caption ☐ by the following:
a.  Attorney:
b.  Firm:
c.  Address:
d.  Telephone number:
e.  Fax number:
f.  E-mail address:
g.  Party represented:
☐  Additional representation is described in Attachment 8.

9.  **Preference**
☐ This case is entitled to preference *(specify code section):*

10.  **Alternative Dispute Resolution (ADR)**
a.  Counsel ☐ has ☐ has not    provided the ADR information package identified in rule 3.221 to the client and has reviewed ADR options with the client.
b.  ☐ All parties have agreed to a form of ADR. ADR will be completed by *(date):*
c.  ☐ The case has gone to an ADR process *(indicate status):*

**CASE MANAGEMENT STATEMENT**

<div align="right">CM-110</div>

| PLAINTIFF/PETITIONER: | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: | |

10. d.  The party or parties are willing to participate in *(check all that apply)*:

    (1) ☐ Mediation

    (2) ☐ Nonbinding judicial arbitration under Code of Civil Procedure section 1141.12 (discovery to close 15 days before arbitration under Cal. Rules of Court, rule 3.822)

    (3) ☐ Nonbinding judicial arbitration under Code of Civil Procedure section 1141.12 (discovery to remain open until 30 days before trial; order required under Cal. Rules of Court, rule 3.822)

    (4) ☐ Binding judicial arbitration

    (5) ☐ Binding private arbitration

    (6) ☐ Neutral case evaluation

    (7) ☐ Other *(specify):*

  e.  ☐ This matter is subject to mandatory judicial arbitration because the amount in controversy does not exceed the statutory limit.

  f.  ☐ Plaintiff elects to refer this case to judicial arbitration and agrees to limit recovery to the amount specified in Code of Civil Procedure section 1141.11.

  g.  ☐ This case is exempt from judicial arbitration under rule 3.811 of the California Rules of Court *(specify exemption):*

**11. Settlement conference**

  ☐ The party or parties are willing to participate in an early settlement conference *(specify when):*

**12. Insurance**

  a.  ☐ Insurance carrier, if any, for party filing this statement *(name):*

  b.  Reservation of rights: ☐ Yes ☐ No

  c.  ☐ Coverage issues will significantly affect resolution of this case *(explain):*

**13. Jurisdiction**

Indicate any matters that may affect the court's jurisdiction or processing of this case, and describe the status.

  ☐ Bankruptcy  ☐ Other *(specify):*

Status:

**14. Related cases, consolidation, and coordination**

  a.  ☐ There are companion, underlying, or related cases.

    (1) Name of case:

    (2) Name of court:

    (3) Case number:

    (4) Status:

    ☐ Additional cases are described in Attachment 14a.

  b.  ☐ A motion to ☐ consolidate ☐ coordinate will be filed by *(name party):*

**15. Bifurcation**

  ☐ The party or parties intend to file a motion for an order bifurcating, severing, or coordinating the following issues or causes of action *(specify moving party, type of motion, and reasons):*

**16. Other motions**

  ☐ The party or parties expect to file the following motions before trial *(specify moving party, type of motion, and issues):*

---

CM-110 [Rev. January 1, 2007]    **CASE MANAGEMENT STATEMENT**    <span align="right">Page 3 of 4</span>

CM-110

| PLAINTIFF/PETITIONER: | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: | |

**17. Discovery**

a. ☐ The party or parties have completed all discovery.

b. ☐ The following discovery will be completed by the date specified (describe all anticipated discovery):

<u>Party</u>           <u>Description</u>           <u>Date</u>

c. ☐ The following discovery issues are anticipated (specify):

**18. Economic Litigation**

a. ☐ This is a limited civil case (i.e., the amount demanded is $25,000 or less) and the economic litigation procedures in Code of Civil Procedure sections 90 through 98 will apply to this case.

b. ☐ This is a limited civil case and a motion to withdraw the case from the economic litigation procedures or for additional discovery will be filed (if checked, explain specifically why economic litigation procedures relating to discovery or trial should not apply to this case):

**19. Other issues**

☐ The party or parties request that the following additional matters be considered or determined at the case management conference (specify):

**20. Meet and confer**

a. ☐ The party or parties have met and conferred with all parties on all subjects required by rule 3.724 of the California Rules of Court (if not, explain):

b. After meeting and conferring as required by rule 3.724 of the California Rules of Court, the parties agree on the following (specify):

**21. Case management orders**

Previous case management orders in this case are (check one): ☐ none ☐ attached as Attachment 21.

**22. Total number of pages attached (if any):** _____

I am completely familiar with this case and will be fully prepared to discuss the status of discovery and ADR, as well as other issues raised by this statement, and will possess the authority to enter into stipulations on these issues at the time of the case management conference, including the written authority of the party where required.

Date:

_____     ▶ _____
(TYPE OR PRINT NAME)                    (SIGNATURE OF PARTY OR ATTORNEY)

_____     ▶ _____
(TYPE OR PRINT NAME)                    (SIGNATURE OF PARTY OR ATTORNEY)

☐ Additional signatures are attached

    **CASE MANAGEMENT STATEMENT**    

# NOTICE

## SONOMA COUNTY SUPERIOR COURT
## CIVIL DIVISION PRO TEM JUDGE PROGRAM

This is to advise that the Civil Division's Pro Tem Judge Program is available to those civil litigants who wish to expedite trial by stipulating to the use of an attorney to serve as Pro Tem Judge. The court maintains a Pro Tem Judge panel, which consists of attorneys sworn by the Court and willing to serve in this capacity. Parties may stipulate to a trial by a Pro Tem Judge of their choice and may inform the Court of such a stipulation by contacting Connie Origer, the Pro Tem Judge Program Coordinator, at (707) 565-6430.

The Program offers three primary benefits to litigants: (1) the date and location of trial can often be scheduled by stipulation of the parties; (2) the trial will take place on the agreed date for trial, thus eliminating the need to trail other cases, and; (3) the trial can be scheduled for full days on a 5 day per week basis, thus shortening the time to try the case. The Program is available for both jury and court trials.

For cases that are tried in 5 days or less (9:00 a.m. to 5:00 p.m., jury or non-jury), the Pro Tem Judge serves at no cost to the parties. For trials that exceed 5 days in length, the parties and the Pro Tem Judge are obliged to agree to a daily fee, not to exceed $1,200 per day, for each full or partial day of trial beginning with the 6th day of trial. Additionally, the Court will charge the parties $656.72 for each day of trial for the Clerk and Court Reporter. The Court discourages the use of overtime and will charge an additional cost of $123.14 for each hour or portion thereof exceeding 8 hours in any day. The parties are also responsible for the payment of jury fees as in any other civil case. Cases in which there are fee waivers are eligible for the Program.

The Court is enthusiastic about this Program and urges all counsel to discuss the availability of the Program and the feasibility of its use with opposing counsel. Counsel must also obtain permission from clients to participation in the Program. To participate in the Program, contact Ms. Origer as soon as possible to discuss trial dates. Ms. Origer will generate and mail all required stipulations and orders with respect to the Program. Parties may obtain additional information on this program by contacting Ms. Origer or by reviewing the court's website at www.sonomasuperiorcourt.com.

Plaintiff is ordered to serve this Notice on all parties and to certify by proof of service filed with the Court that such service has been accomplished within 60 days of the filing of the Complaint.

---

CV-41, New 1/1/07    **PETALUMA PRO TEM JUDGE PROGRAM NOTICE**

| ATTORNEY OR PARTY WITHOUT ATTORNEY (*Name & Address*): | *FOR COURT USE ONLY* |
|---|---|
| Telephone No.:                FAX No.: | |
| ATTORNEY FOR (Name):                Bar No. | |
| **SUPERIOR COURT OF CALIFORNIA, COUNTY OF SONOMA**<br>600 Administration Drive<br>Santa Rosa, CA  95403<br>Telephone:  (707) 521-6500 | |
| PLAINTIFF(S)/PETITIONER(S): | |
| DEFENDANT(S)/RESPONDENT(S): | CASE NUMBER: |

## NOTICE OF SELECTION AS MEDIATOR IN COURT-CONNECTED MEDIATION
### (Sonoma County Superior Court Local Rule 16)

**Name of Mediator Selected:** _____

    **PLEASE TAKE NOTICE** that the above-referenced matter is subject to Sonoma County Superior Court Local Rule 16 (Rules Applicable to Alternative Dispute Resolution (ADR)).  The parties have selected you to serve as the mediator in this matter.  Sonoma County Superior Court has a voluntary, market rate mediation program.  All mediations conducted in cases covered by Local Rule 16 are court-connected mediations and are subject to the provisions of California Rules of Court, Rules 3.850 et seq. It is your obligation to familiarize yourself with Local Rule 16 and California Rules of Court, Rules 3.850 et seq. before the mediation. **PLEASE NOTE:** you are required to have the parties complete an Attendance Sheet for Court-Program Mediation of Civil Case (Alternative Dispute Resolution) (Judicial Council form ADR-107) in accordance with California Rules of Court Rule 3.860.  The form is available at the web site of the California Courts www.courtinfo.ca.gov.

    If you are not a member of the Sonoma County Superior Court panel of mediators, in order to serve as mediator in this case, you must complete the acceptance below (see CRC Rule 3.851(a) (2)), sign it in the space provided, and file the completed Notice *with your original signature* with the Court not less than five days before commencement of the mediation. Please also provide a courtesy copy of the completed and signed Notice to the ADR Program Coordinator, 1450 Guerneville Road, Building G, Santa Rosa, California 95403 or by facsimile transmission to (707) 565-7059.

    If you are mediating a case referred to court-connected mediation during calendar year 2007, regardless of the date of the mediation, you are required to complete and return a Mediator's Questionnaire (Sonoma County Superior Court Local form CV-36) within five (5) days after completion or other termination of the mediation.  The completed questionnaire may be mailed or faxed to ADR Program Coordinator at the above address or FAX number.  The plaintiff should provide the Mediator's Questionnaire to you. The questionnaire is also available on the web site of the Sonoma County Superior Court www.sonomasuperiorcourt.com.

    If you have any questions regarding your selection or service as a mediator in this matter or about the Sonoma County Superior Court ADR Program, please feel free to contact the ADR Program Coordinator at (707) 565-7000 or ADR@sonomacourt.org.

### MEDIATOR'S ACCEPTANCE

I, _____ hereby agree to mediate the above-captioned matter subject to
        (print name)

the conditions stated in this notice.

Dated: _____    _____
                                      (Mediator's Signature)

CM-015

| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address):<br>Laurie Marie Laskey<br>120 Briar Hollow Dr<br>Jacksonville NC 28540<br><br>TELEPHONE NO.: 910-548-3345    FAX NO. (Optional):<br>E-MAIL ADDRESS (Optional):<br>ATTORNEY FOR (Name): | FOR COURT USE ONLY<br><br>**ENDORSED**<br>**FILED**<br><br>JAN 3 0 2008<br><br>SUPERIOR COURT OF CALIFORNIA<br>COUNTY OF SONOMA |
|---|---|

SUPERIOR COURT OF CALIFORNIA, COUNTY OF Sonoma
STREET ADDRESS: 600 Administration Drive
MAILING ADDRESS:
CITY AND ZIP CODE: Santa Rosa CA 95403
BRANCH NAME: civil

| PLAINTIFF/PETITIONER: Laurie Marie Laskey<br><br>DEFENDANT/RESPONDENT: Microsoft Corporation | CASE NUMBER: 5CV 242287 |
|---|---|
| | JUDICIAL OFFICER: |
| **NOTICE OF RELATED CASE** | DEPT.: |

*Identify, in chronological order according to date of filing, all cases related to the case referenced above.*

1.  a. Title: SCIF, McClures Construction Electric
    b. Case number: SRO 0125983
    c. Court: ☐ same as above
        ☑ other state or federal court *(name and address):* WCAB PO BOX 420807 S.F. CA. 94142
    d. Department:
    e. Case type: ☐ limited civil ☐ unlimited civil ☐ probate ☐ family law ☑ other *(specify):* WCAB
    f. Filing date: 05-08-03
    g. Has this case been designated or determined as "complex?" ☐ Yes ☑ No
    h. Relationship of this case to the case referenced above *(check all that apply):*
        ☑ involves the same parties and is based on the same or similar claims.
        ☑ arises from the same or substantially identical transactions, incidents, or events requiring the determination of the same or substantially identical questions of law or fact.
        ☑ involves claims against, title to, possession of, or damages to the same property.
        ☑ is likely for other reasons to require substantial duplication of judicial resources if heard by different judges.
            ☐ Additional explanation is attached in attachment 1h
    i. Status of case:
        ☑ pending
        ☐ dismissed ☐ with ☐ without prejudice
        ☐ disposed of by judgment

2.  a. Title: WCAB, SCIF, McClures Construction and Electric Company
    b. Case number: A1 19225 Div2
    c. Court: ☐ same as above
        ☑ other state or federal court *(name and address):* 1st Dist Court of Appeals 350 McAllister St S.F. CA
    d. Department: civil

Page 1 of 3

| Form Approved for Optional Use<br>Judicial Council of California<br>CM-015 [Rev. July 1, 2007] | **NOTICE OF RELATED CASE** | Cal. Rules of Court, rule 3.300<br>www.courtinfo.ca.gov |
|---|---|---|
| | | American LegalNet, Inc.<br>www.FormsWorkflow.com |

**CM-015**

| PLAINTIFF/PETITIONER: Laurie Marie Laskey | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: Microsoft Corporation | |

**2. (continued)**

e. Case type: ☐ limited civil  ☐ unlimited civil  ☐ probate  ☐ family law  ☑ other (specify): WCAB

f. Filing date: 10-01-07

g. Has this case been designated or determined as "complex"?  ☐ Yes  ☑ No

h. Relationship of this case to the case referenced above (check all that apply):

   ☑ involves the same parties and is based on the same or similar claims.

   ☑ arises from the same or substantially identical transactions, incidents, or events requiring the determination of
   the same or substantially identical questions of law or fact.

   ☑ involves claims against, title to, possession of, or damages to the same property.

   ☑ is likely for other reasons to require substantial duplication of judicial resources if heard by different judges.

      ☐ Additional explanation is attached in attachment 2h

i. Status of case:

   ☐ pending

   ☐ dismissed  ☐ with  ☐ without prejudice

   ☑ disposed of by judgment

**3.** a. Title: WCAB, SCIF, McClures Construction and Electric Company

   b. Case number: S159155

   c. Court: ☐ same as above

      ☑ other state or federal court (name and address): Supreme Court 350 McAllister St S.F. CA 94102

   d. Department: civil

   e. Case type: ☐ limited civil  ☐ unlimited civil  ☐ probate  ☐ family law  ☑ other (specify): WCAB

   f. Filing date: 12-18-07

   g. Has this case been designated or determined as "complex"?  ☐ Yes  ☑ No

   h. Relationship of this case to the case referenced above (check all that apply):

      ☑ involves the same parties and is based on the same or similar claims.

      ☑ arises from the same or substantially identical transactions, incidents, or events requiring the determination of
      the same or substantially identical questions of law or fact.

      ☑ involves claims against, title to, possession of, or damages to the same property.

      ☑ is likely for other reasons to require substantial duplication of judicial resources if heard by different judges.

         ☐ Additional explanation is attached in attachment 3h

   i. Status of case:

      ☑ pending

      ☐ dismissed  ☐ with  ☐ without prejudice

      ☐ disposed of by judgment

**4.** ☐ Additional related cases are described in Attachment 4. Number of pages attached: _____

Date: 1-22-2008

Laurie Marie Laskey
(TYPE OR PRINT NAME OF PARTY OR ATTORNEY)

▶ _Laurie Marie Laskey_
(SIGNATURE OF PARTY OR ATTORNEY)

CM-015

| PLAINTIFF/PETITIONER: Laurie Marie Laskey | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: Microsoft Corporation | |

## PROOF OF SERVICE BY FIRST-CLASS MAIL
### NOTICE OF RELATED CASE

*(NOTE: You cannot serve the Notice of Related Case if you are a party in the action. The person who served the notice must complete this proof of service. The notice must be served on all known parties in each related action or proceeding.)*

1. I am at least 18 years old and not a party to this action. I am a resident of or employed in the county where the mailing took place, and my residence or business address is *(specify)*:

2. I served a copy of the *Notice of Related Case* by enclosing it in a sealed envelope with first-class postage fully prepaid and *(check one)*:
   a. ☐ deposited the sealed envelope with the United States Postal Service.
   b. ☐ placed the sealed envelope for collection and processing for mailing, following this business's usual practices, with which I am readily familiar. On the same day correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service.

3. The *Notice of Related Case* was mailed:
   a. on *(date)*:
   b. from *(city and state)*:

4. The envelope was addressed and mailed as follows:
   a. Name of person served:

      Street address:
      City:
      State and zip code:

   b. Name of person served:

      Street address:
      City:
      State and zip code:

   c. Name of person served:

      Street address:
      City:
      State and zip code:

   d. Name of person served:

      Street address:
      City:
      State and zip code:

   ☐ Names and addresses of additional persons served are attached. *(You may use form POS-030(P).)*

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date:

_____          ▶          _____
(TYPE OR PRINT NAME OF DECLARANT)                          (SIGNATURE OF DECLARANT)

Form PLD-PI-001

Item #14

Plaintiff prays for judgment for costs of suit; for such relief as is fair, just, and equitable; and for:

a. (2) of (2) ___ᴠ___ in the amount of: $ A + B = C (C x D) = Judgement

A = Net worth of the company and or companies involved.

B = What the company and or companies insurance allows.

A + B = C

D = The number of years it has been happening to me and or effected my life.

C x D = Judgement

Or as the courts deem fit, they are a going concern and I am disabled because of it.

**EXHIBIT B**

1  LESLIE N. HARVEY (State Bar No. 241203)
   HELLER EHRMAN LLP
2  333 Bush Street
   San Francisco, California 94104-2878
3  Telephone: (415) 772-6000
   Facsimile: (415) 772-6268
4  Email: Leslie.Harvey@hellerehrman.com

5  Attorneys for Defendant
   MICROSOFT CORPORATION

6

7

8              SUPERIOR COURT OF CALIFORNIA

9                  COUNTY OF SONOMA

10  LAURIE MARIE LASKEY,                    | Case No. SCV 242287
                                            | UNLIMITED JURISDICTION
11              Plaintiff,                   |
                                            | NOTICE TO STATE COURT OF
12  v.                                       | FILING OF NOTICE OF
                                            | REMOVAL
13  MICROSOFT CORPORATION, and DOES 1        |
    through 1000,                            |
14                                           |
                Defendants.                  |
15

16

17

18

19

20

21

22

23

24

25

26

27

Heller
Ehrman LLP   28
                              1
             NOTICE TO STATE COURT OF FILING OF NOTICE OF REMOVAL:
             Case No. SCV 242287

1 **TO THE CLERK OF THE SUPERIOR COURT OF THE STATE OF CALIFORNIA FOR THE COUNTY OF SONOMA, AND TO PLAINTIFF LAURIE MARIE**
2 **LASKEY:**

3 PLEASE TAKE NOTICE that on March 17, 2008, Defendant Microsoft Corporation

4 ("Microsoft") filed a Notice of Removal removing the above-captioned matter from the

5 Superior Court of the State of California for the County of Sonoma to the United States

6 District Court for the Northern District of California.  A true and correct copy of said Notice

7 of Removal is attached hereto as Exhibit 1 and is incorporated herein by reference.

8 Pursuant to 28 U.S.C. § 1446, the filing of the attached Notice of Removal with the

9 United States District Court effects the removal of this action.  The above-captioned Court

10 may proceed no further unless and until the case is remanded.

11

12 Dated: March 17, 2008                    HELLER EHRMAN LLP

13

14 By:
15 LESLIE N. HARVEY
   Attorneys for Defendant
16 MICROSOFT CORPORATION

17
18
19
20
21
22
23
24
25
26
27

Heller
Ehrman LLP   28

NOTICE TO STATE COURT OF FILING OF NOTICE OF REMOVAL:
Case No. SCV 242287

**EXHIBIT C**

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

## FORM 10-Q

☒ **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the Quarterly Period Ended December 31, 2007

**OR**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the Transition Period From              to

Commission File Number: 0-14278

# MICROSOFT CORPORATION
### (Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Washington**<br>(State or other jurisdiction of<br>incorporation or organization) | **91-1144442**<br>(I.R.S. Employer<br>Identification No.) |
| **One Microsoft Way, Redmond, Washington**<br>(Address of principal executive offices) | **98052-6399**<br>(Zip Code) |

**(425) 882-8080**
(Registrant's telephone number, including area code)

**None**
(Former name, former address and former fiscal year, if changed since last report)

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes ☒   No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, or a non-accelerated filer. See definition of "accelerated filer and large accelerated filer" in Rule 12b-2 of the Exchange Act.

Large accelerated filer ☒          Accelerated filer ☐          Non-accelerated filer ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).   Yes ☐   No ☒

Indicate the number of shares outstanding of each of the issuer's classes of common stock, as of the latest practicable date.

| Class | Outstanding at January 21, 2008 |
|---|---|
| Common Stock, $0.00000625 par value per share | 9,306,979,746 shares |

**MICROSOFT CORPORATION**

**FORM 10-Q**

**For the Quarter Ended December 31, 2007**

**INDEX**

|  |  |  | Page |
|---|---|---|---|
| **Part I.** | **Financial Information** | | |
| Item 1. | Financial Statements | | |
| | a) | Income Statements for the Three and Six Months Ended December 31, 2007 and 2006 | 1 |
| | b) | Balance Sheets as of December 31, 2007 and June 30, 2007 | 2 |
| | c) | Cash Flows Statements for the Three and Six Months Ended December 31, 2007 and 2006 | 3 |
| | d) | Stockholders' Equity Statements for the Three and Six Months Ended December 31, 2007 and 2006 | 4 |
| | e) | Notes to Financial Statements | 5 |
| | f) | Report of Independent Registered Public Accounting Firm | 15 |
| Item 2. | Management's Discussion and Analysis of Financial Condition and Results of Operations | | 16 |
| Item 3. | Quantitative and Qualitative Disclosures About Market Risk | | 27 |
| Item 4. | Controls and Procedures | | 28 |
| **Part II.** | **Other Information** | | |
| Item 1. | Legal Proceedings | | 29 |
| Item 1A. | Risk Factors | | 29 |
| Item 2. | Unregistered Sales of Equity Securities and Use of Proceeds | | 32 |
| Item 4. | Submission of Matters to a Vote of Security Holders | | 33 |
| Item 6. | Exhibits | | 34 |
| **Signature** | | | 35 |

**Part 1. Financial Information**

**Item 1. Financial Statements**

## MICROSOFT CORPORATION

### INCOME STATEMENTS
**(In millions, except per share amounts)(Unaudited)**

| | Three Months Ended December 31, | | Six Months Ended December 31, | |
|---|---|---|---|---|
| | 2007 | 2006 | 2007 | 2006 |
| Revenue ........................................ | $16,367 | $12,542 | $30,129 | $23,353 |
| Operating expenses: | | | | |
| Cost of revenue ........................... | 3,543 | 3,620 | 6,218 | 5,316 |
| Research and development.............. | 1,885 | 1,637 | 3,722 | 3,423 |
| Sales and marketing ..................... | 3,392 | 2,999 | 6,006 | 5,190 |
| General and administrative ............ | 1,066 | 814 | 1,784 | 1,478 |
| Total operating expenses .......... | 9,886 | 9,070 | 17,730 | 15,407 |
| Operating income ........................... | 6,481 | 3,472 | 12,399 | 7,946 |
| Investment income and other.............. | 339 | 333 | 637 | 900 |
| Income before income taxes .............. | 6,820 | 3,805 | 13,036 | 8,846 |
| Provision for income taxes................. | 2,113 | 1,179 | 4,040 | 2,742 |
| Net income ................................... | $ 4,707 | $ 2,626 | $ 8,996 | $ 6,104 |
| Earnings per share: | | | | |
| Basic......................................... | $ 0.50 | $ 0.27 | $ 0.96 | $ 0.62 |
| Diluted ..................................... | $ 0.50 | $ 0.26 | $ 0.95 | $ 0.61 |
| Weighted average shares outstanding: | | | | |
| Basic......................................... | 9,361 | 9,806 | 9,370 | 9,867 |
| Diluted ..................................... | 9,503 | 9,942 | 9,519 | 9,996 |
| Cash dividends declared per common share........ | $ 0.11 | $ 0.10 | $ 0.22 | $ 0.20 |

See accompanying notes.

1

## MICROSOFT CORPORATION
## BALANCE SHEETS
### (In millions)

| | December 31, 2007 (Unaudited) | June 30, 2007(1) |
|---|---|---|
| **Assets** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 7,460 | $ 6,111 |
| Short-term investments (including securities pledged as collateral of $1,984 and $2,356) | 13,616 | 17,300 |
| Total cash, cash equivalents, and short-term investments | 21,076 | 23,411 |
| Accounts receivable, net of allowance for doubtful accounts of $149 and $117 | 11,621 | 11,338 |
| Inventories, net | 755 | 1,127 |
| Deferred income taxes | 1,483 | 1,899 |
| Other | 2,840 | 2,393 |
| Total current assets | 37,775 | 40,168 |
| Property and equipment, net | 4,965 | 4,350 |
| Equity and other investments | 9,413 | 10,117 |
| Goodwill | 10,309 | 4,760 |
| Intangible assets, net | 1,717 | 878 |
| Deferred income taxes | 1,200 | 1,389 |
| Other long-term assets | 1,960 | 1,509 |
| Total assets | $ 67,339 | $ 63,171 |
| **Liabilities and stockholders' equity** | | |
| Current liabilities: | | |
| Accounts payable | $ 3,612 | $ 3,247 |
| Accrued compensation | 1,977 | 2,325 |
| Income taxes | 863 | 1,040 |
| Short-term unearned revenue | 10,221 | 10,779 |
| Securities lending payable | 2,166 | 2,741 |
| Other | 3,219 | 3,622 |
| Total current liabilities | 22,058 | 23,754 |
| Long-term unearned revenue | 1,957 | 1,867 |
| Other long-term liabilities | 8,893 | 6,453 |
| Commitments and contingencies | | |
| Stockholders' equity: | | |
| Common stock and paid-in capital—shares authorized 24,000; outstanding 9,329 and 9,380 | 62,528 | 60,557 |
| Retained deficit, including accumulated other comprehensive income of $1,628 and $1,654 | (28,097) | (29,460) |
| Total stockholders' equity | 34,431 | 31,097 |
| Total liabilities and stockholders' equity | $ 67,339 | $ 63,171 |

(1) Derived from audited financial statements.

See accompanying notes.

2

## MICROSOFT CORPORATION

## CASH FLOWS STATEMENTS
### (In millions)(Unaudited)

| | Three Months Ended December 31, | | Six Months Ended December 31, | |
|---|---|---|---|---|
| | 2007 | 2006 | 2007 | 2006 |
| **Operations** | | | | |
| Net income .......................................................... | $ 4,707 | $ 2,626 | $ 8,996 | $ 6,104 |
| Depreciation, amortization, and other noncash items ............ | 481 | 365 | 916 | 614 |
| Stock-based compensation expense ................................ | 360 | 437 | 693 | 893 |
| Net recognized gains on investments ............................. | (134) | (29) | (321) | (235) |
| Excess tax benefits from stock-based payment arrangements ....... | (33) | (8) | (102) | (48) |
| Deferred income taxes ............................................ | 323 | (517) | 680 | (351) |
| Unearned revenue ................................................. | 5,995 | 6,029 | 9,816 | 9,246 |
| Recognition of unearned revenue .................................. | (5,368) | (4,265) | (10,333) | (8,315) |
| Accounts receivable .............................................. | (2,586) | (2,945) | 220 | (444) |
| Other current assets ............................................. | 445 | 723 | 210 | (357) |
| Other long-term assets ........................................... | (55) | (264) | (66) | (399) |
| Other current liabilities ........................................ | 325 | (354) | (864) | (1,196) |
| Other long-term liabilities ...................................... | 107 | 244 | 600 | 591 |
| Net cash from operations ......................................... | 4,567 | 2,042 | 10,445 | 6,103 |
| **Financing** | | | | |
| Common stock issued .............................................. | 2,335 | 4,449 | 2,981 | 4,834 |
| Common stock repurchased ......................................... | (4,057) | (5,797) | (6,987) | (13,480) |
| Common stock cash dividends ...................................... | (1,034) | (980) | (1,972) | (1,877) |
| Excess tax benefits from stock-based payment arrangements ........ | 33 | 8 | 102 | 48 |
| Other ............................................................ | — | (3) | — | (23) |
| Net cash used in financing ....................................... | (2,723) | (2,323) | (5,876) | (10,498) |
| **Investing** | | | | |
| Additions to property and equipment ............................. | (695) | (572) | (1,205) | (983) |
| Acquisition of companies, net of cash acquired .................. | (433) | (125) | (5,829) | (461) |
| Purchases of investments ......................................... | (6,317) | (9,102) | (12,314) | (21,957) |
| Maturities of investments ........................................ | 470 | 1,325 | 800 | 2,159 |
| Sales of investments ............................................. | 6,696 | 7,448 | 15,816 | 26,149 |
| Securities lending payable ....................................... | (770) | (932) | (574) | (404) |
| Net cash from/(used in) investing ................................ | (1,049) | (1,958) | (3,306) | 4,503 |
| Effect of exchange rates on cash and cash equivalents ........... | 28 | 22 | 86 | 37 |
| Net change in cash and cash equivalents .......................... | 823 | (2,217) | 1,349 | 145 |
| Cash and cash equivalents, beginning of period ................... | 6,637 | 9,076 | 6,111 | 6,714 |
| Cash and cash equivalents, end of period ......................... | $ 7,460 | $ 6,859 | $ 7,460 | $ 6,859 |

See accompanying notes.

3

# MICROSOFT CORPORATION

## STOCKHOLDERS' EQUITY STATEMENTS
### (In millions)(Unaudited)

| | Three Months Ended December 31, | | Six Months Ended December 31, | |
|---|---|---|---|---|
| | 2007 | 2006 | 2007 | 2006 |
| **Common stock and paid-in capital** | | | | |
| Balance, beginning of period ............................................ | $ 60,699 | $ 57,657 | $ 60,557 | $ 59,005 |
| Common stock issued ...................................................... | 2,380 | 4,436 | 3,035 | 4,834 |
| Common stock repurchased .............................................. | (805) | (1,232) | (1,621) | (3,106) |
| Stock-based compensation expense ................................... | 360 | 437 | 693 | 893 |
| Stock option income tax deficiencies................................. | (106) | (147) | (193) | (481) |
| Other, net ...................................................................... | — | 1 | 57 | 7 |
| Balance, end of period .................................................. | 62,528 | 61,152 | 62,528 | 61,152 |
| **Retained deficit** | | | | |
| Balance, beginning of period ............................................ | (28,564) | (21,556) | (29,460) | (18,901) |
| Cumulative effect of a change in accounting principle – adoption of FIN 48 (1) | — | — | (395) | — |
| Cumulative effect of a change in accounting principle – adoption of EITF 06-2 (1) | — | — | (17) | — |
| Net income.................................................................... | 4,707 | 2,626 | 8,996 | 6,104 |
| Other comprehensive income: | | | | |
| Net gains/(losses) on derivative instruments ............... | 137 | (1) | 49 | (28) |
| Net unrealized investments gains/(losses)..................... | (78) | 184 | (164) | 337 |
| Translation adjustments and other ................................ | 39 | 35 | 89 | 44 |
| Comprehensive income ................................................. | 4,805 | 2,844 | 8,970 | 6,457 |
| Common stock cash dividends .......................................... | (1,031) | (974) | (2,060) | (1,949) |
| Common stock repurchased .............................................. | (3,307) | (4,832) | (5,135) | (10,125) |
| Balance, end of period .................................................. | (28,097) | (24,518) | (28,097) | (24,518) |
| Total stockholders' equity................................................ | $ 34,431 | $ 36,634 | $ 34,431 | $ 36,634 |

(1) See Note 1 of Notes to Financial Statements.

See accompanying notes.

4

## MICROSOFT CORPORATION
### NOTES TO FINANCIAL STATEMENTS
#### (Unaudited)

### Note 1 – Basis of Presentation and Consolidation and Recent Accounting Pronouncements

#### Basis of Presentation

In the opinion of management, the accompanying balance sheets and related interim statements of income, cash flows, and stockholders' equity include all adjustments, consisting only of normal recurring items, necessary for their fair presentation in conformity with accounting principles generally accepted in the United States of America ("U.S. GAAP"). Preparing financial statements requires management to make estimates and assumptions that affect the reported amounts of assets, liabilities, revenue, and expenses. Examples include: estimates of loss contingencies, product warranties, product life cycles, product returns, and stock-based compensation forfeiture rates; assumptions such as the elements comprising a software arrangement, including the distinction between upgrades/enhancements and new products; when technological feasibility is achieved for our products; the potential outcome of future tax consequences of events that have been recognized in our financial statements or tax returns; estimating the fair value and/or goodwill impairment for our reporting units; and determining when investment impairments are other-than-temporary. Actual results and outcomes may differ from management's estimates and assumptions.

Interim results are not necessarily indicative of results for a full year. The information included in this Form 10-Q should be read in conjunction with information included in the Microsoft Corporation 2007 Form 10-K.

#### Basis of Consolidation

The financial statements include the accounts of Microsoft Corporation and its subsidiaries. Intercompany transactions and balances have been eliminated. Equity investments in which we exercise significant influence but do not exercise control and are not the primary beneficiary are accounted for using the equity method. Investments in which we are not able to exercise significant influence over the investee or which do not have readily determinable fair values are accounted for under the cost method.

#### Recent Accounting Pronouncements

In December 2007, the Financial Accounting Standards Board ("FASB") issued Statement of Financial Accounting Standards ("SFAS") No. 141 (revised 2007), *Business Combinations*, which replaces SFAS No 141. The statement retains the purchase method of accounting for acquisitions, but requires a number of changes, including changes in the way assets and liabilities are recognized in the purchase accounting. It also changes the recognition of assets acquired and liabilities assumed arising from contingencies, requires the capitalization of in-process research and development at fair value, and requires the expensing of acquisition-related costs as incurred. SFAS No. 141R is effective for us beginning July 1, 2009 and will apply prospectively to business combinations completed on or after that date.

In December 2007, the FASB issued SFAS No. 160, *Noncontrolling Interests in Consolidated Financial Statements, an amendment of ARB 51*, which changes the accounting and reporting for minority interests. Minority interests will be recharacterized as noncontrolling interests and will be reported as a component of equity separate from the parent's equity, and purchases or sales of equity interests that do not result in a change in control will be accounted for as equity transactions. In addition, net income attributable to the noncontrolling interest will be included in consolidated net income on the face of the income statement and, upon a loss of control, the interest sold, as well as any interest retained, will be recorded at fair value with any gain or loss recognized in earnings. SFAS No. 160 is effective for us beginning July 1, 2009 and will apply prospectively, except for the presentation and disclosure requirements, which will apply retrospectively. We are currently assessing the potential impact that adoption of SFAS No. 160 would have on our financial statements.

On July 1, 2007, we adopted the provisions of FASB Interpretation No. 48 ("FIN 48"), *Accounting for Uncertainty in Income Taxes – an interpretation of FASB Statement No. 109*, which provides a financial statement recognition threshold and measurement attribute for a tax position taken or expected to be taken in a tax return. Under FIN 48, we may recognize the tax benefit from an uncertain tax position only if it is more likely than not that the tax position will be sustained on examination by the taxing authorities, based on the technical merits of the position. The tax benefits recognized in the financial statements from such a position should be measured based on the largest benefit that has a greater than 50% likelihood of being realized upon ultimate settlement. FIN 48 also provides guidance on derecognition of income tax assets and liabilities, classification of current and deferred income tax assets and liabilities, accounting for interest and penalties associated with tax positions, and income tax disclosures. Upon adoption, we recognized a $395 million charge to our beginning retained deficit as a cumulative effect of a change in accounting principle. See Note 13 – Income Taxes.

On July 1, 2007, we adopted Emerging Issues Task Force Issue No. 06-2 ("EITF 06-2"), *Accounting for Sabbatical Leave and Other Similar Benefits Pursuant to FASB Statement No. 43*. EITF 06-2 requires companies to accrue the costs of compensated

**MICROSOFT CORPORATION**

NOTES TO FINANCIAL STATEMENTS – (Continued)

*(Unaudited)*

absences under a sabbatical or similar benefit arrangement over the requisite service period. Upon adoption, we recognized a $17 million charge to our beginning retained deficit as a cumulative effect of a change in accounting principle.

In February 2007, the FASB issued SFAS No. 159, *The Fair Value Option for Financial Assets and Financial Liabilities.* SFAS No. 159 gives us the irrevocable option to carry many financial assets and liabilities at fair values, with changes in fair value recognized in earnings. SFAS No. 159 is effective for us beginning July 1, 2008, although early adoption is permitted. We are currently assessing the potential impact that electing fair value measurement would have on our financial statements and have not determined what election we will make.

In September 2006, the FASB issued SFAS No. 157, *Fair Value Measurements*, which defines fair value, establishes a framework for measuring fair value in generally accepted accounting principles, and expands disclosures about fair value measurements. This statement does not require any new fair value measurements, but provides guidance on how to measure fair value by providing a fair value hierarchy used to classify the source of the information. SFAS No. 157 is effective for us beginning July 1, 2008. In December 2007, the FASB released a proposed FASB Staff Position (FSP FAS 157-b—*Effective Date of FASB Statement No. 157*) which, if adopted as proposed, would delay the effective date of SFAS No. 157 for all nonfinancial assets and nonfinancial liabilities, except those that are recognized or disclosed at fair value in the financial statements on a recurring basis (at least annually). We are currently assessing the potential impact that adoption of this statement would have on our financial statements.

**Note 2 – Inventories**

Components of inventories were as follows:

| (In millions) | December 31, 2007 | June 30, 2007 |
|---|---|---|
| Raw materials | $241 | $ 435 |
| Work in process | 77 | 148 |
| Finished goods | 437 | 544 |
| Inventories | $755 | $1,127 |

**Note 3 – Earnings Per Share**

Basic earnings per share is computed on the basis of the weighted average number of shares of common stock outstanding during the period. Diluted earnings per share is computed on the basis of the weighted average number of shares of common stock plus the effect of dilutive potential common shares outstanding during the period using the treasury stock method. Dilutive potential common shares include outstanding stock options, stock awards, and shared performance stock awards.

Components of basic and diluted earnings per share were as follows:

| (In millions, except earnings per share) | Three Months Ended December 31, | | Six Months Ended December 31, | |
|---|---|---|---|---|
| | 2007 | 2006 | 2007 | 2006 |
| Net income available for common shareholders (A) | $4,707 | $ 2,626 | $8,996 | $ 6,104 |
| Weighted average outstanding shares of common stock (B) | 9,361 | 9,806 | 9,370 | 9,867 |
| Dilutive effect of employee stock options and awards | 142 | 136 | 149 | 129 |
| Common stock and common stock equivalents (C) | 9,503 | 9,942 | 9,519 | 9,996 |
| Earnings per share: | | | | |
| Basic (A/B) | $ 0.50 | $ 0.27 | $ 0.96 | $ 0.62 |
| Diluted (A/C) | $ 0.50 | $ 0.26 | $ 0.95 | $ 0.61 |

The following shares attributable to outstanding stock options were excluded from the calculation of diluted earnings per share because their inclusion would have been anti-dilutive. In addition, the following shared performance stock awards have been excluded from the calculation of diluted earnings per share because the number of shares ultimately issued is contingent on our performance against metrics established for the performance period.

**MICROSOFT CORPORATION**

NOTES TO FINANCIAL STATEMENTS – (Continued)

*(Unaudited)*

| (In millions) | Three Months Ended December 31, | | Six Months Ended December 31, | |
|---|---|---|---|---|
| | 2007 | 2006 | 2007 | 2006 |
| Shares excluded from calculation of diluted EPS | 71 | 240 | 77 | 266 |
| Shared performance stock awards excluded from calculation of diluted EPS | — | 10 | — | 10 |

### Note 4 – Unearned Revenue

The components of unearned revenue were as follows:

| (In millions) | December 31, 2007 | June 30, 2007 |
|---|---|---|
| Volume licensing programs | $ 9,145 | $ 9,334 |
| Undelivered elements | 1,650 | 1,839 |
| Other | 1,383 | 1,473 |
| Unearned revenue | $12,178 | $12,646 |

Unearned revenue by segment was as follows:

| (In millions) | December 31, 2007 | June 30, 2007 |
|---|---|---|
| Client | $ 2,620 | $ 2,875 |
| Server and Tools | 3,746 | 3,652 |
| Microsoft Business Division | 5,359 | 5,771 |
| Other | 453 | 348 |
| Unearned revenue | $12,178 | $12,646 |

### Note 5 – Stockholders' Equity

#### Share Repurchases

On July 20, 2006, we announced that our Board of Directors authorized two new share repurchase programs: a $20.0 billion tender offer that was completed on August 17, 2006 and authorization for up to an additional $20.0 billion ongoing share repurchase program with an expiration of June 30, 2011. Under the tender offer, we repurchased approximately 155 million shares of common stock, or 1.5% of our common shares outstanding, for approximately $3.8 billion at a price per share of $24.75. On August 18, 2006, we announced that the authorization for the $20.0 billion ongoing share repurchase program had been increased by approximately $16.2 billion. As a result, we are authorized to repurchase additional shares in an amount up to $36.2 billion through June 30, 2011. As of December 31, 2007, approximately $8.7 billion remained of the $36.2 billion approved repurchase amount. All repurchases were made using cash resources. The repurchase program may be suspended or discontinued at any time without notice.

We repurchased the following shares of common stock under the above-described repurchase plans:

| (In millions) | Three Months Ended December 31, | | Six Months Ended December 31, | |
|---|---|---|---|---|
| | 2007 | 2006 | 2007 | 2006 |
| Shares of common stock repurchased | 120 | 205 | 200 | 491 |
| Value of common stock repurchased | $4,081 | $6,037 | $ 6,429 | $12,989 |

# MICROSOFT CORPORATION
## NOTES TO FINANCIAL STATEMENTS – (Continued)
### *(Unaudited)*

### Dividends

Our Board of Directors declared the following dividends:

| Declaration Date | Per Share Dividend | Record Date | Total Amount (in millions) | Payment Date |
|---|---|---|---|---|
| *(Fiscal year 2008)* | | | | |
| September 12, 2007 | $0.11 | November 15, 2007 | $1,034 | December 13, 2007 |
| December 19, 2007 | $0.11 | February 21, 2008 | $1,026(1) | March 13, 2008 |
| *(Fiscal year 2007)* | | | | |
| September 13, 2006 | $0.10 | November 16, 2006 | $979 | December 14, 2006 |
| December 20, 2006 | $0.10 | February 15, 2007 | $977 | March 8, 2007 |

(1)  This dividend was included in other current liabilities on our balance sheet as of December 31, 2007.

### Note 6 – Investment Income and Other

Components of investment income and other were as follows:

| (In millions) | Three Months Ended December 31, 2007 | Three Months Ended December 31, 2006 | Six Months Ended December 31, 2007 | Six Months Ended December 31, 2006 |
|---|---|---|---|---|
| Dividends and interest | $ 206 | $ 316 | $ 445 | $ 685 |
| Net recognized gains on investments | 87 | 103 | 238 | 466 |
| Net gains/(losses) on derivatives | 48 | (75) | 84 | (231) |
| Other | (2) | (11) | (130) | (20) |
| Investment income and other | $ 339 | $ 333 | $ 637 | $ 900 |

### Note 7 – Product Warranties

We provide for the estimated costs of hardware and software warranties at the time the related revenue is recognized. For hardware warranty, we estimate the costs based on historical and projected product failure rates, historical and projected repair costs, and knowledge of specific product failures (if any). The specific hardware warranty terms and conditions vary depending upon the product sold and country in which we do business, but generally include technical support, parts, and labor over a period generally ranging from 90 days to three years. For software warranty, we estimate the costs to provide bug fixes, such as security patches, over the estimated life of the software.

The changes in our aggregate product warranty liabilities, which are included in other current liabilities and other long-term liabilities on our balance sheets, were as follows:

| (In millions) | Amount |
|---|---|
| Balance at July 1, 2007 | $850 |
| Accruals for warranties issued | 82 |
| Adjustments to pre-existing warranties | 11 |
| Settlements of warranty claims | (86) |
| Balance at September 30, 2007 | $857 |
| Accruals for warranties issued | 188 |
| Adjustments to pre-existing warranties | 5 |
| Settlements of warranty claims | (189) |
| Balance at December 31, 2007 | $861 |

**MICROSOFT CORPORATION**

NOTES TO FINANCIAL STATEMENTS – (Continued)

*(Unaudited)*

**Note 8 – Contingencies**

**Government competition law matters.** In March 2004, the European Commission issued a competition law decision that, among other things, ordered us to license certain Windows server protocol technology to our competitors. In March 2007, the European Commission issued a statement of objections claiming that the pricing terms we proposed for licensing the technology as required by the March 2004 decision were "not reasonable." Following additional steps we took to address these concerns, the Commission announced on October 22, 2007 that we were in compliance with the March 2004 decision and that no further penalty should be imposed as from that date. The maximum amount of the potential fine for violation of the March 2004 decision as of October 22, 2007 was €1.5 billion. On January 14, 2008, the European Commission announced that it was opening two new competition law investigations. These investigations appear to relate primarily to interoperability with respect to our Microsoft Office family of products and the inclusion of various capabilities in our Windows operating system software, including Web browsing software. These investigations were precipitated by complaints filed with the Commission by a trade association of Microsoft's competitors and a firm that offers Web browsing software.

We are subject to a Consent Decree and Final Judgment that resolved lawsuits brought by the U.S. Department of Justice, 18 states, and the District of Columbia in two separate actions. The Consent Decree imposed various constraints on our Windows operating system businesses. Portions of the Consent Decree are scheduled to expire on January 31, 2008 and we voluntarily agreed to extend expiration of other elements of the Consent Decree to November 2009. In October 2007, some states filed a motion with the U.S. District Court for the District of Columbia seeking to have most of the provisions of the Final Judgment in the action to which they are party extended for five years. This motion is pending. The U.S. Department of Justice and other states advised the Court that they will not seek any extension of the Final Judgments to which they are party.

In other ongoing investigations, various foreign governments and several state attorneys general have requested information from us concerning competition, privacy, and security issues.

**Antitrust, unfair competition, and overcharge class actions.** A large number of antitrust and unfair competition class action lawsuits have been filed against us in various state, federal, and Canadian courts on behalf of various classes of direct and indirect purchasers of our PC operating system and certain other software products. We obtained dismissals of damages claims of indirect purchasers under federal law and in 15 states. Courts refused to certify classes in two additional states. We have reached agreements to settle all claims that have been made to date in 19 states.

Under the settlements, generally class members can obtain vouchers that entitle them to be reimbursed for purchases of a wide variety of platform-neutral computer hardware and software. The total value of vouchers that we may issue varies by state. We will make available to certain schools a percentage of those vouchers that are not issued or claimed (one-half to two-thirds depending on the state). The total value of vouchers we ultimately issue will depend on the number of class members who make claims and are issued vouchers. The maximum value of vouchers to be issued is approximately $2.7 billion. The actual costs of these settlements will be less than that maximum amount, depending on the number of class members and schools that are issued and redeem vouchers.

The settlements in all states have received final court approval. Cases in Arizona, Mississippi and Canada have not been settled. We estimate the total cost to resolve all of these cases will range between $1.7 billion and $1.9 billion. The actual cost depends on factors such as the quantity and mix of products for which claims will be made, the number of eligible class members who ultimately use the vouchers, the nature of hardware and software that is acquired using the vouchers, and the cost of administering the claims. At December 31, 2007, we have recorded a liability related to these claims of approximately $1.0 billion, which reflects our estimated exposure of $1.7 billion less payments made to date of approximately $665 million, mostly for administrative expenses, vouchers, and legal fees.

**Other antitrust litigation and claims.** In November 2004, Novell, Inc. filed a complaint in U.S. District Court in Utah, now consolidated with other cases in Maryland, asserting antitrust and unfair competition claims against us related to Novell's ownership of WordPerfect and other productivity applications during the period between June 1994 and March 1996. In June 2005, the trial court granted our motion to dismiss four of six claims of the complaint. Both parties appealed, and in October 2007, the court of appeals affirmed the decision of the trial court, remanding the case to that court for further proceedings.

**Patent and intellectual property claims.** We are vigorously defending more than 45 patent infringement cases. Microsoft and Alcatel-Lucent are parties to a number of legal proceedings relating to certain patents of each of the companies. Some of these actions began before the merger of Alcatel and Lucent in 2006. For simplicity, we refer to the post-merger entity of Alcatel-Lucent throughout the following discussion.

9

**MICROSOFT CORPORATION**

NOTES TO FINANCIAL STATEMENTS – (Continued)

*(Unaudited)*

- In 2003, we filed an action in U.S. District Court in California seeking a declaratory judgment that we do not infringe certain Alcatel-Lucent patents. Alcatel-Lucent has asserted claims under these patents against computer manufacturers that sell computers with our operating system and application software pre-installed. In February 2007, the jury returned a verdict in Alcatel-Lucent's favor in the first of a series of patent trials, and awarded $1.5 billion in damages. In September 2007, on our motions for judgment as a matter of law, the trial court overturned the jury verdict and entered orders dismissing plaintiff's claims on multiple grounds. Alcatel-Lucent has appealed. The trial court previously dismissed Alcatel-Lucent's claims with respect to a second group of patents and two patents in a third grouping. Trial on a consolidated group of all remaining patents is scheduled to begin in February 2008.

- In March 2006, Alcatel-Lucent filed a lawsuit against us in U.S. District Court in California, claiming the Xbox 360 violates one of its patents. In response, we asserted counterclaims that Alcatel-Lucent infringes 10 Microsoft patents by its sales of various products. The case has been set for trial in April 2008.

- In November 2006, Alcatel-Lucent filed two patent infringement cases against us in U.S. District Court in Texas, asserting Mediaroom and various networking functionalities violate seven of its patents. In April 2007, we asserted infringement counterclaims based on four of our patents relating to functionality similar to that accused by Alcatel-Lucent. The trial on all of the patents is set for January 2009.

- In February 2007, we filed a complaint against Alcatel-Lucent with the International Trade Commission claiming Alcatel-Lucent is infringing four Microsoft patents related to our unified communications technology and seeking to prevent the import of certain Alcatel-Lucent unified communications products into the U.S. Trial of this matter began in October 2007.

- In April 2007, the Multimedia Patent Trust filed a complaint against Microsoft, Dell, and Gateway in San Diego, California accusing the parties of infringing three video-related patents that originally belonged to Alcatel-Lucent. Alcatel-Lucent created the Multimedia Patent Trust prior to the companies' merger and transferred the patents at issue to the trust.

The actual costs to resolve these cases will depend upon many factors such as the outcome of post-trial motions, any appeals, and the results of the remaining trials.

In *Z4 Technologies, Inc. v. Microsoft*, filed in U.S. District Court in Texas in September 2004, the plaintiff alleged that Microsoft product activation functionality used in certain products (including versions of Windows and Office) infringe its patents. In April 2006, the jury rendered a $115 million verdict against us, and the trial court enhanced damages by $25 million due to a finding of willful infringement. The court declined to award a permanent injunction. We have been selling additional units of allegedly infringing products and thus incurring potential additional liability. The court of appeals affirmed the trial court's judgment, but we are seeking a rehearing by the court of appeals.

In *Veritas Operating Corporation v. Microsoft*, filed in U.S. District Court in Washington in May 2006, a subsidiary of Symantec filed an action asserting trade secret misappropriation, breach of contract, and patent infringement relating to certain storage technologies. The case is scheduled for trial in May 2008.

Adverse outcomes in some or all of the matters described in this section may result in significant monetary damages or injunctive relief against us that would adversely affect distribution of our operating system or application products. We may enter into material settlements because of these risks.

**Other.** We are also subject to a variety of other claims and suits that arise from time to time in the ordinary course of our business. Although management currently believes that resolving claims against us, individually or in aggregate, will not have a material adverse impact on our financial position, our results of operations, or our cash flows, these matters are subject to inherent uncertainties and management's view of these matters may change in the future.

As of December 31, 2007, we had accrued aggregate liabilities of approximately $840 million in other current liabilities and approximately $660 million in other long-term liabilities for all of the contingent matters described in this note. While we intend to vigorously defend these matters, there exists the possibility of adverse outcomes that we estimate could be up to $4.1 billion in aggregate beyond recorded amounts. Were unfavorable final outcomes to occur, there exists the possibility of a material adverse impact on our financial position and on the results of operations for the period in which the effects become reasonably estimable.



**MICROSOFT CORPORATION**

NOTES TO FINANCIAL STATEMENTS – (Continued)

*(Unaudited)*

Note 9 – Segment Information

SFAS No. 131, *Disclosures about Segments of an Enterprise and Related Information*, establishes standards for reporting information about operating segments. This standard requires segmentation based on our internal organization and reporting of revenue and operating income based upon internal accounting methods. Our financial reporting systems present various data for management to operate the business, including internal profit and loss statements prepared on a basis not consistent with U.S. GAAP. The segments are designed to allocate resources internally and provide a framework to determine management responsibility. Operating segments are defined as components of an enterprise about which separate financial information is available that is evaluated regularly by the chief operating decision maker, or decision making group, in deciding how to allocate resources and in assessing performance. Our chief operating decision maker is our Chief Executive Officer. Our five segments are Client; Server and Tools; Online Services Business; Microsoft Business Division; and Entertainment and Devices Division. We have recast certain prior period amounts to conform to the way we internally manage and monitor performance at the segment level in fiscal year 2008.

Segment revenue and operating income/(loss) was as follows:

| (In millions) | Three Months Ended December 31, | | Six Months Ended December 31, | |
| --- | --- | --- | --- | --- |
| | 2007 | 2006 | 2007 | 2006 |
| **Revenue** | | | | |
| Client | $ 4,238 | $ 2,669 | $ 8,283 | $ 5,975 |
| Server and Tools | 3,284 | 2,847 | 6,186 | 5,343 |
| Online Services Business | 863 | 625 | 1,534 | 1,161 |
| Microsoft Business Division | 4,814 | 3,512 | 8,921 | 6,944 |
| Entertainment and Devices Division | 3,060 | 2,968 | 4,988 | 3,978 |
| Unallocated and other | 108 | (79) | 217 | (48) |
| Consolidated | $16,367 | $12,542 | $30,129 | $23,353 |
| **Operating income/(loss)** | | | | |
| Client | $ 3,243 | $ 1,929 | $ 6,488 | $ 4,599 |
| Server and Tools | 1,132 | 986 | 2,016 | 1,787 |
| Online Services Business | (248) | (116) | (510) | (232) |
| Microsoft Business Division | 3,140 | 2,146 | 5,801 | 4,387 |
| Entertainment and Devices Division | 334 | (306) | 470 | (430) |
| Reconciling amounts | (1,120) | (1,167) | (1,866) | (2,165) |
| Consolidated | $ 6,481 | $ 3,472 | $12,399 | $ 7,946 |

Because of our integrated business structure, operating costs included in one segment may benefit other segments, and therefore these segments are not designed to measure operating income or loss directly related to the products included in each segment. Inter-segment cost commissions are estimated by management and used to compensate or charge each segment for such shared costs and to incent shared efforts. Management will continually evaluate the alignment of product development organizations, sales organizations, and inter-segment commissions for segment reporting purposes, which may result in changes to segment allocations in future periods.

Reconciling amounts include adjustments to conform with U.S. GAAP and corporate-level activity not specifically attributed to a segment. Significant internal accounting policies that differ from U.S. GAAP relate to revenue recognition, income statement classification, and accelerated amortization for depreciation, stock awards, and performance-based stock awards. In addition, certain revenue and expenses are excluded from segments or included in corporate-level activity, including certain legal settlements and accruals for legal contingencies.

**MICROSOFT CORPORATION**

NOTES TO FINANCIAL STATEMENTS – (Continued)

*(Unaudited)*

Significant reconciling items were as follows:

| (In millions) | Three Months Ended December 31, | | Six Months Ended December 31, | |
|---|---|---|---|---|
| | 2007 | 2006 | 2007 | 2006 |
| Summary of reconciling amounts: | | | | |
| Corporate-level activity (1) | $(1,346) | $(1,079) | $(2,353) | $(2,022) |
| Stock-based compensation expense | 129 | (4) | 315 | (61) |
| Revenue reconciling amounts | 88 | (85) | 183 | (87) |
| Other | 9 | 1 | (11) | 5 |
| Total | $(1,120) | $(1,167) | $(1,866) | $(2,165) |

(1)  Corporate-level activity excludes stock-based compensation expense and revenue reconciling amounts presented separately in those line items.

**Note 10 – Acquisitions**

On August 10, 2007, we acquired all the outstanding shares of aQuantive, Inc. ("aQuantive") for $5.9 billion, which was paid primarily in cash. Headquartered in Seattle, Washington, aQuantive is a digital marketing business that we expect will play a key role in the future development of our Online Services Business. We also believe the acquisition will help us build and support next-generation advertiser and publisher solutions in environments such as cross media planning, video-on-demand, and internet protocol television. The company was consolidated into our results of operations starting August 10, 2007, the acquisition date.

The following table summarizes the estimated fair values of the assets acquired and liabilities assumed at the date of the acquisition:

| (In millions) | aQuantive as of August 10, 2007 |
|---|---|
| Cash and cash equivalents | $ 342 |
| Accounts receivable, net | 273 |
| Other current assets | 6 |
| Property, plant and equipment | 50 |
| Intangible assets | 939 |
| Goodwill | 5,261 |
| Deferred income taxes | 109 |
| Other long-term assets | 6 |
| Total assets acquired | $6,986 |
| Accrued compensation | 37 |
| Other current liabilities | 683 |
| Deferred income taxes | 338 |
| Other long-term liabilities | 71 |
| Total liabilities assumed | $1,129 |
| Net assets acquired | $5.857 |

As a result of this acquisition, we recorded $5.3 billion of goodwill in our Online Services Business segment. Of the $939 million of acquired intangible assets, $24 million was assigned to in-process research and development assets and was expensed during the first quarter. The remaining acquired intangible assets include $476 million of customer relationships with a weighted average life of six years, $327 million of technology-based intangible assets with a weighted average life of four years, and $112 million of other intangible assets with a weighted average life of five years.

In addition to aQuantive, we acquired nine other entities during the six months ended December 31, 2007 for total consideration of $394 million which was paid primarily in cash. All of the entities were consolidated within Microsoft starting on their respective acquisition dates. Pro forma results of operations have not been presented because the effects of all of these acquisitions, individually and in aggregate, were not material to our consolidated results of operations.

**MICROSOFT CORPORATION**

NOTES TO FINANCIAL STATEMENTS – (Continued)

*(Unaudited)*

Note 11 – Goodwill

| (In millions) | Balance as of July 1, 2007 | Acquisitions /purchase accounting adjustments | Balance as of September 30, 2007 | Acquisitions /purchase accounting adjustments | Balance as of December 31, 2007 |
|---|---|---|---|---|---|
| Client.................................................. | $  77 | $  — | $  77 | $ — | $  77 |
| Server and Tools ................................ | 580 | 70 | 650 | 5 | 655 |
| Online Services Business .................... | 552 | 5,330 | 5,882 | 41 | 5,923 |
| Microsoft Business Division ................ | 3,132 | — | 3,132 | 93 | 3,225 |
| Entertainment and Devices Division....... | 419 | (9) | 410 | 19 | 429 |
| Total ...................................... | $4,760 | $5,391 | $10,151 | $158 | $10,309 |

During the six months ended December 31, 2007, we recorded $5.5 billion of goodwill resulting from the ten acquisitions described in Note 10 – Acquisitions. None of the amount recorded as goodwill is expected to be deductible for tax purposes. The purchase price allocation for all of the acquisitions is preliminary and subject to revision as more detailed analyses are completed and additional information about fair value of assets and liabilities become available. Any change in the fair value of the net assets of the acquired company will change the amount of the purchase price allocable to goodwill.

Note 12 – Intangible Assets

The components of finite-lived intangible assets were as follows:

| (In millions) | December 31, 2007 | | | June 30, 2007 | | |
|---|---|---|---|---|---|---|
| | Gross carrying amount | Accumulated amortization | Net carrying amount | Gross carrying amount | Accumulated amortization | Net carrying amount |
| Contract-based......................... | $ 996 | $ (760) | $  236 | $ 988 | $ (727) | $ 261 |
| Technology-based ..................... | 1,324 | (517) | 807 | 916 | (407) | 509 |
| Marketing-related ..................... | 161 | (49) | 112 | 57 | (39) | 18 |
| Customer-related ...................... | 635 | (73) | 562 | 122 | (32) | 90 |
| Total.............................. | $3,116 | $(1,399) | $ 1,717 | $2,083 | $(1,205) | $878 |

Acquired intangibles are generally amortized on a straight-line basis over their weighted average lives. Intangible assets amortization expense was $112 million for the three months and $214 million for the six months ended December 31, 2007 as compared to $52 million for the three months and $90 million for the six months ended December 31, 2006. The estimated future amortization expense related to intangible assets as of December 31, 2007 is expected to be $244 million for the remainder of fiscal year 2008, $456 million for fiscal year 2009, $400 million for fiscal year 2010, $309 million for fiscal year 2011, and $308 million for fiscal year 2012 and thereafter.

Note 13 – Income Taxes

On July 1, 2007, we adopted the provisions of FIN 48, *Accounting for Uncertainty in Income Taxes – an interpretation of FASB Statement No. 109*, which provides a financial statement recognition threshold and measurement attribute for a tax position taken or expected to be taken in a tax return. Under FIN 48, we may recognize the tax benefit from an uncertain tax position only if it is more likely than not that the tax position will be sustained on examination by the taxing authorities, based on the technical merits of the position. The tax benefits recognized in the financial statements from such a position should be measured based on the largest benefit that has a greater than 50% likelihood of being realized upon ultimate settlement. FIN 48 also provides guidance on derecognition of income tax assets and liabilities, classification of current and deferred income tax assets and liabilities, accounting for interest and penalties associated with tax positions, and income tax disclosures.

Adopting FIN 48 had the following impact on our financial statements: increased current assets by $228 million, long-term assets by $1.1 billion, long-term liabilities by $2.1 billion, and our retained deficit by $395 million; and decreased our income taxes payable by $394 million. As of July 1, 2007, we had $7.1 billion of unrecognized tax benefits of which $5.3 billion, if recognized, would affect our effective tax rate. Our policy is to include interest and penalties related to unrecognized tax benefits in income tax expense. As of July 1, 2007 we had accrued interest related to uncertain tax positions of $863 million, net of federal income tax

# MICROSOFT CORPORATION
## NOTES TO FINANCIAL STATEMENTS – (Continued)
### *(Unaudited)*

benefit, on our balance sheet. Other long-term liabilities related to tax contingencies were $7.7 billion as of December 31, 2007 and $5.1 billion as of June 30, 2007.

We are currently under audit by the Internal Revenue Service for tax years 2000 through 2006. It is reasonably possible that the total amount of unrecognized tax benefits may be reduced within the next 12 months as a result of ongoing discussions we are having with the Internal Revenue Service in connection with the audit of the years 2000 through 2003. In these discussions, we expect to settle certain issues resulting in a reduction of unrecognized tax benefits of approximately $1.1 billion; however, we are unable to determine an estimated range for the resolution of other issues at this time.

We are subject to income tax in many jurisdictions outside the United States, none of which are individually material to our financial position, statement of cash flows, or results of operations.

Deferred income tax balances reflect the effects of temporary differences between the carrying amounts of assets and liabilities and their tax bases and are stated at enacted tax rates expected to be in effect when taxes are actually paid or recovered. We have not provided deferred U.S. income taxes or foreign withholding taxes on temporary differences of approximately $9.5 billion as of December 31, 2007 and $6.1 billion as of June 30, 2007, primarily resulting from earnings for certain non-U.S. subsidiaries which are permanently reinvested outside the United States. The amount of unrecognized deferred tax liabilities associated with these temporary differences was $2.8 billion as of December 31, 2007 and $1.8 billion as of June 30, 2007.

## REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

To The Board of Directors and Stockholders of
Microsoft Corporation
Redmond, Washington

We have reviewed the accompanying consolidated balance sheet of Microsoft Corporation and subsidiaries (the "Corporation") as of December 31, 2007, and the related consolidated statements of income, stockholders' equity, and cash flows for the three-month and six-month periods ended December 31, 2007 and 2006. These interim financial statements are the responsibility of the Corporation's management.

We conducted our reviews in accordance with the standards of the Public Company Accounting Oversight Board (United States). A review of interim financial information consists principally of applying analytical procedures and making inquiries of persons responsible for financial and accounting matters. It is substantially less in scope than an audit conducted in accordance with the standards of the Public Company Accounting Oversight Board (United States), the objective of which is the expression of an opinion regarding the financial statements taken as a whole. Accordingly, we do not express such an opinion.

Based on our reviews, we are not aware of any material modifications that should be made to such consolidated interim financial statements for them to be in conformity with accounting principles generally accepted in the United States of America.

We have previously audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the consolidated balance sheet of Microsoft Corporation and subsidiaries as of June 30, 2007, and the related consolidated statements of income, stockholders' equity, and cash flows for the year then ended (not presented herein); and in our report dated August 3, 2007, we expressed an unqualified opinion on those consolidated financial statements. In our opinion, the information set forth in the accompanying consolidated balance sheet as of June 30, 2007 is fairly stated, in all material respects, in relation to the consolidated balance sheet from which it has been derived.

DELOITTE & TOUCHE LLP

/S/    DELOITTE & TOUCHE LLP
_____
Seattle, Washington
January 24, 2008

**Item 2. Management's Discussion and Analysis of Financial Condition and Results of Operations**

### Special Note About Forward-Looking Statements

Certain statements in Management's Discussion and Analysis ("MD&A"), other than purely historical information, including estimates, projections, statements relating to our business plans, objectives, and expected operating results, and the assumptions upon which those statements are based, are "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995, Section 27A of the Securities Act of 1933 and Section 21E of the Securities Exchange Act of 1934. These forward-looking statements generally are identified by the words "believe," "project," "expect," "anticipate," "estimate," "intend," "strategy," "plan," "may," "should," "will," "would," "will be," "will continue," "will likely result," and similar expressions. Forward-looking statements are based on current expectations and assumptions that are subject to risks and uncertainties, which may cause actual results to differ materially from the forward-looking statements. A detailed discussion of risks and uncertainties that could cause actual results and events to differ materially from such forward-looking statements is included in the section titled "Risk Factors" (refer to Part II, Item 1A). We undertake no obligation to update or revise publicly any forward-looking statements, whether as a result of new information, future events, or otherwise.

### OVERVIEW

The following MD&A is intended to help the reader understand the results of operations and financial condition of Microsoft Corporation. MD&A is provided as a supplement to, and should be read in conjunction with, our financial statements and the accompanying notes to the financial statements ("Notes").

We develop, manufacture, license, and support a wide range of software products for many computing devices. Our software products include operating systems for servers, PCs, and intelligent devices; server applications for distributed computing environments; information worker productivity applications; business solutions applications; and software development tools. We provide consulting and product support services, and we train and certify system integrators and developers. We sell the Xbox video game console and games, the Zune digital music and entertainment device, PC games, and PC peripherals. Online communication and information services are delivered through our MSN portals, channels around the world, and through our search products.

Our revenue historically has fluctuated quarterly and has generally been the highest in the second quarter of our fiscal year due to corporate calendar year-end spending trends in our major markets and holiday season spending by consumers. Our Entertainment and Devices Division is particularly seasonal as its products are aimed at the consumer market and are in highest demand during the holiday shopping season. Typically, the Entertainment and Devices Division has generated over 40% of its yearly segment revenues in our second fiscal quarter. In fiscal year 2007, our revenue was highest in the third quarter due to the recognition of $1.7 billion of revenue previously deferred from the Express Upgrade to Windows Vista and Microsoft Office Technology Guarantee programs and pre-shipments of Windows Vista and the 2007 Microsoft Office system. The technology guarantee programs provided customers who purchased current products with free or discounted rights to Windows Vista and the 2007 Microsoft Office system when those products became available to consumers. We believe the seasonality of revenue is likely to continue in the future consistent with our experience prior to fiscal year 2007.

All growth and percentage comparisons refer to the three or six months ended December 31, 2007, as compared with the three or six months ended December 31, 2006, unless otherwise noted.

### Summary

| (In millions, except per share amounts and percentages) | Three months ended December 31, | | Percentage Change | Six months ended December 31, | | Percentage Change |
|---|---|---|---|---|---|---|
| | 2007 | 2006 | | 2007 | 2006 | |
| Revenue | **$16,367** | $12,542 | 30% | **$30,129** | $23,353 | 29% |
| Operating income | **$ 6,481** | $ 3,472 | 87% | **$12,399** | $ 7,946 | 56% |
| Diluted earnings per share | **$  0.50** | $ 0.26 | 92% | **$  0.95** | $  0.61 | 56% |

For the three and six months ended December 31, 2007, revenue growth was impacted by the deferral of revenue during the first half of fiscal year 2007 from the Express Upgrade to Windows Vista and Microsoft Office Technology Guarantee programs and pre-shipments of Windows Vista and the 2007 Microsoft Office system. Revenue growth for the three months ended December 31, 2007 was driven primarily by licensing of Windows Vista and the 2007 Microsoft Office system, which were made available to consumers in January 2007, and increased revenue associated with Windows Server and SQL Server. Revenue growth for the six months ended December 31, 2007 was driven primarily by licensing of Windows Vista and the 2007 Microsoft Office system, increased Xbox console and game sales, and increased revenue associated with Windows Server and SQL Server. Revenue from licensing of Windows Vista and the 2007 Microsoft Office system reflects growth in our OEM channel and growth from volume licensing. Foreign currency

16

exchange rates accounted for a $410 million or three percentage point increase in revenue during the three months and a $615 million or three percentage point increase during the six months ended December 31, 2007.

Operating income growth for the three months ended December 31, 2007 was driven primarily by the increased revenue, partially offset by increased headcount-related expenses, increased sales and marketing expenses, and increased costs for legal settlements and legal contingencies. During the quarter, we incurred $237 million in legal charges as compared with $111 million in legal charges during the three months ended December 31, 2006. Operating income growth for the six months ended December 31, 2007 was driven primarily by the increased revenue, partially offset by increased cost of revenue, increased headcount-related expenses, and increased sales and marketing expenses. Total headcount-related expenses increased 13% during the three months and 10% during the six months ended December 31, 2007, driven by a 12% increase in headcount over the past twelve months and an increase in salaries and benefits for existing headcount, partially offset by decreased stock-based compensation expense.

Worldwide macroeconomic factors have a strong correlation to business and consumer demand for our software, services, games, and Internet service offerings. While we are monitoring the changing economic conditions, we continue to expect double-digit revenue growth. We estimate worldwide PC shipments will grow 11% to 13%. We expect a continued favorable impact from changes in year-over-year foreign currency exchange rates in fiscal year 2008. We expect our operating income growth rate to continue to exceed our revenue growth rate in fiscal year 2008.

## SEGMENT PRODUCT REVENUE/OPERATING INCOME/(LOSS)

Revenue and operating income/(loss) amounts in this section are presented on a basis consistent with U.S. GAAP and include certain reconciling items attributable to each of the segments. Segment information appearing in Note 9 – Segment Information is presented on a basis consistent with our current internal management reporting, in accordance with Statement of Financial Accounting Standards ("SFAS") No. 131, *Disclosures about Segments of an Enterprise and Related Information*. Certain corporate-level activity has been excluded from segment operating results and is analyzed separately. Prior period amounts have been recast to conform to the way we internally manage and monitor performance at the segment level in fiscal year 2008.

### Client

| (In millions, except percentages) | Three months ended December 31, | | Percentage Change | Six months ended December 31, | | Percentage Change |
|---|---|---|---|---|---|---|
| | 2007 | 2006 | | 2007 | 2006 | |
| Revenue ........................................ | $4,335 | $2,586 | 68% | $8,473 | $5,893 | 44% |
| Operating income ........................... | $3,358 | $1,838 | 83% | $6,727 | $4,485 | 50% |

Client offerings consist of premium edition and standard Windows operating systems. Premium offerings are those that include additional functionality and are sold at a price above our standard versions. Premium offerings include Windows XP Professional, XP Media Center Edition, XP Tablet PC Edition, Vista Business, Vista Home Premium, Vista Ultimate, and Vista Enterprise. Standard Windows operating systems include Windows XP Home and Windows Vista Home Basic. Client revenue growth correlates with the growth of purchases of PCs from OEMs that pre-install versions of Windows operating systems because the OEM channel accounts for approximately 80% of total Client revenue. The differences between unit growth rates and revenue growth rates from year to year are affected by changes in the mix of OEM Windows operating systems licensed with premium edition operating systems as a percentage of total OEM Windows operating systems licensed ("OEM premium mix"), changes in the geographical mix, and changes in the channel mix of products sold by large, multi-national OEMs versus those sold by local and regional system builders.

Client revenue increased during the three and six months ended December 31, 2007, primarily reflecting licensing of Windows Vista. During the second quarter of fiscal year 2007, we deferred approximately $1.1 billion of revenue and during the first half of fiscal year 2007, we deferred approximately $1.2 billion of revenue pending the January 2007 release of Windows Vista to consumers. During the three months ended December 31, 2007, OEM revenue increased $1.7 billion or 80% driven by 18% growth in OEM license units. During the six months ended December 31, 2007, OEM revenue increased $2.4 billion or 48%, driven by 19% growth in OEM license units. Revenue from commercial and retail licensing of Windows operating systems increased $92 million or 18% during the three months and $218 million or 21% during the six months ended December 31, 2007, primarily due to strong sales from Enterprise Agreements and anti-piracy efforts in Russia, China, and other emerging markets. The OEM premium mix increased eight percentage points to 75% compared with the second quarter of last year and 12 percentage points to 75% compared to the first half of last year, driven by increased consumer premium mix. Based on our estimates, total worldwide PC shipments from all sources grew 14% to 16% from the second quarter of the previous year and 13% to 15% from the first half of the previous year driven by demand in both emerging and mature markets.

Client operating income increased during the three and six months ended December 31, 2007, reflecting the increased revenue, partially offset by increased cost of revenue and increased sales and marketing expenses. Cost of revenue increased $89 million or 54% during the three months and $193 million or 70% during the six months ended December 31, 2007, driven by Windows Vista

17

product costs. Sales and marketing expenses increased $78 million or 22% during the three months and $157 million or 27% during the six months ended December 31, 2007, primarily reflecting increased headcount-related expenses associated with our corporate sales force. Headcount-related expenses increased 38% during the three months and 4% during the six months ended December 31, 2007.

For the remainder of fiscal year 2008, we expect continued strength in OEM revenue growth, in line with strength in the PC market. We expect PC shipments to grow 11% to 13% for fiscal year 2008. We believe that PC unit growth rates will be higher in the consumer segment than in the business segment and higher in emerging markets than in mature markets.

*Server and Tools*

| (In millions, except percentages) | Three months ended December 31, | | Percentage Change | Six months ended December 31, | | Percentage Change |
| --- | --- | --- | --- | --- | --- | --- |
| | 2007 | 2006 | | 2007 | 2006 | |
| Revenue | $3,278 | $2,843 | 15% | $6,178 | $5,339 | 16% |
| Operating income | $1,172 | $ 981 | 19% | $2,132 | $1,751 | 22% |

Server and Tools offerings consist of server software licenses and client access licenses ("CAL") for Windows Server, Microsoft SQL Server, and other server products. It also includes developer tools, training, certification, Microsoft Press, Premier and Professional product support services, and Microsoft Consulting Services. Server and Tools concentrates on licensing products, applications, tools, content, and services that make information technology professionals and developers more productive and efficient. We use multiple channels for licensing, including pre-installed OEM versions, licenses through partners, and licenses directly to end customers. We sell licenses both as one-time licenses, and as multi-year volume licenses.

Server and Tools revenue increased during the three and six months ended December 31, 2007, reflecting growth in both product and services revenue. Server and server application revenue (including CAL revenue) and developer tools, training, and certificate revenue increased $289 million or 12% during the three months and $551 million or 13% during the six months ended December 31, 2007, primarily driven by growth in new and recurring volume licensing of Windows Server and SQL Server products and reflects broad adoption of the Windows Platform and applications. Consulting, Premier and Professional product support services revenue increased $146 million or 28% during the three months and $288 million or 30% during the six months ended December 31, 2007, primarily due to higher demand for consulting and support services in corporate enterprises. Foreign currency exchange rates accounted for a $111 million or four percentage point increase in revenue for the three months and $177 million or four percentage point increase in revenue for the six months ended December 31, 2007.

Server and Tools operating income increased for the three and six months ended December 31, 2007, primarily reflecting the increased revenue, partially offset by increased sales and marketing expenses and cost of revenue for services. Sales and marketing expenses increased $102 million or 12% during the three months and $235 million or 15% during the six months ended December 31, 2007, primarily reflecting increased headcount-related expenses associated with our corporate sales force. Cost of revenue increased $93 million or 18% during the three months and $169 million or 16% during the six months ended December 31, 2007, reflecting the growth in services provided. Headcount-related expenses increased 9% during the three months and 6% during the six months ended December 31, 2007, driven by an 11% increase in headcount over the past twelve months and an increase in salaries and benefits for existing headcount, partially offset by decreased stock-based compensation expense.

For the remainder of fiscal year 2008, we expect continued growth in both product and services revenue. We expect product revenue growth from platform adoption through new and renewal volume licensing growth coupled with our new product offerings.

*Online Services Business*

| (In millions, except percentages) | Three months ended December 31, | | Percentage Change | Six months ended December 31, | | Percentage Change |
| --- | --- | --- | --- | --- | --- | --- |
| | 2007 | 2006 | | 2007 | 2006 | |
| Revenue | $ 863 | $ 625 | 38% | $1,534 | 1,161 | 32% |
| Operating loss | $(245) | $(118) | (108)% | $ (510) | (236) | (116)% |

Online Services Business ("OSB") provides personal communications services, such as e-mail and instant messaging, online information offerings, such as Live Search, and the MSN portals and channels around the world. OSB also provides a variety of online services such as MSN Internet Access and MSN Premium Web Services. We earn revenue primarily from online advertising, including search, home page, email, and messaging services, from consumers and partners through subscriptions and transactions generated from online paid services, and from MSN narrowband Internet access subscribers. We continue to launch new online

initiatives and expect to do so in the future. During the first quarter of fiscal year 2008, we launched a new release of Windows Live Search, and during the second quarter of fiscal year 2008, we launched the Windows Live suite of applications and services.

During the first quarter of fiscal year 2008, we completed our acquisition of aQuantive, Inc. ("aQuantive"), a digital marketing business which we expect will play a key role in the future development of our advertising business. aQuantive earns revenue from online advertising and from digital marketing and advertising agency services. We believe the acquisition will help us build and support next-generation advertiser and publisher solutions in environments such as cross-media planning, video-on-demand, and internet protocol television. aQuantive was consolidated into our results of operations starting August 10, 2007, the acquisition date.

OSB revenue increased during the three and six months ended December 31, 2007 driven primarily by increased online advertising revenue and the inclusion of aQuantive revenue, partially offset by decreased access revenue. Online advertising revenue increased $170 million or 38% to $623 million during the three months and $286 million or 35% to $1.1 billion during the six months ended December 31, 2007. This increase reflects growth in our existing online advertising business and includes aQuantive online advertising revenue of $52 million during the three months and $81 million during the six months ended December 31, 2007. Agency revenue, which is solely derived from aQuantive, was $102 million during the three months and $153 million during the six months ended December 31, 2007. Access revenue was $67 million for the three months and $137 million for the six months ended December 31, 2007, reflecting decreases of 26% and 29%, respectively. As of December 31, 2007, we had approximately 427 million Windows Live IDs compared with 352 million as of the same period last year.

OSB operating loss increased during the three and six months ended December 31, 2007, driven primarily by increased cost of revenue and increased sales and marketing expenses, partially offset by the increased revenue. OSB operating loss for the quarter ended December 31, 2007 included $46 million of amortization of intangible assets acquired from aQuantive, and OSB operating loss for the six months ended December 31, 2007 includes $76 million of intangible assets amortization and a $24 million in-process research and development write-off. Cost of revenue increased $218 million or 82% during the three months and $369 million or 73% during the six months ended December 31, 2007, primarily driven by increased data center costs, online content expenses, and aQuantive-related expenses. Sales and marketing expenses increased $92 million or 43% during the three months and $161 million or 43% during the six months ended December 31, 2007, primarily due to increased marketing costs and amortization of customer-related intangible assets. Headcount-related expenses increased 23% during the three months and 15% during the six months ended December 31, 2007, driven by a 22% increase in headcount over the past twelve months and an increase in salaries and benefits for existing headcount.

For the remainder of fiscal year 2008, we expect continued growth in online advertising revenue as the portals, channels, and communications services continue to expand globally and the overall Internet advertising market continues to expand. Online advertising revenue is expected to benefit from our acquisition of aQuantive, while revenue from narrowband Internet Access is expected to continue to decline. For the remainder of fiscal year 2008, we expect operating expenses to increase as we continue to invest in our long-term strategy. We believe these investments will lay the groundwork for future growth.

### *Microsoft Business Division*

| (In millions, except percentages) | Three months ended December 31, | | Percentage Change | Six months ended December 31, | | Percentage Change |
|---|---|---|---|---|---|---|
| | 2007 | 2006 | | 2007 | 2006 | |
| Revenue | **$4,811** | $3,513 | 37% | **$8,922** | $6,941 | 29% |
| Operating income | **$3,185** | $2,152 | 48% | **$5,879** | $4,391 | 34% |

Microsoft Business Division ("MBD") offerings consist of the Microsoft Office system and Microsoft Dynamics business solutions. Microsoft Office system products are designed to increase personal, team, and organization productivity through a range of programs, services, and software solutions. Growth of revenue from the Microsoft Office system offerings, which generate over 90% of MBD revenue, depends on our ability to add value to the core Office product set and to continue to expand our product offerings in other information worker areas such as enterprise content management, collaboration, unified communications, and business intelligence. Microsoft Dynamics products provide business solutions for financial management, customer relationship management, supply chain management, and analytics applications for small and mid-size businesses, large organizations, and divisions of global enterprises. We evaluate our results based upon the nature of the end user in two primary parts: business revenue which includes Microsoft Office system revenue generated through volume licensing agreements and Microsoft Dynamics revenue and consumer revenue, which includes revenue from retail packaged product sales and OEM revenue.

MBD revenue increased during the three and six months ended December 31, 2007, primarily reflecting licensing of the 2007 Microsoft Office system and the fiscal year 2007 second quarter revenue deferral of approximately $500 million as a result of the Microsoft Office Technology Guarantee program. Business revenue increased $706 million or 23% during the three months and $1.4

billion or 24% during the six months ended December 31, 2007, primarily as a result of growth in volume licensing agreement revenue and strong transactional license sales to businesses. The increase in business revenue also included a 26% increase in Microsoft Dynamics customer billings during the three months and a 24% increase during the six months ended December 31, 2007. Consumer revenue increased $592 million or 153% during the three months and $620 million or 53% during the six months ended December 31, 2007, primarily reflecting the technology guarantee deferral of approximately $500 million discussed above. Foreign currency exchange rates accounted for a $170 million or five percentage point increase in revenue during the three months and a $263 million or four percentage point increase in revenue during the six months ended December 31, 2007.

MBD operating income increased for the three and six months ended December 31, 2007, reflecting the increased revenue, partially offset by increased sales and marketing expenses, cost of revenue, and research and development expenses. Sales and marketing expenses increased $159 million or 19% during the three months and $312 million or 20% during the six months ended December 31, 2007, primarily reflecting increased headcount-related expenses associated with our corporate sales force. Cost of revenue increased $47 million or 26% during the three months and $97 million or 28% during the six months ended December 31, 2007, primarily driven by an increase in online costs reflecting the April 2007 acquisition of Tellme Networks. Research and development expenses increased $52 million or 17% during the three months and $74 million or 12% during the six months ended December 31, 2007, primarily reflecting increased headcount-related expenses. Headcount-related expenses increased 9% during the three months and 4% during the six months ended December 31, 2007, driven by a 6% increase in headcount over the past twelve months and an increase in salaries and benefits for existing headcount, partially offset by decreased stock-based compensation expense.

For the remainder of fiscal year 2008, we expect revenue to continue to increase over the prior year due to the strong performance of the 2007 Microsoft Office system. We continue to develop plans to grow revenue in new areas such as unified communications and through our existing portfolio of Microsoft Dynamics products.

### Entertainment and Devices Division

| (In millions, except percentages) | Three months ended December 31, | | Percentage Change | Six months ended December 31, | | Percentage Change |
|---|---|---|---|---|---|---|
| | 2007 | 2006 | | 2007 | 2006 | |
| Revenue ................................................. | **$3,060** | $2,969 | 3% | **$4,989** | $3,980 | 25% |
| Operating income/(loss) ......................... | **$ 357** | $(302) | * | **$ 524** | $(423) | * |

\* *Not meaningful*

The Entertainment and Devices Division ("EDD") products include the Xbox 360 platform (which includes the Microsoft Xbox video game console system, Xbox 360 video games, Xbox Live, and Xbox 360 accessories), PC games, consumer software and hardware products, the Zune digital music and entertainment platform, Mediaroom (our internet protocol television software), the Windows Mobile software platform, the Windows Embedded device operating system, and Windows Automotive. The success of video game consoles is determined by console innovation and quality, the portfolio of video game content for the console, online offerings, and the market share of the console. We believe that the functionality of the Xbox 360 console, games portfolio, and online offerings are well positioned relative to competitive consoles.

EDD revenue increased during the three and six months ended December 31, 2007, primarily due to increased Xbox 360 platform sales. During the three months ended December 31, 2007, Xbox platform and PC game revenue increased $115 million or 5% primarily as a result of increased Xbox 360 video game sales, Xbox Live revenue, and Xbox 360 accessory sales, partially offset by decreased Xbox 360 console sales. Xbox platform and PC game revenue increased $1.0 billion or 35% during the six months ended December 31, 2007, as a result of increased Xbox 360 console sales, video game sales led by Halo 3, Xbox Live revenues, and Xbox 360 accessory sales. We shipped 4.3 million and 6.1 million Xbox 360 consoles in the second quarter and first half of fiscal year 2008, respectively, as compared to 4.4 million and 5.4 million Xbox 360 consoles in the second quarter and first half of fiscal year 2007, respectively.

EDD operating income increased during the three and six months ended December 31, 2007, primarily due to the increased revenue, decreased cost of revenue, and decreased sales and marketing expenses. Cost of revenue decreased $523 million or 22% during the three months ended December 31, 2007, primarily driven by decreased Xbox 360 manufacturing costs. Sales and marketing expenses decreased $81 million or 16%, reflecting a decline in Xbox 360 platform marketing expenses. EDD operating income increased during the six months ended December 31, 2007, primarily due to the increased revenue. Headcount-related expenses increased 17% and 14% during the three and six months ended December 31, 2007, respectively, reflecting a 4% increase in headcount and an increase in salaries and benefits for existing headcount, partially offset by decreased stock-based compensation expense.

For the remainder of fiscal year 2008, we expect revenue to increase due to increased sales of Xbox 360 consoles and related games, accessories, and services. Revenue from existing mobility and embedded devices is expected to increase due to unit volume increases of Windows Mobile software driven by increased market demand for phone-enabled devices and Windows Embedded operating systems.

### Corporate-Level Activity

| (In millions, except percentages) | Three months ended December 31, | | Percentage Change | Six months ended December 31, | | Percentage Change |
|---|---|---|---|---|---|---|
| | 2007 | 2006 | | 2007 | 2006 | |
| Corporate-level results .......... | $(1,346) | $(1,079) | (25)% | $ (2,353) | $(2,022) | (16)% |

Certain corporate-level results are not allocated to our segments. Those results include expenses related to corporate operations related to broad-based sales and marketing, product support services, human resources, legal, finance, information technology, corporate development and procurement activities, research and development and other costs, and legal settlements and contingencies.

Corporate-level expenses increased for the three months ended December 31, 2007, primarily reflecting increased costs for legal settlements and legal contingencies, increased headcount-related expenses, and increased consulting and professional fees. Corporate-level expenses increased for the six months ended December 31, 2007, primarily reflecting increased headcount-related expenses, increased consulting and professional fees, and increased costs for legal settlements and legal contingencies, partially offset by decreased costs for corporate advertising. We incurred $237 million of legal charges during the three months and $277 million during the six months ended December 31, 2007, compared with $111 million of legal charges during the three months and $198 million during the six months ended December 31, 2006. Headcount-related expenses increased 10% during the three months and 12% during the six months ended December 31, 2007, driven by a 6% increase in headcount over the past twelve months, an increase in salaries and benefits for existing headcount, and an increase in stock-based compensation.

## OPERATING EXPENSES

### Cost of Revenue

| (In millions, except percentages) | Three months ended December 31, | | Percentage Change | Six months ended December 31, | | Percentage Change |
|---|---|---|---|---|---|---|
| | 2007 | 2006 | | 2007 | 2006 | |
| Cost of revenue...................... | $ 3,543 | $3,620 | (2)% | $6,218 | $5,316 | 17% |
| As a percent of revenue ......... | 22% | 29% | (7)ppt | 21% | 23% | (2)ppt |

Cost of revenue includes manufacturing and distribution costs for products sold and programs licensed, operating costs related to product support service centers and product distribution centers, costs incurred to support and maintain Internet-based products and services, warranty costs, inventory write-downs, and costs associated with the delivery of consulting services. Cost of revenue decreased during the three months ended December 31, 2007, reflecting decreased Xbox manufacturing costs, offset by increased OSB data center costs and online costs, increased costs associated with the growth in consulting services, and increased Windows Vista product costs. Cost of revenue increased during the six months ended December 31, 2007, primarily driven by increased OSB data center costs and online costs, increased Windows Vista product costs, and increased costs associated with the growth in consulting services.

### Research and Development

| (In millions, except percentages) | Three months ended December 31, | | Percentage Change | Six months ended December 31, | | Percentage Change |
|---|---|---|---|---|---|---|
| | 2007 | 2006 | | 2007 | 2006 | |
| Research and development .... | $ 1,885 | $1,637 | 15% | $3,722 | $3,423 | 9% |
| As a percent of revenue ......... | 12% | 13% | (1) ppt | 12% | 15% | (3)ppt |

Research and development expenses include payroll, employee benefits, stock-based compensation expense, and other headcount-related expenses associated with product development. Research and development expenses also include third-party development and programming costs, localization costs incurred to translate software for international markets, and the amortization of purchased software code and services content. The increase in research and development expenses for the three and six months ended December 31, 2007 was primarily driven by an increase in headcount-related expenses of 14% during the three months and 7% during the six months ended December 31, 2007, reflecting a 7% increase in headcount over the past twelve months and an increase in salaries and benefits for existing headcount, partially offset by decreased stock-based compensation expense.

### Sales and Marketing

| (In millions, except percentages) | Three months ended December 31, 2007 | Three months ended December 31, 2006 | Percentage Change | Six months ended December 31, 2007 | Six months ended December 31, 2006 | Percentage Change |
|---|---|---|---|---|---|---|
| Sales and marketing | **$3,392** | $2,999 | 13% | **$6,006** | $5,190 | 16% |
| As a percent of revenue | **21%** | 24% | (3)ppt | **20%** | 22% | (2)ppt |

Sales and marketing expenses include payroll, employee benefits, stock-based compensation expense, and other headcount-related expenses associated with sales and marketing personnel and advertising, promotions, trade shows, seminars, and other programs. Sales and marketing expenses increased during the three and six months ended December 31, 2007, primarily as a result of increased headcount-related expenses. Headcount-related expenses increased 14% during the three months and 13% during the six months ended December 31, 2007, reflecting both an increase in salaries and benefits for existing headcount and a 7% increase in headcount over the past twelve months, partially offset by decreased stock-based compensation expense.

### General and Administrative

| (In millions, except percentages) | Three months ended December 31, 2007 | Three months ended December 31, 2006 | Percentage Change | Six months ended December 31, 2007 | Six months ended December 31, 2006 | Percentage Change |
|---|---|---|---|---|---|---|
| General and administrative | **$ 1,066** | $814 | 31% | **$ 1,784** | $1,478 | 21% |
| As a percent of revenue | **7%** | 6% | 1 ppt | **6%** | 6% | —ppt |

General and administrative costs include payroll, employee benefits, stock-based compensation expense and other headcount-related expenses associated with finance, legal, facilities, certain human resources, other administrative headcount, and legal and other administrative fees. General and administrative costs increased for the three and six months ended December 31, 2007, primarily reflecting increased costs for legal settlements and legal contingencies and increased consulting and professional fees. We incurred $237 million of legal charges during the three months and $277 million during the six months ended December 31, 2007, compared with $111 million of legal charges during the three months and $198 million during the six months ended December 31, 2006. Headcount-related expenses increased 7% during the three months and 5% during the six months ended December 31, 2007, reflecting a 12% increase in headcount over the past twelve months, an increase in salaries and benefits for existing headcount, and an increase in stock-based compensation expense.

## INVESTMENT INCOME, INCOME TAXES, AND OTHER

### Investment Income and Other

The components of investment income and other were as follows:

| (In millions) | Three Months Ended December 31, 2007 | Three Months Ended December 31, 2006 | Change | Six Months Ended December 31, 2007 | Six Months Ended December 31, 2006 | Change |
|---|---|---|---|---|---|---|
| Dividends and interest | **$ 206** | $ 316 | $(110) | **$ 445** | $ 685 | $(240) |
| Net recognized gains on investments | **87** | 103 | (16) | **238** | 466 | (228) |
| Net gains/(losses) on derivatives | **48** | (75) | 123 | **84** | (231) | 315 |
| Other | **(2)** | (11) | 9 | **(130)** | (20) | (110) |
| Investment income and other | **$ 339** | $ 333 | $ 6 | **$ 637** | $ 900 | $(263) |

During the three and six months ended December 31, 2007, dividends and interest income decreased, reflecting a reduction in the average balance of interest-bearing investments coupled with lower interest rates on our fixed-income investments. Net recognized gains on investments include other-than-temporary impairments of $54 million in the three months ended December 31, 2007 and $69 million in the six months ended December 31, 2007. During the six months ended December 31, 2007, net recognized gains on investments decreased primarily due to lower gains on sales of fixed-income and equity investments coupled with higher other-than-temporary impairments.

During the three and six months ended December 31, 2007, net derivative gains increased primarily due to net gains on equity, interest rate and commodity derivatives during the current fiscal year compared with net losses in the prior year. We use derivative instruments to manage exposures to interest rates, equity prices, and foreign currency markets and to facilitate portfolio diversification. Gains and losses arising from derivatives not designated as accounting hedges are in large part economically offset by unrealized losses and gains, respectively, in the underlying securities, which are recorded as a component of other comprehensive income. Commodity derivatives are held for the purpose of portfolio diversification. Net losses related to foreign currency contracts relate primarily to changes in time value of options used to hedge anticipated foreign currency revenues. Additionally, net gains and losses on foreign currency contracts include the changes in the fair value of derivatives used as economic hedges. These gains and losses are partially offset economically by unrealized losses and gains, respectively, in the underlying assets, which are included in other comprehensive income. Other of $130 million for the six months ended December 31, 2007 includes the correction of several immaterial items from prior periods.

We lend certain fixed-income and equity securities to increase investment returns. The loaned securities continue to be carried as investments on our balance sheet. Collateral and/or security interest is determined based upon the underlying security and the creditworthiness of the borrower. Cash collateral is recorded as an asset with a corresponding liability. We anticipate that the magnitude of securities lent under this program will remain relatively consistent during the fiscal year.

### Income Taxes

Our effective tax rate was 31% for the three and six months ended December 31, 2007 and 2006.

On July 1, 2007, we adopted the provisions of the Financial Accounting Standards Board ("FASB") Interpretation No. 48 ("FIN 48") *Accounting for Uncertainty in Income Taxes – an interpretation of FASB Statement No. 109,* which provides a financial statement recognition threshold and measurement attribute for a tax position taken or expected to be taken in a tax return. Under FIN 48, we may recognize the tax benefit from an uncertain tax position only if it is more likely than not that the tax position will be sustained on examination by the taxing authorities, based on the technical merits of the position. The tax benefits recognized in the financial statements from such a position should be measured based on the largest benefit that has a greater than 50% likelihood of being realized upon ultimate settlement. FIN 48 also provides guidance on derecognition of income tax assets and liabilities, classification of current and deferred income tax assets and liabilities, accounting for interest and penalties associated with tax positions, and income tax disclosures.

Adopting FIN 48 had the following impact on our financial statements: increased current assets by $228 million, long-term assets by $1.1 billion, long-term liabilities by $2.1 billion, and our retained deficit by $395 million; and decreased our income taxes payable by $394 million. As of July 1, 2007, we had $7.1 billion of unrecognized tax benefits of which $5.3 billion, if recognized, would affect our effective tax rate. Our policy is to include interest and penalties related to unrecognized tax benefits in income tax expense. As of July 1, 2007, we had accrued interest related to uncertain tax positions of $863 million, net of federal income tax benefit, on our balance sheet.

## FINANCIAL CONDITION

Cash and cash equivalents and short-term investments totaled $21.1 billion as of December 31, 2007, compared with $23.4 billion as of June 30, 2007. Equity and other investments were $9.4 billion as of December 31, 2007, compared with $10.1 billion as of June 30, 2007. Our investments consist primarily of fixed-income securities, diversified among industries and individual issuers. Our investments are generally liquid and investment grade. The portfolio is invested predominantly in U.S.-dollar-denominated securities, but also includes foreign-denominated securities in order to diversify financial risk. We invest primarily in short-term securities to facilitate rapid deployment for immediate cash needs. As a result of the special dividend paid in the second quarter of fiscal year 2005 and shares repurchased, our retained deficit, including accumulated other comprehensive income, was $28.1 billion at December 31, 2007. Our retained deficit is not expected to affect our future ability to operate or pay dividends given our continuing profitability and strong cash and financial position.

### Unearned Revenue

Unearned revenue from volume licensing programs represents customer billings, paid either upfront or annually at the beginning of each billing coverage period, that are accounted for as subscriptions with revenue recognized ratably over the billing coverage period. For certain other licensing arrangements, revenue attributable to undelivered elements, including free post-delivery telephone support and the right to receive unspecified upgrades/enhancements of Microsoft Internet Explorer on a when-and-if-available basis for Windows XP and previous PC operating systems, is based on the sales price of those elements when sold separately and is recognized ratably on a straight-line basis over the life cycle of the related product. Other unearned revenue includes services, Microsoft Dynamics business solution products, Xbox Live subscriptions, advertising, and TV platform for which we have been paid upfront and earn the revenue when we provide the service or software, or otherwise meet the revenue recognition criteria.

The following table outlines the expected recognition of unearned revenue as of December 31, 2007:

| (In millions) | Recognition of Unearned Revenue |
|---|---|
| Three months ended: | |
| March 31, 2008 | $ 4,346 |
| June 30, 2008 | 3,083 |
| September 30, 2008 | 1,787 |
| December 31, 2008 | 1,005 |
| Thereafter | 1,957 |
| Unearned revenue | $ 12,178 |

See Note 4 – Unearned Revenue (Part I, Item 1).

### *Cash Flows*

Cash flow from operations for the six months ended December 31, 2007 increased $4.3 billion compared with the same period in fiscal year 2007 to $10.4 billion due to increased cash collections from customers reflecting our continued revenue growth along with $1.0 billion from deferred taxes reflecting the tax impact of changes in unearned revenue. Cash used for financing was $5.9 billion in the first half of fiscal year 2008, a decrease of $4.6 billion compared with the same period in fiscal year 2007. The decrease reflects $7.0 billion of common stock repurchases in the six months ended December 31, 2007, compared with $13.5 billion in the first six months of the prior fiscal year, which included the impact of our tender offer on August 17, 2006. This impact was partially offset by a $1.9 billion decrease in proceeds from issuance of common stock reflecting the JPMorgan exercise of approximately 113 million call options for $3.3 billion in December 2006, which was included in the $4.8 billion of common stock issued during the six months ended December 31, 2006, as compared with $3.0 billion in the current year. Cash used for investing was $3.3 billion in the first half of fiscal year 2008 as compared with cash provided from investing of $4.5 billion in the first half of fiscal 2007, a change of $7.8 billion. This change reflects a $5.4 billion increase in cash paid for acquisition of companies reflecting the purchase of aQuantive in the first quarter of fiscal year 2008, along with a $2.0 billion decrease in cash from combined investment purchases, sales, and maturities.

In January 2008, we announced an offer to purchase all the outstanding shares of Fast Search & Transfer ASA for approximately $1.2 billion in cash. We expect to complete this transaction in the fourth quarter of fiscal year 2008.

We have no material long-term debt. Stockholders' equity at December 31, 2007 was $34.4 billion. We will continue to invest in sales, marketing, product support infrastructure, and existing and advanced areas of technology. Additions to property and equipment will continue, including new facilities, data centers, and computer systems for research and development, sales and marketing, support, and administrative staff. We have operating leases for most U.S. and international sales and support offices and certain equipment. We have not engaged in any related party transactions or arrangements with unconsolidated entities or other persons that are reasonably likely to materially affect liquidity or the availability of requirements for capital resources.

On July 20, 2006, we announced that our Board of Directors authorized two new share repurchase programs: a $20.0 billion tender offer that was completed on August 17, 2006 and authorization for up to an additional $20.0 billion ongoing share repurchase program with an expiration of June 30, 2011. Under the tender offer, we repurchased approximately 155 million shares of common stock, or 1.5% of our common shares outstanding, for approximately $3.8 billion at a price per share of $24.75. On August 18, 2006, we announced that the authorization for the $20.0 billion ongoing share repurchase program had been increased by approximately $16.2 billion. As a result, we are authorized to repurchase additional shares in an amount up to $36.2 billion through June 30, 2011. As of December 31, 2007, approximately $8.7 billion remained of the $36.2 billion approved repurchase amount.

Our Board of Directors declared the following dividends:

| Declaration Date | Per Share Dividend | Record Date | Total Amount (in millions) | Payment Date |
|---|---|---|---|---|
| *(Fiscal year 2008)* | | | | |
| September 12, 2007 | $0.11 | November 15, 2007 | $1,034 | December 13, 2007 |
| December 19, 2007 | $0.11 | February 21, 2008 | $1,026 | March 13, 2008 |
| *(Fiscal year 2007)* | | | | |
| September 13, 2006 | $0.10 | November 16, 2006 | $979 | December 14, 2006 |
| December 20, 2006 | $0.10 | February 15, 2007 | $977 | March 8, 2007 |

We believe existing cash and equivalents and short-term investments, together with funds generated from operations, should be sufficient to meet operating requirements, regular quarterly dividends, and planned share repurchases. Our philosophy regarding the maintenance of a balance sheet with a large component of cash and short-term investments, as well as equity and other investments, reflects our views on potential future capital requirements relating to research and development, creation and expansion of sales distribution channels, investments and acquisitions, share dilution management, legal risks, and challenges to our business model. We regularly assess our investment management approach in view of our current and potential future needs.

### *Off-Balance Sheet Arrangements*

We provide indemnifications of varying scope and amount to certain customers against claims of intellectual property infringement made by third parties arising from the use of our products. We evaluate estimated losses for such indemnifications under SFAS No. 5, *Accounting for Contingencies*, as interpreted by FASB Interpretation No. 45, *Guarantor's Accounting and Disclosure Requirements for Guarantees, Including Indirect Guarantees of Indebtedness of Others*. We consider factors such as the degree of probability of an unfavorable outcome and the ability to make a reasonable estimate of the amount of loss. To date, we have not encountered material costs as a result of such obligations and have not accrued any material liabilities related to such indemnifications in our financial statements.

## RECENT ACCOUNTING PRONOUNCEMENTS

In December 2007, the FASB issued SFAS No. 141 (revised 2007), *Business Combinations*, which replaces SFAS No 141. The statement retains the purchase method of accounting for acquisitions, but requires a number of changes, including changes in the way assets and liabilities are recognized in the purchase accounting. It also changes the recognition of assets acquired and liabilities assumed arising from contingencies, requires the capitalization of in-process research and development at fair value, and requires the expensing of acquisition-related costs as incurred. SFAS No. 141R is effective for us beginning July 1, 2009 and will apply prospectively to business combinations completed on or after that date.

In December 2007, the FASB issued SFAS No. 160, *Noncontrolling Interests in Consolidated Financial Statements, an amendment of ARB 51*, which changes the accounting and reporting for minority interests. Minority interests will be recharacterized as noncontrolling interests and will be reported as a component of equity separate from the parent's equity, and purchases or sales of equity interests that do not result in a change in control will be accounted for as equity transactions. In addition, net income attributable to the noncontrolling interest will be included in consolidated net income on the face of the income statement and, upon a loss of control, the interest sold, as well as any interest retained, will be recorded at fair value with any gain or loss recognized in earnings. SFAS No. 160 is effective for us beginning July 1, 2009 and will apply prospectively, except for the presentation and disclosure requirements, which will apply retrospectively. We are currently assessing the potential impact that adoption of SFAS No. 160 would have on our financial statements.

On July 1, 2007, we adopted provisions of FIN 48, *Accounting for Uncertainty in Income Taxes – an interpretation of FASB Statement No. 109*, which provides a financial statement recognition threshold and measurement attribute for a tax position taken or expected to be taken in a tax return. Under FIN 48, we may recognize the tax benefit from an uncertain tax position only if it is more likely than not that the tax position will be sustained on examination by the taxing authorities, based on the technical merits of the position. The tax benefits recognized in the financial statements from such a position should be measured based on the largest benefit that has a greater than 50% likelihood of being realized upon ultimate settlement. FIN 48 also provides guidance on derecognition of income tax assets and liabilities, classification of current and deferred income tax assets and liabilities, accounting for interest and penalties associated with tax positions, and income tax disclosures. Upon adoption, we recognized a $395 million charge to our beginning retained deficit as a cumulative effect of a change in accounting principle. See Note 13 – Income Taxes (Part I, Item 1).

On July 1, 2007, we adopted Emerging Issues Task Force Issue No. 06-2 ("EITF 06-2"), *Accounting for Sabbatical Leave and Other Similar Benefits Pursuant to FASB Statement No. 43*. EITF 06-2 requires companies to accrue the costs of compensated

25

absences under a sabbatical or similar benefit arrangement over the requisite service period. Upon adoption, we recognized a $17 million charge to our beginning retained deficit as a cumulative effect of a change in accounting principle.

In February 2007, the FASB issued SFAS No. 159, *The Fair Value Option for Financial Assets and Financial Liabilities.* SFAS No. 159 gives us the irrevocable option to carry many financial assets and liabilities at fair values, with changes in fair value recognized in earnings. SFAS No. 159 is effective for us beginning July 1, 2008, although early adoption is permitted. We are currently assessing the potential impact that electing fair value measurement would have on our financial statements and have not determined what election we will make.

In September 2006, the FASB issued SFAS No. 157, *Fair Value Measurements,* which defines fair value, establishes a framework for measuring fair value in generally accepted accounting principles, and expands disclosures about fair value measurements. SFAS No. 157 does not require any new fair value measurements, but provides guidance on how to measure fair value by providing a fair value hierarchy used to classify the source of the information. This statement is effective for us beginning July 1, 2008. In December 2007, the FASB released a proposed FASB Staff Position (FSP FAS 157-b—*Effective Date of FASB Statement No. 157*) which, if adopted as proposed, would delay the effective date of SFAS No. 157 for all nonfinancial assets and nonfinancial liabilities, except those that are recognized or disclosed at fair value in the financial statements on a recurring basis (at least annually). We currently are assessing the potential impact that adoption of SFAS No. 157 would have on our financial statements.

## APPLICATION OF CRITICAL ACCOUNTING POLICIES

Our financial statements and accompanying notes are prepared in accordance with U.S. GAAP. Preparing financial statements requires management to make estimates and assumptions that affect the reported amounts of assets, liabilities, revenue, and expenses. These estimates and assumptions are affected by management's application of accounting policies. Critical accounting policies for us include revenue recognition, impairment of investment securities, impairment of goodwill, accounting for research and development costs, accounting for contingencies, accounting for income taxes, and accounting for stock-based compensation.

We account for the licensing of software in accordance with American Institute of Certified Public Accountants Statement of Position ("SOP") 97-2, *Software Revenue Recognition.* The application of SOP 97-2 requires judgment, including whether a software arrangement includes multiple elements, and if so, whether vendor-specific objective evidence ("VSOE") of fair value exists for those elements. For some of our products, customers receive certain elements of our products over a period of time. These elements include free post-delivery telephone support and the right to receive unspecified upgrades/enhancements of Microsoft Internet Explorer on a when-and-if-available basis. The fair value of these elements is recognized over the estimated life cycle for the Windows XP and previous PC operating systems. For Windows Vista, there are no significant undelivered elements and accordingly, no license revenue is deferred for Windows Vista sales. Changes to the elements in a software arrangement, the ability to identify VSOE for those elements, the fair value of the respective elements, and changes to a product's estimated life cycle could materially impact the amount of earned and unearned revenue. Judgment also is required to assess whether future releases of certain software represent new products or upgrades and enhancements to existing products.

SFAS No. 115, *Accounting for Certain Investments in Debt and Equity Securities,* and SAB Topic 5M, *Accounting for Noncurrent Marketable Equity Securities,* provide guidance on determining when an investment is other-than-temporarily impaired. Investments are reviewed quarterly for indicators of other-than-temporary impairment. This determination requires significant judgment. In making this judgment, we employ a systematic methodology quarterly that considers available quantitative and qualitative evidence in evaluating potential impairment of our investments. If the cost of an investment exceeds its fair value, we evaluate, among other factors, general market conditions, the duration and extent to which the fair value is less than cost, and our intent and ability to hold the investment. We also consider specific adverse conditions related to the financial health of and business outlook for the investee, including industry and sector performance, changes in technology, operational and financing cash flow factors, and rating agency actions. Once a decline in fair value is determined to be other-than-temporary, an impairment charge is recorded and a new cost basis in the investment is established. If market, industry, and/or investee conditions deteriorate, we may incur future impairments.

SFAS No. 142, *Goodwill and Other Intangible Assets,* requires that goodwill be tested for impairment at the reporting unit level (operating segment or one level below an operating segment) on an annual basis (July 1 for us) and between annual tests if an event occurs or circumstances change that would more likely than not reduce the fair value of a reporting unit below its carrying value. These events or circumstances could include a significant change in the business climate, legal factors, operating performance indicators, competition or sale or disposition of a significant portion of a reporting unit. Application of the goodwill impairment test requires judgment, including the identification of reporting units, assignment of assets and liabilities to reporting units, assignment of goodwill to reporting units, and determination of the fair value of each reporting unit. The fair value of each reporting unit is estimated using a discounted cash flow methodology. This analysis requires significant judgments including estimation of future cash flows, which is dependent on internal forecasts, estimation of the long-term rate of growth for our business, the useful life over which cash flows will occur, and determination of our weighted average cost of capital. Changes in these estimates and assumptions could materially affect the determination of fair value and/or goodwill impairment for each reporting unit. We allocate goodwill to reporting

26

units based on the reporting unit expected to benefit from the combination. We evaluate our reporting units on an annual basis and, if necessary, reassign goodwill using a relative fair value allocation approach.

We account for research and development costs in accordance with applicable accounting pronouncements, including SFAS No. 2, *Accounting for Research and Development Costs*, and SFAS No. 86, *Accounting for the Costs of Computer Software to be Sold, Leased, or Otherwise Marketed*. SFAS No. 86 specifies that costs incurred internally in researching and developing a computer software product should be charged to expense until technological feasibility has been established for the product. Once technological feasibility is established, all software costs should be capitalized until the product is available for general release to customers. Judgment is required in determining when technological feasibility of a product is established. We have determined that technological feasibility for our software products is reached after all high-risk development issues have been resolved through coding and testing. This is generally shortly before the products are released to manufacturing. We determined that technological feasibility was reached with Windows Vista and the 2007 Microsoft Office system during the second quarter of fiscal year 2007 and accordingly, we capitalized approximately $120 million of software development costs. The amortization of these costs will be included in cost of revenue over the estimated life of the products. Previously, costs incurred prior to technological feasibility were not material and were expensed as incurred.

The outcomes of legal proceedings and claims brought against us are subject to significant uncertainty. SFAS No. 5, *Accounting for Contingencies*, requires that an estimated loss from a loss contingency such as a legal proceeding or claim should be accrued by a charge to income if it is probable that an asset has been impaired or a liability has been incurred and the amount of the loss can be reasonably estimated. Disclosure of a contingency is required if there is at least a reasonable possibility that a loss has been incurred. In determining whether a loss should be accrued we evaluate, among other factors, the degree of probability of an unfavorable outcome and the ability to make a reasonable estimate of the amount of loss. Changes in these factors could materially impact our results of operations, financial position, or cash flows.

SFAS No. 109, *Accounting for Income Taxes*, establishes financial accounting and reporting standards for the effect of income taxes. The objectives of accounting for income taxes are to recognize the amount of taxes payable or refundable for the current year and deferred tax liabilities and assets for the future tax consequences of events that have been recognized in an entity's financial statements or tax returns. Judgment is required in assessing the future tax consequences of events that have been recognized in our financial statements or tax returns. Variations in the actual outcome of these future tax consequences could materially impact our financial position, results of operations, or cash flows. Accruals for uncertain tax positions are provided for in accordance with the requirements of FIN 48.

We account for stock-based compensation in accordance with SFAS No. 123(R), *Share-Based Payment*. Under the fair value recognition provisions of this statement, share-based compensation cost is measured at the grant date based on the fair value of the award and is recognized as expense over the requisite service period. Determining the fair value of share-based awards at the grant date requires judgment, including estimating expected dividends. In addition, judgment is also required in estimating the amount of share-based awards that are expected to be forfeited. If actual results differ significantly from these estimates, stock-based compensation expense and our results of operations could be materially impacted.

We account for product warranties in accordance with SFAS No. 5, *Accounting for Contingencies*. We provide for the estimated costs of hardware and software warranties at the time the related revenue is recognized. For hardware warranty, we estimate the costs based on historical and projected product failure rates, historical and projected repair costs, and knowledge of specific product failures (if any). The specific hardware warranty terms and conditions vary depending upon the product sold and country in which we do business, but generally include technical support, parts, and labor over a period generally ranging from 90 days to three years. For software warranty, we estimate the costs to provide bug fixes, such as security patches, over the estimated life of the software. We reevaluate our estimates at least quarterly to assess the adequacy of the recorded warranty liabilities and adjust the amounts as necessary.

## Item 3. Quantitative and Qualitative Disclosures About Market Risk

We are exposed to foreign currency, interest rate, fixed-income, equity, and commodity price risks. A portion of these risks is hedged, but fluctuations could impact our results of operations, financial position, and cash flows. We hedge a portion of anticipated revenue and accounts receivable exposure to foreign currency fluctuations, primarily with option contracts. We monitor our foreign currency exposures daily to maximize the overall effectiveness of our foreign currency hedge positions. Principal currencies hedged include the euro, Japanese yen, British pound, and Canadian dollar. Fixed-income securities and interest rate derivatives are subject primarily to interest rate risk. The portfolio is diversified and structured to minimize credit risk. Securities held in our equity and other investments portfolio and equity derivatives are subject to price risk, and generally are not hedged. However, we use put-call collars to hedge our price risk on certain equity securities that are held primarily for strategic purposes. Commodity derivatives held for the purpose of portfolio diversification are subject to commodity price risk.

We use a value-at-risk ("VaR") model to estimate and quantify our market risks. VaR is the expected loss, for a given confidence level, in fair value of our portfolio due to adverse market movements over a defined time horizon. The VaR model is not intended to represent actual losses in fair value, but is used as a risk estimation and management tool. The model used for currencies,

equities, and commodities is geometric Brownian motion, which allows incorporation of optionality with regard to these risk exposures. For interest rate risk, exposures such as key rate durations and spread durations are used in calculations that reflect the principle that fixed-income security prices revert to maturity value over time.

VaR is calculated by computing the exposures of each holding's market value to a range of over 1,000 equity, fixed-income, foreign exchange, and commodity risk factors. The exposures are then used to compute the parameters of a distribution of potential changes in the total market value of all holdings, taking into account the weighted historical volatilities of the different rates and prices and the weighted historical correlations among the different rates and prices. The VaR is then calculated as the total loss that will not be exceeded at the 97.5 percentile confidence level or, alternatively stated, the losses could exceed the VaR in 25 out of 1,000 cases. Several risk factors are not captured in the model, including liquidity risk, operational risk, credit risk, and legal risk.

Certain securities in our equity portfolio are held for strategic purposes. We hedge the value of a portion of these securities through the use of derivative contracts such as put-call collars. In these arrangements, we hedge a security's equity price risk below the purchased put strike and forgo most or all of the benefits of the security's appreciation above the sold call strike. We also hold equity securities for general investment return purposes. We have incurred material impairment charges related to these securities in previous periods.

The VaR amounts disclosed below are used as a risk management tool and reflect an estimate of potential reductions in fair value of our portfolio. Losses in fair value over the specified holding period can exceed the reported VaR by significant amounts and can also accumulate over a longer time horizon than the specified holding period used in the VaR analysis. VaR amounts are not necessarily reflective of potential accounting losses, including determinations of other-than-temporary losses in fair value in accordance with U.S. GAAP.

VaR numbers are shown separately for interest rate, currency rate, equity price, and commodity price risks. These VaR numbers include the underlying portfolio positions and related hedges. We use historical data to estimate VaR. Given the reliance on historical data, VaR is most effective in estimating risk exposures in markets in which there are no fundamental changes or shifts in market conditions. An inherent limitation in VaR is that the distribution of past changes in market risk factors may not produce accurate predictions of future market risk.

The following table sets forth the one-day VaR for substantially all of our positions as of and for the three months ended December 31, 2007, and as of June 30, 2007:

| (In millions) Risk Categories | December 31, 2007 | June 30, 2007 | Three months ended December 31, 2007 | | |
|---|---|---|---|---|---|
| | | | Average | High | Low |
| Interest rates | $31 | $34 | $32 | $37 | $28 |
| Currency rates | 72 | 55 | 80 | 96 | 64 |
| Equity prices | 58 | 60 | 55 | 60 | 49 |
| Commodity prices | 6 | 7 | 6 | 7 | 6 |

Total one-day VaR for the combined risk categories was $102 million at December 31, 2007 and $95 million at June 30, 2007. The total VaR is 39% less at December 31, 2007, and 39% less at June 30, 2007, than the sum of the separate risk categories in the above table due to the diversification benefit of the overall portfolio.

## Item 4. Controls and Procedures

Under the supervision and with the participation of our management, including the Chief Executive Officer and Chief Financial Officer, we have evaluated the effectiveness of our disclosure controls and procedures as required by Exchange Act Rule 13a-15(b) as of the end of the period covered by this report. Based on that evaluation, the Chief Executive Officer and Chief Financial Officer have concluded that these disclosure controls and procedures are effective. There were no changes in our internal control over financial reporting during the quarter ended December 31, 2007 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

Part II. Other Information

**Item 1. Legal Proceedings**

See Note 8 – Contingencies (Part 1, Item 1) for more information about legal proceedings in which we are involved.

**Item 1A. Risk Factors**

Our operations and financial results are subject to various risks and uncertainties, including those described below, that could adversely affect our business, financial condition, results of operations, cash flows, and trading price of our common stock.

**Challenges to our business model may reduce our revenues and operating margins.** Our business model has been based upon customers paying a fee to license software that we developed and distributed. Under this license-based software model, software developers bear the costs of converting original ideas into software products through investments in research and development, offsetting these costs with the revenue received from the distribution of their products. In recent years, certain "open source" software business models have evolved into a growing challenge to our license-based software model. Open source commonly refers to software whose source code is subject to a license allowing it to be modified, combined with other software and redistributed, subject to restrictions set forth in the license. A number of commercial firms compete with us using an open source business model by modifying and then distributing open source software to end users at nominal cost and earning revenue on complementary services and products. These firms do not have to bear the full costs of research and development for the software. A prominent example of open source software is the Linux operating system. Proponents of open source software continue efforts to convince governments worldwide to mandate the use of open source software in their purchase and deployment of software products. Although we believe our products provide customers with significant advantages in security, productivity, and total cost of ownership, the open source software model continues to pose a significant challenge to our business model. To the extent open source software gains increasing market acceptance, sales of our products may decline, we may have to reduce the prices we charge for our products, and revenue and operating margins may decline.

Another development is the software-as-a-service business model, under which companies provide applications, data, and related services over the Internet. Providers use primarily advertising or subscription-based revenue models. Recent advances in computing and communications technologies have made this model viable and enabled the rapid growth of some of our competitors. We are devoting significant resources toward developing our own competing software plus services strategies. It is uncertain whether these strategies will be successful.

**We face intense competition.** We continue to experience intense competition across all markets for our products and services. Our competitors range in size from Fortune 100 companies to small, specialized single-product businesses and open source community-based projects. Although we believe the breadth of our businesses and product portfolio are a competitive advantage, our competitors that are focused on narrower product lines may be more effective in devoting technical, marketing, and financial resources to compete with us. In addition, barriers to entry in our businesses generally are low and products, once developed, can be distributed broadly and quickly at relatively low cost. Open source software vendors are devoting considerable efforts to developing software that mimics the features and functionality of our products. In response to competition, we are developing versions of our products with basic functionality that are sold at lower prices than the standard versions. These competitive pressures may result in decreased sales volumes, price reductions, and/or increased operating costs, such as for marketing and sales incentives, resulting in lower revenue, gross margins and operating income.

**We may not be able to adequately protect our intellectual property rights.** Protecting our global intellectual property rights and combating unlicensed copying and use of software and other intellectual property is difficult. While piracy adversely affects U.S. revenue, the impact on revenue from outside the U.S. is more significant, particularly in countries where laws are less protective of intellectual property rights. Similarly, the absence of harmonized patent laws makes it more difficult to ensure consistent respect for patent rights. Throughout the world, we actively educate consumers about the benefits of licensing genuine products and obtaining indemnification benefits for intellectual property risks, and we educate lawmakers about the advantages of a business climate where intellectual property rights are protected. However, continued educational and enforcement efforts may fail to enhance revenue. Reductions in the legal protection for software intellectual property rights or additional compliance burdens could both adversely affect revenue.

**Third parties may claim we infringe their intellectual property rights.** From time to time we receive notices from others claiming we infringe their intellectual property rights. The number of these claims may grow. To resolve these claims we may enter into royalty and licensing agreements on less favorable terms, stop selling or redesign affected products, or pay damages to satisfy indemnification commitments with our customers. Such agreements may cause operating margins to decline. We have made and expect to continue making significant expenditures to settle claims related to the use of technology and intellectual property rights as part of our strategy to manage this risk.

**We may not be able to protect our source code from copying if there is an unauthorized disclosure of source code.** Source code, the detailed program commands for our operating systems and other software programs, is critical to our business. Although we

29

license portions of our application and operating system source code to a number of licensees, we take significant measures to protect the secrecy of large portions of our source code. If an unauthorized disclosure of a significant portion of our source code occurs, we could potentially lose future trade secret protection for that source code. This could make it easier for third parties to compete with our products by copying functionality, which could adversely affect our revenue and operating margins. Unauthorized disclosure of source code also could increase the security risks described in the next paragraph.

**Security vulnerabilities in our products could lead to reduced revenues or to liability claims.** Maintaining the security of computers and computer networks is a critical issue for us and our customers. Hackers develop and deploy viruses, worms, and other malicious software programs that attack our products. Although this is an industry-wide problem that affects computers across all platforms, it affects our products in particular because hackers tend to focus their efforts on the most popular operating systems and programs and we expect them to continue to do so. We devote significant resources to address security vulnerabilities through:

- engineering more secure products;

- enhancing security and reliability features in our products;

- helping our customers make the best use of our products and services to protect against computer viruses and other attacks;

- improving the deployment of software updates to address security vulnerabilities;

- investing in mitigation technologies that help to secure customers from attacks even when such software updates are not deployed; and

- providing customers online automated security tools, published security guidance, and security software such as firewalls, anti-virus, and other security software.

The cost of these steps could reduce our operating margins. Despite these efforts, actual or perceived security vulnerabilities in our products could lead some customers to seek to return products, to reduce or delay future purchases, or to use competing products. Customers may also increase their expenditures on protecting their existing computer systems from attack, which could delay adoption of new technologies. Any of these actions by customers could adversely affect our revenue. In addition, actual or perceived vulnerabilities may lead to claims against us. Although our license agreements typically contain provisions that eliminate or limit our exposure to such liability, there is no assurance these provisions will withstand all legal challenges.

**We are subject to government litigation and regulatory activity that affects how we design and market our products.** As a leading global software maker, we receive close scrutiny from government agencies under U.S. and foreign competition laws. Some jurisdictions also provide private rights of action for competitors or consumers to assert claims of anti-competitive conduct. For example, we have been involved in the following actions.

Lawsuits brought by the U.S. Department of Justice, 18 states, and the District of Columbia in two separate actions were resolved through a Consent Decree that took effect in 2001 and a Final Judgment entered in 2002. These proceedings imposed various constraints on our Windows operating system businesses. These constraints include limits on certain contracting practices, mandated disclosure of certain software program interfaces and protocols, and rights for computer manufacturers to limit the visibility of certain Windows features in new PCs. Although we believe we are in full compliance with these rules, if we fail to comply with them, additional restrictions could be imposed on us that would adversely affect our business.

The European Commission has initiated proceedings against us under European competition law. In 2004, the Commission ordered us to create new versions of Windows that do not include certain multimedia technologies and to provide our competitors with specifications for how to implement certain proprietary Windows communications protocols in their own products. The design of these special versions of Windows and the terms on which we make our protocol technology available are closely regulated by the Commission. The Commission's impact on product design may limit our ability to innovate in Windows in the future, diminish the developer appeal of the Windows platform, and increase our product development costs. The availability of protocol licenses may enable competitors to develop software products that better mimic the functionality of our own products which could result in decreased sales of our products.

Government regulatory actions and court decisions may hinder our ability to provide the benefits of our software to consumers and businesses, thereby reducing the attractiveness of our products and the revenues that come from them. New actions could be initiated at any time, either by these or other governments or private claimants, including with respect to new versions of Windows or other Microsoft products. The outcome of such actions could adversely affect us in a variety of ways, including:

- We may have to choose between withdrawing products from certain geographies to avoid fines or designing and developing alternative versions of those products to comply with government rulings, which may entail removing functionality that customers want or developers rely on.

- We may be required to make available licenses to our proprietary protocol technologies on terms that do not reflect their fair market value or do not protect our associated intellectual property.

30

- The rulings described above may be cited as a precedent in other competition law proceedings.

Our software and services online offerings are subject to government regulation of the Internet domestically and internationally in many areas including user privacy, telecommunications, data protection, and online content. The application of these laws and regulations to our business is often unclear and sometimes may conflict. Compliance with these regulations may involve significant costs or require changes in business practices that result in reduced revenue. Noncompliance could result in penalties being imposed on us or orders that we stop doing the alleged noncompliant activity.

**Our business depends largely on our ability to attract and retain talented employees.** Our business is based on successfully attracting and retaining talented employees. The market for highly skilled workers and leaders in our industry is extremely competitive. We are limited in our ability to recruit internationally by restrictive domestic immigration laws. If we are less successful in our recruiting efforts, or if we are unable to retain key employees, our ability to develop and deliver successful products and services may be adversely affected. Effective succession planning is also important to our long-term success. Failure to ensure effective transfer of knowledge and smooth transitions involving key employees could hinder our strategic planning and execution.

**Delays in product development schedules may adversely affect our revenues.** The development of software products is a complex and time-consuming process. New products and enhancements to existing products can require long development and testing periods. Significant delays in new product releases or significant problems in creating new products could adversely affect our revenue.

**We make significant investments in new products and services that may not be profitable.** We have made and will continue to make significant investments in research, development, and marketing for new products, services, and technologies, including Windows Vista, the 2007 Microsoft Office system, Xbox 360, Live Search, Windows Server, Zune, and Windows Live. Investments in new technology are speculative. Commercial success depends on many factors including innovativeness, developer support, and effective distribution and marketing. We may not achieve significant revenue from new product and service investments for a number of years, if at all. Moreover, new products and services may not be profitable, and even if they are profitable, operating margins for new products and businesses may not be as high as the margins we have experienced historically.

**Adverse economic conditions may harm our business.** Inflation, softness in corporate information technology spending, or other changes in economic conditions that affect demand for computer hardware or software could adversely affect our revenue or our investment portfolio. If demand for PCs, servers, and other computing devices declines significantly, or consumer or corporate spending for such products declines, our revenue will be adversely affected. In addition, our revenue may be unfavorably impacted if customers reduce their purchases of new software products or upgrades because new offerings such as Windows Vista and the 2007 Microsoft Office system are not perceived as providing significant new functionality or other value to prospective purchasers.

**We have claims and lawsuits against us that may result in adverse outcomes.** We are subject to a variety of claims and lawsuits. Adverse outcomes in some or all of these claims may result in significant monetary damages or injunctive relief that could adversely affect our ability to conduct our business. Although management currently believes resolving all of these matters, individually or in the aggregate, will not have a material adverse impact on our financial position, results of operations, or cash flows, the litigation and other claims are subject to inherent uncertainties and management's view of these matters may change in the future. A material adverse impact on our financial position, results of operations, and cash flows also could occur for the period in which the effect of an unfavorable final outcome becomes probable and reasonably estimable.

**We may have additional tax liabilities.** We are subject to income taxes in the United States and many foreign jurisdictions. Significant judgment is required in determining our worldwide provision for income taxes. In the ordinary course of our business, there are many transactions and calculations where the ultimate tax determination is uncertain. We regularly are under audit by tax authorities. Although we believe our tax estimates are reasonable, the final determination of tax audits and any related litigation could be materially different from our historical income tax provisions and accruals. The results of an audit or litigation could have a material effect on our income tax provision, net income, or cash flows in the period or periods for which that determination is made.

**Our consumer hardware products may experience quality or supply problems.** Our hardware products such as the Xbox 360 console are highly complex and can have defects in design, manufacture, or associated software. We could incur significant expenses, lost revenue, and reputational harm if we fail to detect or effectively address such issues through design, testing, or warranty repairs. We obtain some components of our hardware devices from sole suppliers. If a component delivery from a sole-source supplier is delayed or becomes unavailable or industry shortages occur, we may be unable to obtain timely replacement supplies, resulting in reduced sales. Either component shortages or excess or obsolete inventory may require us to record charges to cost of revenue. Xbox 360 consoles are assembled in Asia; disruptions in the supply chain may result in console shortages that would affect our revenues and operating margins.

**If our goodwill or amortizable intangible assets become impaired we may be required to record a significant charge to earnings.** Under generally accepted accounting principles, we review our amortizable intangible assets for impairment when events or

changes in circumstances indicate the carrying value may not be recoverable. Goodwill is tested for impairment at least annually. Factors that may be considered a change in circumstances indicating that the carrying value of our goodwill or amortizable intangible assets may not be recoverable include a decline in stock price and market capitalization, reduced future cash flow estimates, and slower growth rates in our industry. We may be required to record a significant charge to earnings in our financial statements during the period in which any impairment of our goodwill or amortizable intangible assets is determined, negatively impacting our results of operations.

**We operate a global business that exposes us to additional risks.** We operate in over 100 countries and a significant part of our revenue comes from international sales. Pressure to make our pricing structure uniform might require that we reduce the sales price of our software in the United States and other countries. Operations outside the United States may be affected by changes in trade protection laws, policies and measures, and other regulatory requirements affecting trade and investment; changes in regulatory requirements for software; social, political, labor or economic conditions in a specific country or region; and difficulties in staffing and managing foreign operations. Although we hedge a portion of our international currency exposure, significant fluctuations in exchange rates between the U.S. dollar and foreign currencies may adversely affect our net revenues.

**Catastrophic events or geo-political conditions may disrupt our business.** A disruption or failure of our systems or operations in the event of a major earthquake, weather event, cyber-attack, terrorist attack, or other catastrophic event could cause delays in completing sales, providing services or performing other mission-critical functions. Our corporate headquarters, a significant portion of our research and development activities, and certain other critical business operations are located in the Seattle, Washington area, and we have other business operations in the Silicon Valley area of California, both of which are near major earthquake faults. A catastrophic event that results in the destruction or disruption of any of our critical business or information technology systems could harm our ability to conduct normal business operations and our operating results. Abrupt political change, terrorist activity, and armed conflict pose a risk of general economic disruption in affected countries, which may increase our operating costs. These conditions also may add uncertainty to the timing and budget for technology investment decisions by our customers.

**Acquisitions and joint ventures may have an adverse effect on our business.** We expect to continue making acquisitions or entering into joint ventures as part of our long-term business strategy. These transactions involve significant challenges and risks including that the transaction does not advance our business strategy, that we don't realize a satisfactory return on our investment, or that we experience difficulty in the integration of new employees, business systems, and technology, or diversion of management's attention from our other businesses. These events could harm our operating results or financial condition.

**Improper disclosure of personal data could result in liability and harm our reputation.** We store and process large amounts of personally identifiable information. It is possible that our security controls over personal data, our training of employees and vendors on data security, and other practices we follow may not prevent the improper disclosure of personally identifiable information. Such disclosure could harm our reputation and subject us to liability under laws that protect personal data, resulting in increased costs or loss of revenue. Our software products also enable our customers to store and process personal data. Perceptions that our products do not adequately protect the privacy of personal information could inhibit sales of our products.

**Other risks that may affect our business.** Other factors that may affect our performance may include sales channel disruption, such as the bankruptcy of a major distributor, and our ability to implement operating cost structures that align with revenue growth.

## Item 2. Unregistered Sales of Equity Securities and Use of Proceeds

Items 2(a) and (b) are not applicable.

### (c) STOCK REPURCHASES

| Period | (a) Total number of shares purchased | (b) Average price paid per share | (c) Total number of shares purchased as part of publicly announced plans or programs | (d) Maximum number of shares (or approximate dollar value of shares) that may yet be purchased under the plans or programs (in millions) |
|---|---|---|---|---|
| October 1, 2007 – October 31, 2007.............. | 8,378,300 | $29.74 | 8,378,300 | $12,540 |
| November 1, 2007 – November 30, 2007......... | 95,837,252 | 34.24 | 95,837,252 | $9,258 |
| December 1, 2007 – December 31, 2007.......... | 15,399,210 | 35.72 | 15,399,210 | $8,708 |
| | 119,614,762 | | 119,614,762 | |

On July 20, 2006, we announced that our Board of Directors authorized two new share repurchase programs: a $20.0 billion tender offer that was completed on August 17, 2006 and authorization for up to an additional $20.0 billion ongoing share repurchase program that expires on June 30, 2011. Under the tender offer, we repurchased approximately 155 million shares of common stock, or

1.5% of our common shares outstanding, for approximately $3.8 billion at a price per share of $24.75. On August 18, 2006, we announced that the authorization for the $20.0 billion ongoing share repurchase program had been increased by approximately $16.2 billion. As a result, we are authorized to repurchase additional shares in an amount up to $36.2 billion through June 30, 2011. The repurchase program may be suspended or discontinued at any time without prior notice. During the second quarter of fiscal year 2008, we repurchased 120 million shares for $4.1 billion under the plans described in this paragraph. The transactions occurred in open market purchases and pursuant to a trading plan under Rule 10b5-1.

## Item 4. Submission of Matters to a Vote of Security Holders

The Annual Meeting of Shareholders was held on November 13, 2007.

The following proposals were adopted by the margins indicated:

1.    To elect a Board of Directors to hold office until the next annual meeting of shareholders and until their successors are elected and qualified.

|  | Number of Shares | | |
| --- | --- | --- | --- |
|  | For | Against | Abstain |
| William H. Gates III | 8,012,136,106 | 109,572,915 | 16,105,883 |
| Steven A. Ballmer | 8,005,405,328 | 114,646,475 | 17,763,101 |
| James I. Cash Jr. | 8,001,438,411 | 111,866,387 | 24,510,106 |
| Dina Dublon | 8,025,642,932 | 90,639,073 | 21,532,899 |
| Raymond V. Gilmartin | 8,022,477,056 | 93,385,362 | 21,952,486 |
| Reed Hastings | 8,028,115,383 | 87,954,132 | 21,745,389 |
| David F. Marquardt | 7,989,340,239 | 123,300,324 | 25,174,341 |
| Charles H. Noski | 8,027,301,315 | 88,711,118 | 21,802,471 |
| Helmut Panke | 8,027,175,356 | 92,595,546 | 18,044,002 |
| Jon A. Shirley | 7,999,566,637 | 115,434,684 | 22,813,583 |

2.    To ratify selection of Deloitte & Touche LLP as the Company's independent auditor for fiscal year 2007.

| | |
| --- | --- |
| For | 8,053,422,269 |
| Against | 20,624,109 |
| Abstain | 63,768,526 |

The following proposals were not adopted by the margins indicated:

3.    Shareholder proposal to adopt Policies on Internet Censorship.

| | |
| --- | --- |
| For | 225,816,110 |
| Against | 5,501,735,247 |
| Abstain | 860,249,522 |
| Broker non-vote | 2,813,950,775 |

4.    Shareholder proposal to establish Board of Directors Committee on Human Rights.

| | |
| --- | --- |
| For | 234,479,263 |
| Against | 5,545,629,079 |
| Abstain | 807,692,536 |
| Broker non-vote | 2,813,950,776 |

**Item 6. Exhibits**

10.18   Form of Shared Performance Stock Award Agreement under the Microsoft Corporation 2001 Stock Plan for the fiscal year 2008 performance period

15      Letter re: unaudited interim financial information

31.1    Certifications of Chief Executive Officer Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002

31.2    Certifications of Chief Financial Officer Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002

32.1    Certification of Chief Executive Officer Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002

32.2    Certification of Chief Financial Officer Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002

**Items 3 and 5 are not applicable and have been omitted.**

## SIGNATURE

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

Date: January 24, 2008

Microsoft Corporation

By: _____ /s/   FRANK H. BROD _____
**Frank H. Brod**
**Corporate Vice President, Finance and Administration;**
**Chief Accounting Officer**
**(Principal Authorized Officer)**

35

Exhibit 15

January 24, 2008

Microsoft Corporation
One Microsoft Way
Redmond, Washington

We have reviewed, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the unaudited interim financial information of Microsoft Corporation and subsidiaries for the periods ended December 31, 2007 and 2006, as indicated in our report dated January 24, 2008; because we did not perform an audit, we expressed no opinion on that information.

We are aware that our report referred to above, which was included in your Quarterly Report on Form 10-Q for the quarter ended December 31, 2007, is incorporated by your reference in Registration Statements Nos. 333-120511, 333-109185, 333-06298, 333-16665, 333-118764, 333-91755, 333-52852, 333-102240, 33-36498, 33-45617 and 333-132100 of Microsoft Corporation on Forms S-8 and Registration Statement Nos. 333-43449, 333-110107, and 333-108843 of Microsoft Corporation on Forms S-3.

We also are aware that the aforementioned report, pursuant to Rule 436(c) under the Securities Act of 1933, is not considered a part of the Registration Statement prepared or certified by an accountant or a report prepared or certified by an accountant within the meaning of Sections 7 and 11 of that Act.

DELOITTE & TOUCHE LLP

/s/ DELOITTE & TOUCHE LLP
Seattle, Washington

Exhibit 31.1

# CERTIFICATIONS

I, Steven A. Ballmer, certify that:

1. I have reviewed this quarterly report on Form 10-Q of Microsoft Corporation;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

January 24, 2008

/s/   Steven A. Ballmer
Steven A. Ballmer
Chief Executive Officer

Exhibit 31.2

# CERTIFICATIONS

I, Christopher P. Liddell, certify that:

1. I have reviewed this quarterly report on Form 10-Q of Microsoft Corporation;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

January 24, 2008

/s/   Christopher P. Liddell

Christopher P. Liddell
Chief Financial Officer

Exhibit 32.1

## CERTIFICATIONS PURSUANT TO
## SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002
### (18 U.S.C. SECTION 1350)

In connection with the Quarterly Report of Microsoft Corporation, a Washington corporation (the "Company"), on Form 10-Q for the quarter ended December 31, 2007, as filed with the Securities and Exchange Commission (the "Report"), Steven A. Ballmer, Chief Executive Officer of the Company, does hereby certify, pursuant to § 906 of the Sarbanes-Oxley Act of 2002 (18 U.S.C. § 1350), that to his knowledge:

(1) The Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2) The information contained in the Report fairly presents, in all material respects, the financial condition and result of operations of the Company.

/s/　Steven A. Ballmer
Steven A. Ballmer
Chief Executive Officer
January 24, 2008

[A signed original of this written statement required by Section 906 has been provided to Microsoft Corporation and will be retained by Microsoft Corporation and furnished to the Securities and Exchange Commission or its staff upon request.]

Exhibit 32.2

**CERTIFICATIONS PURSUANT TO**
**SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**
**(18 U.S.C. SECTION 1350)**

In connection with the Quarterly Report of Microsoft Corporation, a Washington corporation (the "Company"), on Form 10-Q for the quarter ended December 31, 2007, as filed with the Securities and Exchange Commission (the "Report"), Christopher P. Liddell, Chief Financial Officer of the Company, does hereby certify, pursuant to § 906 of the Sarbanes-Oxley Act of 2002 (18 U.S.C. § 1350), that to his knowledge:

(1) The Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2) The information contained in the Report fairly presents, in all material respects, the financial condition and result of operations of the Company.

/s/    Christopher P. Liddell
Christopher P. Liddell
Chief Financial Officer
January 24, 2008

[A signed original of this written statement required by Section 906 has been provided to Microsoft Corporation and will be retained by Microsoft Corporation and furnished to the Securities and Exchange Commission or its staff upon request.]

# EXHIBIT D



**PROOF OF SERVICE BY FEDERAL EXPRESS**
CASE NO. _____, N.D. CAL.
CASE NO.: SCV-242287, SONOMA SUPERIOR

I, Mark C. Williams, declare as follows:

I am and was at the time of the service mentioned in this certificate employed with

Heller Ehrman at 333 Bush Street, San Francisco, CA 94104. I am over the age of 18 years

and not a party to the within action.

On March 17, 2008 I served the following documents:

**NOTICE OF REMOVAL OF ACTION UNDER 28 U.S.C. § 1441 [FEDERAL ACTION]**

**NOTICE TO STATE COURT OF FILING OF NOTICE OF REMOVAL [STATE ACTION]**

on the party to this action by placing a true and correct copy in an envelope marked for

delivery via Federal Express for next day delivery to the attention of:

Ms. Laurie Marie Laskey

120 Briar Hollow Drive

Jacksonville, NC 28540

(910) 548-3345

I declare under penalty of perjury under the laws of the state of California that the

foregoing is true and correct and that this proof of service was executed on this 17th day of

March, 2008 at San Francisco, CA.

_____
Mark C. Williams

Heller
Ehrman LLP